Docket No. 11 - 1792

_____

In The United States Court of Appeals
For The First Circuit

_____

# UNITED  STATES  OF  AMERICA

Appellee

v.

# BRIMA WURIE

Defendant - Appellant

_____

Appeal from a Judgment of the United States District Court
for the District of Massachusetts

Hon. Richard G. Stearns, U.S. District Judge

_____

## BRIEF  OF  DEFENDANT - APPELLANT

_____

Ian Gold
Ct. of Appeals Bar No. 1131056
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02110
(617) 223-8061
Ian_Gold@fd.org

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................ I

ADDENDUM .......................................................................................... II

TABLE OF AUTHORITIES..................................................................... III

JURISDICTIONAL  STATEMENT............................................................1

STATEMENT  OF  THE  ISSUES ..............................................................2

STATEMENT  OF  THE  CASE .................................................................3

STATEMENT  OF  FACTS .........................................................................5

      A.      Facts Relevant to the Suppression Issue. .............................5

      B.      Facts Relevant to the Sentencing Issue ................................9

SUMMARY  OF  THE  ARGUMENT..........................................................11

ARGUMENT .........................................................................................15

I.      THE DISTRICT COURT ERRED IN DECLINING TO SUPPRESS THE
      INFORMATION OBTAINED FROM THE SEARCH OF THE CELLPHONE .................15

      A.      Standard of Review. ...........................................................15

      B.      The District Court Correctly Determined that Mr. Wurie had a
              Reasonable Expectation of Privacy in the Cellphone ........15

      C.      Cell Phones are *Sui Generis* and Should Not Be Characterized as
              "Containers" Under Prevailing Doctrine; Rather, The Privacy
              Interest in the Contents Cell Phones is Very High, Not
              Appreciably Reduced by the Fact of Arrest, and Searching Them
              Requires a Warrant in the Absence of Exigent Circumstances ..........16

            1.      Discussion of Supreme Court Precedent ...................................17

            2.      Application of Precedent to Cell Phone  Searches ...................24

            3.      The *Smith* Decision .................................................................25

4.      Application to This Case ........................................................28

D.    If Cell Phones Can be Analyzed as Containers, They Are Akin to the *Chadwick* footlocker, And Provide Ready Access to Information  "Not Immediately Associated with the Person"; Warrantless Searches of Items Under *Chadwick* are Not Permissible When the Item is Secured by Police and There Are No Exigent Circumstances ........................................................31

1.      United States v. Park ................................................31

E.    Cases Allowing Evidence Obtained from Warrantless Cell Phones Are Wrongly Decided; Cases Relied on by the District Court Allowing Searches Incident to Arrest of Physical Containers do Not Dictate a Different Result ..........................................34

II.    THIS COURT'S DECISIONS ANALYZING THE MASSACHUSETTS OFFENSES OF ASSAULT AND BATTERY BY MEANS OF A DANGEROUS WEAPON, ASSAULT AND BATTERY ON A POLICE OFFICER, LARENCY FROM THE PERSON, AND RESISTING ARREST ARE AT ODDS WITH THE SUPREME COURT'S DECISIONS IN BEGAY AND JOHNSON AND THIS COURT SHOULD ULTIMATELY CONSIDER EN BANC TO RECONSIDER ITS PRIOR DECISIONS AND REMAND THE CASE TO THE DISTRICT COURT TO SENTENCE MR. WURIE WITHOUT APPLICATION OF THE ACCA .............................................38

A.    Assault and Battery by Mean of a Dangerous Weapon and Assault and Battery on a Police Officer ..........................................40

B.    Resisting Arrest ..............................................................44

C.    Larceny From the Person ................................................48

CONCLUSION ..............................................................................53

CERTIFICATE OF COMPLIANCE ..............................................54

CERTIFICATE OF SERVICE ........................................................55

ADDENDUM

# <u>TABLE OF AUTHORITIES</u>

### *Federal Cases*

*Arizona v. Gant,* 556 U.S. 332 (2009) ............................................11, 13, 16, 22, 30

*Begay v. United States*, 553 U.S. 137 (2008) .......................................14, 40, 45, 49

*California v. Acevedo*, 500 U.S. 565 (1991) ...........................................................12

*Chambers v. United States*, 555 U.S. 122 (2009).............................................41, 46

*Chimel v. California,* 395 U.S 752 (1969) .....................................11, 13, 17, 22, 35

*Commonwealth v. Burno*, 396 Mass. 622 (1986) ....................................................42

*Commonwealth v. Correia,* 737 N.E.2d 1264, 1266 (Mass.App.Ct.2000) ............43

*Commonwealth v. Davis*, 7 Mass.App.Ct. 9 (1979) ................................................49

*Commonwealth v. Ford*, 424 Mass. 709 (1997) .....................................................42

*Commonwealth v. Grandison*, 433 Mass. 135 (2001) ............................................45

*Commonwealth v. Jones*, 362 Mass. 83 (1972) ......................................................49

*Commonwealth v. Katykhin*, 59 Mass.App.Ct. 261 (2003) ....................................44

*Commonwealth v. Maylott*, 65 Mass.App.Ct. 466 (2006) .......................................45

*Commonwealth v. Montoya*, 457 Mass. 102 (2010) ................................................44

*Commonwealth v. Subilosky*, 352 Mass. 153 (1967)...............................................48

*Curd v. City Court of Judsonia, Ark.*, 141 F.3d 839 (8th Cir. 1989) .....................21

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) .................................................16

*Johnson v. United States*, 130 S.Ct. 1265 (2010) ........................................14, 40, 42

*Katz v. United States,* 389 U.S. 347 (1967) ................................................ 30

*Mincey v. Arizona,* 437 U.S. 385 (1978) .....................................................16

*New York v. Belton*, 453 U.S. 454 (1981) ...........................................20, 21

*People v. Diaz*, 244 P.3d 501 (Cal. 2011).............. ........................ 16, 25

*Schlossberg v. Solesbee,* -- F.Supp.2d ---, 2012 WL 141741 (D. Or. Jan. 18, 2012)

................................................................ ....................................25

*Shepard v. United States*, 544 U.S. 13 (2005) .....................................41, 45

*Silvan W. v. Briggs*, 309 Fed.Appx. 216, 225 (10th Cir.2009) ..............................24

*State v. Smith*, 920 N.E. 2d 949 (Ohio 2009) ............................................ 15, 25-28

*Sykes v. United States*, 131 S.Ct. 2267 (2011)............................................14, 46, 51

*Taylor v. United States*, 495 U.S. 575 (1990)............................................39, 40

*Thornton v. United States,* 541 US 615 (2004) ....................................................21

*United States v. Almenas*, 553 F.3d 27 (1st Cir. 2009).....................................13, 47

*United States v. Camacho,* 661 F.3d 718 (1st Cir. 2011) ........................................16

*United States v. Castro*, 596 F.2d 674, 677 (5th Cir. 1979) .........................9, 21, 36

*United States v. Chadwick,* 433 U.S. 1 (1977) .................................................12, 19

*United States v. Chan*, 830 F.Supp. 531 (N.D. Cal. 1993) .....................................27

*United States v. Chappell*, 2010 WL 1131474 (D.Minn.) (Jan. 12, 2010) .............23

*United States v. Dancy*, 640 F.3d 455 (1stCir. 2011).......................................14, 43

*United States v. David*, 756 F.Supp. 1385 (D. Nev. 1991) ....................................27

*United States v. DeJesus*, 984 F.2d 21 (1st Cir. 1993) .......................................14, 48

*United States v. Edwards*, 415 U.S. 800 (1974) .........................................18, 19, 21

*United States v. Espinoza*, 490 F.3d 41 (1st Cir. 2007)...........................................15

*United States v. Finley,* 477 F.3d 250 (5th Cir. 2007) ...............................15, 24, 26

*United States v. Flores-Lopez*, 670 F.3d 803 (7th Cir. 2012) ....................15, 24, 37

*United States v. Garcia*, 650 F.2d 349, 355 (7th Cir. 1979) ...............................9, 35

*United States v. Glover*, 558 F.3d 71 (1st Cir. 2009) ..................................13, 40, 42

*United States v. Holloway*, 630 F.3d 252 (1st Cir. 2011).....................39, 40, 42, 43

*United States v. Ivy*, 973 F.2d 1184, 1187 (5th Cir 1992) ......................................21

*United States v. Lopez*, 380 F.3d 538, 543 (1st Cir. 2004).....................................16

*United States v. Mangos*, 134 F.3d 460 (1st Cir. 1998)...........................................41

*United States v. McCroy*, 102 F.3d 239, 240-41 (6th Cir. 1996) ..........................21

*United States v. Molinaro*, 877 F.2d 1341, 1346-47 (7th Cir. 1989) ....................36

*United States v. Monclavo-Cruz,* 662 F.2d 1285 (9th Cir. 1981)…………...........21

*United States v. Moreno*, 569 F.2d 1049, 1052 (9th Cir. 1978) ........................9, 35

*United States v. Murphy*, 552 F.3d 405 (4th Cir. 2009) .........................................25

*United States v. Nascimento*, 491 F.3d 25 (2007) ..................................................17

*United States v. Ortiz* , 84 F.3d 977, 984 (2007) ...................................................27

*United States v. Park,* 2007 WL 1521573 (N.D.Cal. May 23, 2007)...............26, 31

*United States v. Robinson*, 414 U.S. 218 (1973) ...................................11, 17, 19, 21

*United States v. Rodriguez*, 659 F.3d 117 (1stCir. 2011)............................14, 50, 51

*United States v. Rodriguez,* 995 F.2d 776, 788 (7th Cir. 1993) ....................8, 21, 35

*United States v. Rust*, 650 F.2d 927, 978 (8th Cir. 1981) ..................................8, 34

*United States v. Sheehan*, 583 F.2d 30 (1st Cir. 1978) .....................................29, 36

*United States v. Weekes*, 611 F.3d 68 (1st Cir. 2010) ............................................47

*United States v. Wurie*, 612 F.Supp.2d 104 (D.Mass. 2009) ..................................3

### Federal Statutes

18 U.S.C. § 922.......................................................................................................39

18 U.S.C. § 924...................................................................................................39, 48

18 U.S.C. § 3231......................................................................................................1

18 U.S.C. § 3742......................................................................................................1

28 U.S.C. § 1291......................................................................................................1

### State Statutes

Mass. Gen. Laws ch. 265, § 25B ............................................................................48

Mass. Gen. Laws ch. 268, § 32B ............................................................................44

Mass. Gen. Laws ch. 277, § 79 ...............................................................................41

### Federal Sentencing Guidelines

U.S.S.G. § 2D1.1.......................................................................................9

U.S.S.G. § 4B1.4.......................................................................................9

### Other Authorities

David A. Couillard, Note, *Defogging the Cloud: Applying Fourth
  Amendment Principles to Evolving Privacy Expectations in Cloud
  Computing*, 93 MINN. L. REV. 2205 (2009). ......................................25

Adam M. Gershowitz, *Password Protected? Can a Password Save Your
  Cell Phone From a Search Incident to Arrest?* 96 IOWA L. REV 1125
  (2011)...................................................................................................25

Matthew E. Orso, *Cellular Phones, Warrantless Searches, and the New
  Frontier of Fourth Amendment Jurisprudence*, 50 SANTA CLARA L. REV.
  183 (2010)............................................................................................23

Chelsea Oxton, The Search Incident to Arrest Exception Plays Catch Up:
  Why Police May No Longer Search Cell Phones Incident to Arrest
  Without A Warrant, 43 Creighton L. Rev. 1157 (2010) ...................23

## <u>JURISDICTIONAL  STATEMENT</u>

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231, which grants exclusive jurisdiction over all offenses against the laws of the United States.

This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291, which confers jurisdiction to review all final decisions of the district courts, and 18 U.S.C. § 3742, which permits a defendant to appeal a sentence imposed in violation of law.

The district court entered final judgment on June 30, 2011.  [AD 14 , A 14.][1] A notice of appeal was timely filed on July 7, 2011.  [A 14.]

---

[1] Citations to the Addendum are referenced as "AD___".  Citations to the Appendix are referenced as "A___".  Citations to the Sealed Appendix (containing the Presentence Report) are referenced as "SA___".

## <u>STATEMENT  OF  THE  ISSUES</u>

1.     Whether the district court erred when it denied Mr. Wurie's motion to suppress on the ground that police officers' warrantless search of his cellphone violated his Fourth Amendment rights.

2.     Whether the district court erred in sentencing Mr. Wurie as an armed career criminal and career offender based upon predicate Massachusetts convictions for assault and battery with a dangerous weapon, assault and battery on a police officer, and larceny from the person.

## STATEMENT OF THE CASE

Brima Wurie was charged in a three-count indictment with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1), one count of distribution of at least 5 grams of crack cocaine, and one count of possession with intent to distribute at least 50 grams crack cocaine, both in violation of 21 U.S.C. § 841(a)(1). [A 16.] Mr. Wurie moved to suppress all evidence obtained as a result of the seizure and subsequent search of his cellphone, relying on the Fourth Amendment to the Constitution of the United States. [A 25.] The district court, relying on affidavits submitted by the government and an affidavit in support of a related search warrant, denied the motion by written order [AD 1], subsequently published as *United States v. Wurie*, 612 F.Supp.2d 104 (D.Mass. 2009)

Mr. Wurie went to trial and was convicted of all three counts, based in substantial part on evidence obtained as a result of the cellphone search. [A10.]

Mr. Wurie was sentenced on June 29, 2011. He objected at sentencing to consideration of his five prior Massachusetts convictions (for larceny from the person, assault and battery with a dangerous weapon (2), assault and battery on a police officer, and resisting arrest) as "crimes of violence" or "violent felonies" under the Armed Career Criminal Act ("ACCA") and career offender guideline. [A264, SA 47-50.]

The district court rejected this argument, and sentenced Mr. Wurie as an armed career criminal and career offender, to twenty-two and one half years imprisonment (262 months), to be followed by five years of supervised release. [AD13-14.]

This appeal followed.

## STATEMENT  OF  FACTS

### A.    Facts Relevant to the Suppression Issue.

On September 5, 2007, Mr. Wurie was arrested for participation in a drug sale which took place in Andrew Square in South Boston.  [AD A 50.]  Boston Police Department Sergeant Detective Paul Murphy (Detective Murphy) of the Area C-6 Drug Control Unit ("DCU"), while performing routine surveillance, observed a man in a convenience store parking lot on Dorchester Avenue whom he regarded as suspicious.  The man, later identified as Fred Wade, was talking on a cellphone and watching traffic.  After a period of about five minutes, a white Nissan, driven by Mr. Wurie, arrived; Mr. Wade entered the car and Mr. Wurie drove out of the parking lot.  [A 51.]

Detective Murphy, believing he was observing a drug sale by "car delivery," followed behind Mr. Wurie's car, which drove a short distance before making a U-turn and returning to the parking lot.  [A 51.]  Mr. Wade got out of the car, and entered the convenience store, while Mr. Wurie drove away.  [Id.]  Detective Murphy broadcast the make and model of Mr. Wurie's car to other members of his squad to arrange for its surveillance, while he, now accompanied by another officer, accosted Mr. Wade.  [A 51.]  A search of Mr. Wade revealed two plastic bags containing "8-balls" of crack cocaine.  Mr. Wade, given his Miranda rights, subsequently stated he bought the crack cocaine from Mr. Wurie.  Mr. Wade also

5

stated that Mr. Wurie went by the nickname "B," sold crack cocaine in quantities no smaller than an "8-ball," lived in South Boston, and that Mr. Wade had purchased crack cocaine from him in South Boston and at his father's house in Dorchester in the past.  [A 52.]

At the direction of Detective Murphy, the Boston Police officer following Mr. Wurie, Officer Steven Smigliani, arrested him for selling drugs to Mr. Wade. Mr. Wurie was arrested shortly after he parked his car near the intersection of Silver Street and Dorchester Street in South Boston.  [A 52.]

At the police station, Mr. Wurie's two cellphones and other effects were seized during a search incident to his arrest by Police Officers Kevin Jones and Robert England, "prior to [his] being booked," and about five to ten minutes after his arrival at the station.  [A 79.]   The phone was "repeatedly receiving calls"; it had an external caller ID screen which indicated the calls were coming from "my house."  [Id.]   After another five minutes, the officers opened the phone for the purpose of looking at its "call log."  Id.  One button press by the officers brought them to the call log, while another button press revealed the phone number associated with the "my house" entry.  Officer Jones subsequently entered this phone number into a website called "AnyWho," which revealed an associated name and an address: 315 Silver Street in South Boston.  [Id.]

Under questioning by Detective Murphy, Mr. Wurie denied giving Mr. Wade a ride, and stated he lived not in South Boston, but in Dorchester. [A53.] Suspecting he was lying about his address, that he lived nearby, and that he may have a cache of drugs hidden at his residence, Detective Murphy took Mr. Wurie's keys and went with other officers to the Silver Street address the cellphone search had revealed. [A 54.]

Detective Murphy found that Mr. Wurie's key unlocked the door to one of the apartments at 315 Silver Street by inserting them and trying them out. He also noted that Mr. Wurie's name was on the mailbox. Detective Murphy subsequently questioned the occupant of the apartment, a woman who appeared to be the same woman pictured on the wallpaper of Mr. Wurie's cellular phone. [A 55.] She admitted that Mr. Wurie stayed at the apartment on occasion, had been there earlier in the day and the night before.

Smelling "the distinct odor of burnt marijuana," Detective Murphy and other officers entered the apartment, in order to "freeze" it, while they applied for a search warrant. [A 55-56.] Detective Murphy subsequently drafted an affidavit in support of a search warrant request. The warrant was granted, and officers found contraband during the subsequent search, including over 215 grams of crack cocaine, a .9 millimeter handgun and ammunition, marijuana, as well as personal papers tying Mr. Wurie to the apartment. [A 56.]

7

Mr. Wurie was subsequently indicted in the district court on March 27, 2008, in a three count indictment, charging him with one count of gun possession by a felon, one count of distribution of cocaine within 1000 feet of a school, and one count of possession of cocaine with intent to distribute. [A 16.]

Mr. Wurie moved to suppress the results of the cell phone search. The government responded with a memorandum, to which it appended three affidavits. On January 20, 2009, a brief hearing on this motion was held. [A 82.] The district court issued an order denying the motion on May 4, 2009. [AD 1.]

The district court noted that "neither the Supreme Court nor the First Circuit has directly considered the issue of whether a search incident to arrest may include a search of a cell phone's contents, and if it does, how thorough the search might be," and that decisions of other district courts and Courts of Appeal "trend heavily in favor of finding that the search incident to arrest or exigent circumstances exceptions apply to searches of the contents of cell phones." [A8.] The district court found the search of Mr. Wurie's cell phone incident to his arrest was "limited and reasonable," and that it saw:

> no principled basis for distinguishing a warrantless search of a cell phone from the search of other types of personal containers found on a defendant's person that fall within the Edwards-Lafayette exceptions to the Fourth Amendment's reasonableness [sic] requirements. *See e.g., United States v. Rodriguez,* 995 F.2d 776, 788 (7th Cir. 1993) (contents of an address book in arrestee's wallet); *United States v. Rust*, 650 F.2d 927, 978 (8th Cir.

> 1981) (per curiam) ( arrestee's pockets); *United States v. Garcia*, 650 F.2d 349, 355 (7th Cir. 1979) (hand-held luggage); *United States v. Castro*, 596 F.2d 674, 677 (5th Cir. 1979) (man's wallet); *United States v. Moreno*, 569 F.2d 1049, 1052 (9th Cir. 1978) (woman's purse)."

An amended indictment subsequently issued, which deleted the school zone allegation, on February 22, 2010. [A 98.] After a four day jury trial, Mr. Wurie was convicted of all three counts.

### B.    Facts Relevant to the Sentencing Issue

The PSR set Mr. Wurie's base offense level at 30, and applied a two level enhancement for possession of a firearm in connection with a drug offense, resulting in a total offense level of 32. [SA11] *See* U.S.S.G. § 2D1.1(b)(1). Mr. Wurie's prior record placed him in Criminal History Category VI [SA 25], which would have resulted in an advisory Guideline Sentencing Range of 210 to 262 months, with no mandatory minimum sentence. However, because the PSR concluded that Mr. Wurie had at least three predicate convictions for crimes of violence, he was deemed eligible for a statutory mandatory minimum sentence of 15 years pursuant to 18 U.S.C. § 924(e), and his offense level was raised from 32 to 34 under U.S.S.G. § 4B1.4(b)(2). [SA12.]

Mr. Wurie objected in writing to his designation as an armed career criminal on the ground that the predicate convictions identified by the Probation Department did not in fact qualify as "crimes of violence" or "violent felonies".

[SA 47-50.]  Mr. Wurie requested the Court impose a below-guideline sentence of 12 and one half years imprisonment.

Mr. Wurie argued that under the Supreme Court's decisions in *Johnson v. United States,* ___ U.S. ___, 130 S. Ct. 1265 (2010) and *Begay v. United States*, 553 U.S. 137 (2008), his five prior Massachusetts convictions (for larceny from the person, assault and battery with a dangerous weapon (2), assault and battery on a police officer, and resisting arrest) were not categorically "crimes of violence" or "violent felonies"  under the Armed Career Criminal Act ("ACCA") and career offender guideline, [SA 47-50.], and that there was insufficient evidence under *Shepard v. United States*, 544 U.S. 13 (2005) to demonstrate that these convictions warranted the "violent" classification.  Id.

The district court stated it found the guideline range "reasonable," and adopted the findings of the PSR, which included a rejection of these arguments, and imposed a 262 month sentence, the bottom of the applicable range.  [AD276.] Mr. Wurie filed a timely notice of appeal.  [A14.]

## SUMMARY  OF  THE  ARGUMENT

The warrantless search of Mr. Wurie's cellphone was unconstitutional.  The results of the search—the phone number associated with the "my house" entry which led police to his girlfriend's apartment, and without which there would have been no search of the apartment—must be suppressed.  This result is required because the search here was not justifiable as a search incident to arrest.

The Supreme Court recently reaffirmed that the scope of the search incident to arrest is determined by its purposes, which are to disarm arrestees, and to search for evidence on an arrestee's person or nearby which, if not seized, may be discarded or destroyed.  *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (*citing Chimel v. California*, 395 U.S. 752, 763 (1969)).  The *Chimel* factors justified the seizure of the cellphone, but did not justify the further manipulation or exploration of the information contained within the phone, undertaken for investigational purposes, which occurred here.

Supreme Court and Circuit precedent allows police to search an arrestee and containers found on his or her person without obtaining a warrant, and has not require d these searches to be precisely contemporaneous with arrest.  The district court relied on this authority in upholding the search of Mr. Wurie's cellphone.  But cell phones are not properly considered "containers" within the meaning of

these prior cases: they are portable computers, capable of storing or providing remote access to vast amounts of sensitive information in digital form.  The privacy interest in these devices is usefully compared to the privacy interest in the home, which until quite recently was the only place data of the type and quantity found on today's computers could feasibly be stored.  Analogies to wallets or purses because they contain information and are carried on the person are inadequate.  Cell phones are objects which are different in kind from these objects, and therefore require different treatment under the Fourth Amendment.

Even if cell phones are considered to be containers, Supreme Court precedent requires suppression of the evidence here.  Whereas in *United States v. Robinson*, 414 U.S. 218 (1973), the Supreme Court upheld the warrantless search of a crumpled up cigarette package incident to an arrest, on the ground that searching it was subsumed under the long upheld authority to search the person of an arrestee, *Robinson*, 414 U.S. *at* 236, in *United States v. Chadwick*, 433 U.S. 1 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565, 578-79 (1991), the Supreme Court suppressed the results of the search of a footlocker, which was seized from arrestees and searched an hour and a half after an arrest at a separate location.

The contemporary cell phone, although the approximate size of the cigarette package in *Robinson*, is otherwise dissimilar, and provides ready access to a

volume of information that would fill many *Chadwick* footlockers. Although carried on the person, a cell phone or computer's contents are not "immediately associated with the person" in the *Chadwick* sense, and may not be searched unless the *Chimel* factors warranting such a search are present.

Other cases relied on by the district court do not dictate a contrary result. Container cases which do not involve the accessing of information are not apposite. Pager cases are distinguishable because of the qualitative difference between cell phones and pagers. Finally, many of the cases on which the district court relied, or decided subsequently, were either decided prior to the decision of the Supreme Court's re-affirmance of *Chimel* in *Gant*, or failed to grapple with it, and their holdings are in doubt for that reason.

The district court erred in concluding that Mr. Wurie's prior convictions for larceny from the person, assault and battery by means of a dangerous weapon ("ABDW"), assault and battery on a police officer ("ABPO"), and an associated charge of resisting arrest, and larceny from the person were categorically crimes of violence, conclusions that made Mr. Wurie subject to the ACCA and its associated GSR. The district court did so in accord with this Court's decisions construing as categorical crimes of violence the Massachusetts offenses of assault and battery by means of a dangerous weapon, *United States v. Glover*, 558 F.3d 71 (1st Cir. 2009), resisting arrest, *United States v. Almenas*, 553 F.3d 27 (1st Cir. 2009),

13

larceny from the person, *United States v. DeJesus*, 984 F.2d 21 (1st Cir. 1993), and

assault and battery on a police officer, *United States v. Dancy*,  640 F.3d 455 (1st

Cir. 2011).   However, this Court's holding in each of those cases, as well as its

subsequent decisions in *United States v. Rodriguez*, 659 F.3d 117, 119 (1st Cir.

2011), decided after the district court sentenced Mr. Wurie, are incompatible with

the Supreme Court's decisions in *Begay v. United States*, 553 U.S. 141 (2008) and

*Johnson v. United States*, ___ U.S. ___, 130 S.Ct. 1265, 1269 (2010), and this

Court should reconsider those decisions.  The Supreme Court's later decision in

*Sykes v. United States*, ___ U.S. ___, 131 S.Ct. 2267 (2011) does not support the

conclusion that these Massachusetts offenses are categorically crimes of violence.

Accordingly, the argument below is presented to raise and preserve the issue for

potential en banc review by this Court or review by the Supreme Court.   This

Court should ultimately reconsider its holdings as to each of the offenses, reverse

the decision of the district court, and remand the case to the district court for

sentencing without application of the ACCA.

# ARGUMENT

I.  **THE DISTRICT COURT ERRED IN DECLINING TO SUPPRESS THE INFORMATION OBTAINED FROM THE SEARCH OF THE CELLPHONE.**

### A.    Standard of Review.

With regard to a motion to suppress, this Court reviews the district court's findings of fact for clear error and its legal conclusions, including ultimate constitutional determinations, *de novo*. *See United States v. Espinoza*, 490 F.3d 41, 45-46 (1st Cir. 2007).

### B.    The District Court Correctly Determined that Mr. Wurie had a Reasonable Expectation of Privacy in the Cellphone

The district court correctly stated that Mr. Wurie had a reasonable expectation of privacy in his cell phone, noting that it "seems indisputable that a person has a subjective expectation of privacy in the contents of his or her cell phone." [AD , *citing United States v. Finley*, 477 F.3d 250, 259-260 (5th Cir. 2007).][2]  *See also United States v. Jones*, 565 U.S. ___, 132 S.Ct. 945, 957(2012)

---

[2] Although the cellphone was entered into evidence, the record as to its capabilities and storage capacity was not developed at the suppression hearing.  Appellant discusses so-called smart phones and conventional cell phones as a class, as even conventional cell phones contain information in quantities, from text messages, emails, web browsing history and photographs, that dwarf what can be found on a pager or in an address book.  See *United States v. Flores-Lopez*, 670 F.3d 803, 806(7th Cir. 2012)  ("[e]ven the dumbest of modern cell phones gives the user access to large stores of information."); *State v. Smith*, 920 N.E.2d 949, 954 (suppressing results of search of conventional cell phone and noting "that in today's advanced technological age many 'standard' cell phones include a variety of features above and beyond the ability to place phone calls. Indeed, like Smith's phone, many cell phones give users the ability to send text messages and take

(Sotomayor, J., concurring) (noting "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties … [an] approach ill-suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks [such as] phone numbers that they dial or text to their cellular providers [and] URLs that they visit and the e-mail addresses with which they correspond  to their Internet Service providers.")

### C. Cell Phones are *Sui Generis* and Should Not Be Characterized as "Containers" Under Prevailing Doctrine; Rather, The Privacy Interest in the Contents of Cell Phones is Very High, and Not Appreciably Reduced by the Fact of Arrest. Searching Cell Phones Requires a Warrant in the Absence of Exigent Circumstances

The Fourth Amendment guarantees the right to be free from all unreasonable searches and seizures.  U.S. Const., Amend IV.  Warrantless searches are *per se* unreasonable under the Fourth Amendment, unless "one of a few specifically

---

pictures. Other modern 'standard' cell phones can also store and transfer data and allow users to connect to the Internet" and declining to fashion a "rule that requires officers to discern the capabilities of a cell phone.")  *See also People v. Diaz*, 244 P.3d 501, 514 (Cal. 2011), *cert. denied,* 132 Sup. Ct. 94 (Oct. 3, 2011) (Werdergar, J. dissenting) (agreeing with majority the legal question as to the search of cell phones "should not depend on the features or technical specifications of the mobile device, which could be difficult to determine at the time of arrest," and grouping "smartphones as well as other mobile phones" for purposes of legal analysis).

established and well-delineated exceptions" applies. *United States v. Camacho*, 661 F.3d 718, 724 (1st Cir. 2011) (*quoting Arizona v. Gant*, 556 U.S. 332, 338 (2009)). *See also Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971). The government bears the burden of proving the lawfulness of a warrantless search. *United States v. Lopez*, 380 F.3d 538, 543 (1st Cir. 2004) (citing *Mincey v. Arizona*, 437 U.S. 385, 390-91 (1978)). Searches incident to lawful arrest present one of the exceptions to the rule against warrantless searches and seizures. *United States v. Nascimento*, 491 F.3d 25, 49 (1st Cir. 2007) (*citing Chimel v.California*, 395 U.S. 752, 763 (1969)).

1.       **Supreme Court Precedent on Searches Incident to Arrest**

In the seminal *Chimel* case, the Court attempted to rationalize search incident to arrest doctrine, and laid down the "proper extent" of a search incident to lawful, custodial arrest. It invalidated a search following arrest which encompassed respondent's "entire three bedroom house, including the attic, the garage, and a small workshop." *Chimel*, 395 U.S. at 754. The Court noted that "'[t]he scope of [a] search must be "strictly tied to and justified by" the circumstances which rendered its initiation permissible,'" and fashioned a rule to ensure that searches incident to arrest would be linked to the two exigency rationales that render them "imperative" in the first place. *Id*. at 761-62. Under the search incident to arrest exception to the warrant requirement, officers could search

17

an arrestee's person and the area within his "immediate control – … mean[ing] the area from within which he might gain possession of a weapon or destructible evidence." *Id*. at 763 (quotation marks omitted).

Subsequently, in *United States v. Robinson*, 414 U.S. 218 (1973) the Court upheld the search of a crumpled cigarette packet found in the defendant's coat pocket following his arrest for driving without a license. *Id*. at 220-21. Lower courts had invalidated the search, reasoning that *Chimel* limited the search incident to arrest to evidence of the crime of arrest, and there was no potential evidence of that crime in the cigarette pack. Id. at 227. The Supreme Court reversed, stating:

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.

*Id*. at 235.

In *United States v. Edwards*, 415 U.S. 800, 805 (1974), the Supreme Court made an exception to *Chimel's* contemporaneity requirement and authorized the

warrantless search of a suspect's clothes that occurred ten hours after the arrest at the police station. In *Edwards*, the police took an arrestee's clothes to examine them for evidence of a crime. The court noted that the police had probable cause to believe the defendant's clothing was evidence, and held that taking such evidence "was and is a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that Edwards was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention." *Id*. at 805.

In *Chadwick*, the Court held a search of a container was invalid under the search incident to arrest exception where the arrestee could not conceivably access it when it was searched. 433 U.S. at 15.There, authorities arrested the defendants as they were loading a footlocker into a car's trunk and searched the footlocker at the stationhouse 90 minutes later. The Court rejected the contention that the warrantless search was incident to the arrests, reasoning that a search is not "incident to th[e] arrest either if the search is remote in time or place from the arrest or no exigency exists." *Id*. at 15 (internal citation and quotation marks omitted) (emphases added).

The *Chadwick* court distinguished *Edwards* as follows, "[u]nlike searches of the person, *United States v. Robinson*, 414 U.S. 218 (1973); *United States v. Edwards*, 415 U.S. 800, … (1974), searches of possessions within an arrestee's

19

immediate control cannot be justified by any reduced expectations of privacy

caused by the arrest." *Chadwick*, 433 U.S. at 16 n. 10 (internal citations omitted).

Because authorities had removed the footlocker to "their exclusive control" before

searching it, "there [was] no longer any danger that the arrestee might gain access

to the property to seize a weapon or destroy evidence." *Id*. at 15.

In *New York v. Belton*, 453 U.S. 454 (1981) the court considered the search

incident to arrest of a jacket in the context of a vehicle stop.  An officer stopped the

car Belton was in, and, when he smelled marijuana, arrested him and his three

companions.  He subsequently searched the passenger area of the car incident to

the arrest, and found a jacket in the back seat.  The officer found cocaine in a

pocket of the jacket.  *Id.* at 456-57. Lower courts suppressed the fruits of the

search, reasoning that the jacket was not on Belton's person, and thus not a

*Robinson* item, and had been reduced to police control upon his arrest and the

seizure of the vehicle. Thus, under *Chadwick*, the warrantless search should have

been invalidated. *Id.*

The Supreme Court reversed, setting out a "bright line" rule for the search

incident to arrest in the vehicle context: a warrantless search of a vehicle of an

arrested recent occupant is permissible. As the court said:

> It is not questioned that the respondent was the subject of a
> lawful custodial arrest on a charge of possessing marihuana.
> The search of the respondent's jacket followed immediately
> upon that arrest. The jacket was located inside the passenger

> compartment of the car in which the respondent had been a passenger just before he was arrested. The jacket was thus within the area which we have concluded was 'within the arrestee's immediate control' within the meaning of the *Chimel* case. The search of the jacket, therefore, was a search incident to a lawful custodial arrest, and it did not violate the Fourth and Fourteenth Amendments.

Id. at 462-63.

Following *Belton*, the search incident to arrest exception broke down into three categorical approaches. First, pursuant to *Belton*, a search of a vehicle was categorically permissible. Lower courts applied *Belton* universally to allow the search of a vehicle under virtually any factual scenario. *See Thornton v. United States*, 541 U.S. 615, 624 (2004) ("lower court decisions seem now to treat the ability to search a vehicle incident to the arrest of a recent occupant as a police entitlement rather than as an exception justified by the twin rationales of *Chimel*.") (O'Connor, J. concurring).

Second, under *Robinson/Edwards*, a defendant's person items found on the person at the time of arrest and categorized as "personal" in nature could be searched incident to arrest. Under *Robinson* and *Edwards* federal courts have upheld searches of purses, wallets, briefcases, and day timers. *See e.g. Curd v. City Court of Judsonia, Ark.*, 141 F.3d 839, 842 (8th Cir. 1989) (upholding search of a purse); *United States v. McCroy*, 102 F.3d 239, 240-41 (6th Cir. 1996) (upholding search of a wallet); *United States v. Castro*, 596 F2d 674, 677 (5th Cir 1979)

(upholding searching papers found in wallet); *United States v. Ivy*, 973 F.2d 1184, 1187 (5th Cir. 1992) (upholding search of a briefcase within defendant's reach); *United States v. Rodriguez*, 995 F.2d 776, 778 (7th Cir 1993) (upholding search of address book found in wallet).

Under the third category, when the search was directed not against the suspect's person, but against his possessions, or items deemed "possessory" *Chimel* and *Chadwick* controlled the analysis. Under *Chimel* and *Chadwick*, if those possessory items posed no safety risk to the officers, once they were reduced to police custody, the rationale for the search incident to arrest exception terminated, and any search of their contents were governed by the warrant requirement. *See e.g., United States v. Monclavo–Cruz*, 662 F.2d 1285, 1290 (9th Cir.1981)

In *Arizona v. Gant*, 556 U.S. 332 (2009) the Supreme Court reexamined the search incident to arrest doctrine, and retreated from the hard categorical approach of *Belton*. *Gant* also clarified that the search incident to arrest doctrine is not controlled by rigid application of categories, but by the touchstone of reasonableness:

> [The *Chimel*] limitation, which continues to define the boundaries of the exception, ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy. See *ibid*.(noting that searches incident to arrest are reasonable

22

> '*in order* to remove any weapons [the arrestee] might seek to
> use' and '*in order* to prevent [the] concealment or destruction'
> of evidence (emphasis added)). If there is no possibility that an
> arrestee could reach into the area that law enforcement officers
> seek to search, both justifications for the search-incident-to-
> arrest exception are absent and the rule does not apply.

*Id*. at 339.

Courts and commentators have questioned the continued validity of applying

*Robinson* and *Edwards* to all personal effects after *Gant*. *See e.g.*, *United States v.

Chappell*, 2010 WL 1131474 at *14 n. 9 (D.Minn.) (Jan. 12, 2010) (cell phone

search incident to arrest cases decided prior to *Gant* may be of "limited persuasive

value"); Matthew E. Orso, *Cellular Phones, Warrantless Searches, and the New

Frontier of Fourth Amendment Jurisprudence*, 50 SANTA CLARA L. REV. 183, 207-

08 (2010) ("*Gant* raised a timing issue for searches incident to arrest that could

have widespread impact on searches of all containers, including cellular phones…

[I]t is difficult to see why measuring a search's scope based on the time of search

rather than the time of arrest should be limited to a scenario involving the search of

an automobile incident to arrest."); Chelsea Oxton, *The Search Incident to Arrest

Exception Plays Catch Up: Why Police May No Longer Search Cell Phones

Incident to Arrest Without A Warrant*, 43 CREIGHTON L. REV. 1157, 1207-08

(2010) ("In light of the Supreme Court rejecting a broad reading of the *Belton* rule,

courts should rethink whether it is appropriate to broadly interpret the *Belton*

decision's denotation of a container to encompass such modern technological

devices as cell phones. Decisions that relied on Belton are now subject to

reexamination in light of *Gant*.").

## 2.        Lower Court Application of Precedent to Cell Phone Searches

The applicability of this doctrine to searches of the data contained within

cell phones has been addressed by the Fourth, Fifth, and Seventh Circuits in

published opinions[3] and two state supreme courts.  *United States v. Flores-Lopez*,

670 F.3d at 806 (upholding cell phone search as search incident to arrest); *United

States v. Finley*, 477 F.3d 250, 259 (5th Cir.), *cert. denied*, 549 U.S. 1353 (2007)

(same); *see also United States v. Curtis,* 635 F.3d 704, 712 (5th Cir. 2011).  *United

States v. Murphy*, 552 F.3d 405, 410 (4th Cir. 2009); *State v. Smith*, 920 N.E. 2d

949 (Ohio), *cert. denied*, 132 Sup. Ct. 102 (2010) (suppressing fruits of warrantless

cell phone search); *People v. Diaz*, 244 P.3d 501, 514 (Cal. 2011), *cert. denied*,

132 Sup. Ct. 94 (2011) (declining to suppress fruits of warrantless cell phone

search).

---

[3] The Tenth Circuit in *Silvan W. v. Briggs*, 309 Fed.Appx. 216, 225 (10th Cir.
2009) endorsed *Finley* without analysis in an unpublished opinion.

The issue is recurring with increasing frequency in the lower courts, with the majority of cases declining to suppress data obtained from warrantless cell phone searches. *See* Adam M. Gershowitz, *Password Protected? Can a Password Save Your Cell Phone From a Search Incident to Arrest?* 96 IOWA L. REV. 1125, 1136 (2001) (identifying approximately fifty cases in which the issue has arisen). *See also Schlossberg v. Solesbee*, --- F.Supp.2d ----, 2012 WL 141741 at * 4 (D. Or. Jan. 18, 2012) (in decision suppressing fruits of search of digital camera noting that "many courts now allow officers to conduct warrantless searches of electronic devices capable of holding large volumes of private information which may or may not have any relevance to the arrest offense," and finding this "inexplicable as well as inconsistent with the privacy interest at the core of the Fourth Amendment.")

### 3.    The *Smith* Decision

The Supreme Court of Ohio, in *State v. Smith*, 920 N.E. 2d 949 (Ohio 2009), has presented an extensive and nuanced discussion of the status of cell phones of searches incident to arrest. It reversed a lower court decision declining to suppress the fruits of a cellphone search. The question presented was "whether police may search data within an arrestee's phone without a warrant." Id. at 953. The court stated the answer depended first on how a cell phone is "characterized," specifically whether it should be characterized as a "closed container" as that term had been used in previous cases, and discussed approaches in the two leading  pre-

*Gant* cell phone cases, *Id. at* 953-4, *Finley*, and the district court case *United States*

*v. Park*, 2007 WL 1521573 (N.D. Cal. May 23, 2007).

   *Smith* noted that the defendant in *Finley* had not contested the

characterization of a cell phone as a "closed container," thereby suggesting the

issue had not been given a full hearing.  It also noted that the district court in *Park*

had appropriately focused its analysis on the nature of the contemporary cell

phone, and had "likened the devices to laptop computers, in which arrestees have

significant privacy interests, rather than to address books or pagers found on their

persons, in which they have lesser privacy interests." *Id*. at 954

   The *Smith* court declined the state's invitation to liken cell phones to "closed

containers."  The court found it of determinative significance that discussions of

"containers" in the cases had "traditionally" been discussions of physical objects,

and that the Supreme Court  in *Belton* had in fact *defined* the concept of

"container"  in these terms, as ''any object capable of holding another object.'' *Id*.

(*citing Belton*, 453 U.S. at 460).  The court distinguished several federal cases

characterizing pagers or other electronic devices as "containers," suggesting they

were insensitive to this dimension of the *Belton c*ourt's definition, and were

perhaps wrongly decided for that reasons.  *Id.* (*citing United States v. Chan*, 830

F.Supp. 531, 534 (N.D. Cal. 1993);  *United States v. Ortiz* , 84 F.3d 977, 984 (7th

Cir. 1996), *United States v. David*, 756 F.Supp. 1385, 1390 (D. Nev. 1991).  The

Ohio court further stated that the pager cases were factually distinguishable from

the cell phone case as well.  This was because:

> the pagers and computer memo books of the early and mid-1990s bear little resemblance to the cell phones of today. Even the more basic models of modern cell phones are capable of storing a wealth of digitized information wholly unlike any physical object found within a closed container.

*Id*.

Determining that cell phones were in this sense *sui generis*, *Smith* analyzed

the question of whether police searches of cell phone data incident to arrest were

permissible.   It concluded that the privacy interests in these devices were higher

than in most ordinary physical objects, and that once reduced to police control,

police could not "intrude" upon their contents without resort to the warrant

process:

> Given the continuing rapid advancements in cell phone technology, … there are legitimate concerns regarding the effect of allowing warrantless searches of cell phones, especially so-called smart phones, which allow for high-speed Internet access and are capable of storing tremendous amounts of private data.
>
> On one hand, [phones] contain digital address books very much akin to traditional address books carried on the person, which are entitled to a lower expectation of privacy in a search incident to an arrest. On the other hand, they have the ability to transmit large amounts of data in various forms, likening them to laptop computers, which are entitled to a higher expectation of privacy.
>
> Although cell phones cannot be equated with laptop computers, their ability to store large amounts of private data gives their

users a reasonable and justifiable expectation of a higher level of privacy in the information they contain. Once the cell phone is in police custody, the state has satisfied its immediate interest in collecting and preserving evidence and can take preventive steps to ensure that the data found on the phone are neither lost nor erased. But because a person has a high expectation of privacy in a cell phone's contents, police must then obtain a warrant before intruding into the phone's contents.

*Id*.

### 4.    Application to This Case

The continued vitality of *Chimel* as the touchstone of search incident to arrest analysis was recently reaffirmed by the Supreme Court in *Gant*.  *Gant*, 556 U.S. *at* 343.  The scope of the search incident to arrest is determined by its purposes, which are to disarm arrestees, as well as search for "destructible evidence," that is, evidence on an arrestee's person or nearby which, if not seized, may be discarded or destroyed.  *Gant*, 556 U.S. *at* 335 (*citing Chimel* 395 U.S at 763).  The preservation of evidence of rationale does not justify further exploratory searches of items for information once they have been seized.

In this case, officers seized Mr. Wurie's cell phone  at the station house but prior to the initiation of the booking process.  The seizure took place some ten minutes after the arrest took place.  The government justified the seizure and subsequent search as a search incident to Mr. Wurie's arrest.  There was no evidence that officers flipped open the phone and examined its contents for either the  safety or the evidentiary-preservation rationales identified as defining the permissible scope of a search incident to arrest *Chimel*.  Rather, officers examined

28

the cell phone's contents for purely investigatory purposes .  The district court

relied, inter alia, on this Court's decision declining to suppress information

obtained from a search of an arrestee's wallet in *United States v. Sheehan*, 583

F.2d 30 (1978).  Given the nature of the modern cell phones—essentially a

portable computer in which individuals maintain a high privacy interest—the

warrantless intrusion into the contents of the device, even as limited here, was

unconstitutional.

 The district court was incorrect when it concluded there was no "principled

basis for distinguishing a warrantless search of a cell phone from the search of

other types of personal containers found on a defendant's person."  [AD 11].

Contemporary cell phones comprise a category of devices with vastly more

capability than laptop computers had just several years ago.  See e.g., *Flores-

Lopez*, *supra*, at  804 (the "modern cell phone *is* a computer"), and are certainly

distinguishable from wallets.  With increased networking capabilities (the "cloud")

increasing apace, it is not an exaggeration to say that cell phones and similar

devices as a class give ready access to a person's entire digital biography.  David

A. Couillard, Note, *Defogging the Cloud: Applying Fourth Amendment Principles

to Evolving Privacy Expectations in Cloud Computing*, 93 MINN. L. REV. 2205

(2009).  Intimate information which used to be kept in the home, the doctor's

office, and the bank, or was previously never collected at all,[4] can now be

accessed from digital devices no bigger than the cigarette package in Robinson's

shirt pocket some forty years ago.

     *Gant* also emphasized the continuing centrality of the warrant requirement to

Fourth Amendment analysis.  556 U.S *at* 338 ("our analysis begins, as it should in

every case addressing the reasonableness of a warrantless search, with the basic

rule that 'searches conducted outside the judicial process, without prior approval

by judge or magistrate, are per se unreasonable under the Fourth Amendment.)  To

allow police unbridled discretion to perform investigatory searches of electronic

devices would be inconsistent with Fourth Amendment principles.  As the

Supreme Court's observed  in *Katz* , in the course of recognizing that the Fourth

Amendment protected the petitioner's privacy interest in his communications in a

public telephone booth, "[t]o read the Constitution more narrowly is to ignore the

vital role that the public telephone has come to play in private communication."

*Katz v. United States*, 389 U.S. 347, 352 (1967).  Similarly, to permit warrantless

searches of cell phones under the arrest authority ignores the capabilities and the

---

[4] See Jones, *supra*, 130 Sup. Ct. *at*  963(Alito, J. concurring in the judgment)
(noting "cell phones and other wireless devices now permit wireless carriers to
track and record the location of users—and as of June 2011, it has been reported,
there were more than 322 million wireless devices in use in the United States."(

changing role the devices are playing in people's lives, and is not true to Fourth

Amendment principles.

The correct rule, with reference to the principles animating the Fourth

Amendment, is one which prohibits warrantless access to personal digital devices

such as cell phones where, as here, exigent circumstance are absent.

    **D.    If Cell Phones Can be Analyzed as Containers, They Are Akin to the *Chadwick* footlocker, And Provide Ready Access to Information "Not Immediately Associated with the Person"; Warrantless Searches of Items Under *Chadwick* are Not Permissible When the Item is Secured by Police and There Are No Exigent Circumstances**

### 1.    United States v. Park

In *United States v. Park*, a district court suppressed information obtained

from warrantless cellphone searches in a thoughtful order. *United States v. Park*,

2007 WL 1521573 (N.D. Cal. May 23, 2007). *Park* involved a San Francisco

police investigation of a marijuana grow operation. Park and other defendants

were arrested prior to the execution of a search warrant. At the station house,

approximately an hour and a half after the arrests, San Francisco Police Inspectors

extracted information from the defendants' cellphones, principally the list of

contacts in the address book. The government justified the warrantless searches as

being incident to arrest or as booking searches. The Inspector who searched the

phone "[did] not recall searching the cellular telephone for information stored or

accessed via the internet, or, for photographs, videos, calendars, email or text messages, or any other stored data." *Id*. at *3.

The district court noted the justification for the search incident to arrest authority:

> the need of law enforcement officers to seize weapons or other things which might be used to assault an officer or effect an escape, as well as the need to prevent the loss or destruction of evidence.

*Id.* at *6. It described *Edwards*' upholding of a search of clothing hours after arrest as setting out what it viewed as an "exception to the contemporaneity requirement" of search incident to arrest doctrine. *Id*., (*citing United Edwards*, 415 U.S. 800, 805 (1974).) The Court then quoted the following passage from *Chadwick*:

> Warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the search is remote in time or place from the arrest, or no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

Id. at *6 (*quoting Chadwick*, 433 U.S. at 15)

*Park* noted that the Supreme Court in *Chadwick* distinguished *Edwards* and *Robinson* as follows:

> [u]nlike searches of the person [*Robinson*] [*Edwards*], searches
> of possessions within an arrestee's immediate control cannot be
> justified by any reduced expectations of privacy caused by the
> arrest."  Id. at 16 n. 10 (internal citations omitted)

Id. (*quoting Chadwick*, 433 U.S. *at* 16. n. 10 *and omitting internal citations*)

The *Park* court addressed the one circuit precedent on cell phone searches at the time, noting that the search in *Finley* appeared to be "substantially contemporaneous" with the arrest, unlike the case before it.  The court was clear it was deciding the case on more than contemporaneity grounds, however.  "More fundamentally," *Park*  disagreed with the Fifth Circuit because it found:

> [U]nlike the *Finley* court, …  for purposes of Fourth Amendment
> analysis cellular phones should be considered "possessions within an
> arrestee's immediate control" and not part of "the person." *Chadwick*,
> 433 U.S. at 16 n. 10. This is so because modern cellular phones have
> the capacity for storing immense amounts of private information.
> Unlike pagers or address books, modern cell phones record incoming
> and outgoing calls, and can also contain address books, calendars,
> voice and text messages, email, video and pictures.  Individuals can
> store highly personal information on their cell phones, and can record
> their most private thoughts and conversations on their cell phones
> through email and text, voice and instant messages.

*Id.* at *8.

The *Park* court was correct to recognize the continuing vitality of *Chadwick*, and to interpret it as standing for the principle that whether one's privacy interest in a containers is reduced by the fact of the arrest (said another way, whether society acceptance of a police entitlement to search such the container ouponn an arrest) depends on what is stored in it, and not merely its physical size or proximity

to the body.  Like the Ohio Supreme Court in *Smith*, *Park* viewed modern electronic devices such as cellphones—which now in the ordinary course provide ready access to the most intimate details of an individual's life—as requiring a return to first principles, and offers an alternate doctrinal avenue for suppressing the result of the search in this case.

### E.     Cases Allowing Evidence Obtained from Warrantless Cell Phone Searches Are Inapposite or Wrongly Decided; Cases Relied on by the District Court Allowing Searches of Physical Containers Incident to Arrest Do Not Dictate a Different Result

The district court said that it saw no principled distinction for distinguishing a warrantless search of a cell phone from searches of other types of "personal containers" found on a defendant's person, [AD 11] that had been upheld by other courts.  Those cases, however, are either distinguishable, or fail to grapple with a fundamental issue presented by a cell phone search, which is whether and to what extent the police may go through and extract information from items during incidental searches.

*United States v. Rust*, 650 F.2d 927 (8th Cir.1981) cited by the district court for the proposition that an "arrestee's pockets" are a container legally indistinguishable from a cell phone, is inapposite.  In *Rust*, a bank robbery suspect tripped after being fired upon by an officer.  Upon his subsequent arrest, lock-picking tools were seized from the his pockets, and a walkie-talkie was seized from a harness around his belt.  650 F.2d *at* 928.  The case presented a straightforward

application of the *Chimel* doctrine, not evidently contested by the appellant.  The case did not involve any later probing of the items for more information.

*United States v. Moreno*, 569 F.2d 1049 (9th Cir. 1978) and *United States v. Garcia*, 650 F.2d 349 (7th Cir. 1979), were similarly relied on by the district court as involving indistinguishable searches of containers.  These cases involve a purse and luggage, respectively, and are not on point for the same reason.  In *Moreno*, the Ninth Circuit upheld the search of a woman's purse which lead to the seizure of marked money and a revolver.  569 F.2d *at* 1051.  The defendant challenged the arrest itself, and does not appear to have otherwise challenged the seizure of these items.  In *Garcia*, a divided panel of the Seventh Circuit addressed the application of *Chadwick* to the seizure of drugs from a suitcase.  The majority distinguished *Chadwick* on the ground that "the portable suitcases" at the defendant's feet "were quite capable of being opened quickly by the defendant in order to gain access to a weapon or evidence."  650 F.2d *at* 354.  In the majority's view, the case involved straightforward application of the *Chimel* doctrine, and did not involve further exploration of the contents of the luggage.

The district court also relied on cases involving searches of wallets.  In *United States v. Rodriguez*, 995 F.2d 776 (7th Cir. 1993) the Seventh Circuit upheld a district court's refusal to suppress information obtained from an address book found within a wallet seized from the defendant at the station house.  The

information linked the defendant to a co-defendant. The court did not engage in extensive discussion of the issue, relying on a previous case in which agents had inspected the papers found in a wallet, and treated the wallet as equivalent to an object under *Robinson. See* 995 F.2d *at* 778 (citing *United States v. Molinaro*, 877 F.2d 1341, 1346-47 (7th Cir. 1989)). *United States v. Castro*, 596 F.2d 674 (5th Cir. 1979) likewise involved the search of a folded-up piece of paper obtained from the defendants wallet. In *United States v. Sheehan*, 583 F.2d 30, 31 (1st Cir. 1978) this Court similarly upheld the search of a defendant's wallet. There, the defendant did not contest the warrantless search of his wallet, but the later seizure of a paper which was photocopied by an FBI agent. *Id.*

While these cases can be read to provide support for the further investigation of personal items such as cell phones for information once they have been reduced to police control, they are distinguishable. As discussed earlier, the nature of cell phones and similar devices makes them dissimilar from other objects carried on the body. Despite the fact that they are carried on the person, they are not typical effects which courts have contemplated in allowing inspection of items on the person upon arrest, in their ability to store or provide portals to vast amounts of private data. Furthermore, these cases they were decided under a broad understanding of the authority to search incident to arrest, which is in doubt after *Gant*.

This Court should also decline to follow the lead of sister circuits that have allowed the warrantless search of cell phones. The Fifth Circuit's opinion in *Finley* failed to grapple with the fundamental issues raised by warrantless searches of modern cell phones. *Finley* was not decided on a truly adversarial presentation of the issues. The defendant in *Finley* did not dispute the characterization of his cell phone as a closed container. On the contrary, he argued that it should be treated as such. The Fifth Circuit therefore assumed that point; and did not need to analyze or decide it. 477 F.3d at 260. The Fourth Circuit in *Murphy* relied on the Fifth Circuit without engaging in independent analysis. Notably, the defendant there argued that the police had to ascertain the storage capacity of each individual arrestee's cell phone to determine how private it was and whether they could search it without a warrant. The Fourth Circuit understandably rejected such a rule as impractical. *Murphy*, 552 F.3d at 411

In *Flores-Lopez*, the Seventh Circuit upheld the admission of the fruits of a cell phone search on facts similar to the case presented here. 670 F.3d at 803. This Court should decline to follow Flores Lopez because its conception of the latitude afforded to police discretion is too wide, it relies too heavily on a  broad of police authority suggested by *Robinson*, but fails to address the limitations on that authority suggested by *Chimel*, *Chadwick* and *Gant*. The shortcomings of its analysis are stark, where the court conceded the nature of modern cell phones as

37

portable computers, and conceded that their nature makes them qualitatively different from physical objects.  Id.  Quoting the Sixth Circuit, it stated: "[a]nalogizing computers to other physical objects when applying Fourth Amendment law is not an exact fit because computers hold so much personal and sensitive information touching on many private aspects of life. . . . [T]here is a far greater potential for the 'intermingling' of documents and a consequent invasion of privacy when police execute a search for evidence on a computer."  Id. (quoting United States v. Lucas, 640 F.3d 168, 178 (6th Cir. 2011)).

Prior cases allowing searches of "containers" in the context of the searches incident to arrest must be distinguished, for the following reasons.  Cellphones are not "containers" within the meaning of these prior cases: they are small computers, capable of storing or providing remote access to vast amounts of private information in digital form.  The privacy interest in these devices is equivalent to the privacy interest in the home, which until quite recently was the only place data of the type and in the quantity found on computers was usually stored.  Analogies comparing these devices to wallets or purses because they may contain some information and are carried on the person are inadequate.   Cell phones are objects which are different in kind, and therefore require different treatment, under the Fourth Amendment.

## II.     THIS COURT'S DECISIONS ANALYZING THE MASSACHUSETTS OFFENSES OF ASSAULT AND BATTERY BY MEANS OF A DANGEROUS WEAPON,

**ASSAULT AND BATTERY ON A POLICE OFFICER, LARCENY FROM THE PERSON, AND RESISTING ARREST ARE AT ODDS WITH THE SUPREME COURT'S DECISIONS IN BEGAY AND JOHNSON AND THIS COURT SHOULD ULTIMATELY CONSIDER EN BANC TO RECONSIDER ITS PRIOR DECISIONS AND REMAND THE CASE TO THE DISTRICT COURT TO SENTENCE MR. WURIE WITHOUT APPLICATION OF THE ACCA**

This Court reviews the interpretation of the ACCA, including the question whether a Massachusetts assault and battery is necessarily a violent felony, *de novo. See United States v. Holloway*, 499 F.3d 114, 118 (1st Cir. 2007).

The ACCA singles out for particularly severe punishment "career offenders-those who commit a large number of fairly serious crimes as their means of livelihood, and who, because they possess weapons, present at least a potential threat of harm to persons." *Taylor v. United States*, 495 U.S. 575, 587-88 (1990). An individual who is convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) is subject to a mandatory minimum fifteen-year sentence if he also has three prior convictions for "serious drug offenses" or "violent felonies" as those terms are defined by 18 U.S.C. § 924(e)(2)(B).

Whether a conviction qualifies as a "crime of violence" is determined categorically, considering the offense's legal definition without regard to defendant's offense conduct. *Taylor*, 495 U.S. at 600. If a statute encompasses multiple offenses, a conviction may not serve as a career-offender predicate unless either (1) all of the possible offenses of conviction are "crimes of violence," or (2) Shepard-approved sources identify the particular offense of conviction as a crime

of violence. *Johnson v. United States*, 130 S.Ct. 1265, 1269 (2010); *Chambers v. United States*, 555 U.S. 122, 128-129 (2009); *Holloway*, 630 F.3d at 256-257. The only information in the record concerning Mr. Wurie's ABDW, resisting-arrest, larceny from the person and ABPO convictions are the PSR's summaries of police reports, which are not *Shepard*-approved sources. *Shepard v. United States*, 544 U.S. 13, 16 (2005). The question is whether all possible ABDW, resisting-arrest, larceny from the person and ABPO offenses are "crimes of violence." *Holloway*, 630 F. 3d at 256-57.

As explained below, while this Court has determined the Massachusetts offenses that were at issue before the district court categorically fall within the category of offenses included in 18 U.S.C. § 924(e)(2)(B), those determinations should be reconsidered.

### A.     Assault and Battery by Mean of a Dangerous Weapon and Assault and Battery on a Police Officer

Prior to *Johnson v. United States*, 130 S. Ct. 1265 (2010), this Court consistently rejected claims that the boilerplate "assault and beat" language set forth in M.G.L. ch. 277, § 79 did not mean that the predicate offense was of the harmful battery type. This Court also consistently rejected claims that because Massachusetts assault and battery, and the other Massachusetts assaultive statutes, could be committed in a reckless fashion, the offenses could not be categorically treated as predicate offenses. See, e.g., *United States v. Glover*, 558 F.3d 71, 80-

81 (1st Cir. 2009)(Massachusetts assault and battery by means of a dangerous weapon is a crime of violence). As this Court recognized in *Holloway*, however, *Johnson* required a departure from this Court's jurisprudence regarding the interplay of Massachusetts assault offenses and the federal analysis of categorical crimes of violence. *Holloway*, 630 F.3d at 259. *Johnson* and *Holloway* support the conclusion that this Court's previous holding that assault and battery by means of a dangerous weapons is categorically a crime of violence is erroneous.

Reversing fourteen years of Circuit precedent, this Court in *Holloway* held that a Massachusetts assault and battery conviction could no longer be used as an ACCA predicate based on the charging language of the complaint alone. "[W]e agree that *Mangos's* rule that the boilerplate charging language of assault and battery alone establishes a violent felony is no longer good law." *Holloway*, 630 F.3d at 254-255. This Court recognized that the Massachusetts crime of assault and battery encompasses three types of battery: harmful battery, offensive battery and reckless battery. Only harmful battery has been recognized as a violent felony under the ACCA. Id. at 254.

This Court first reasoned that under *Johnson*, assault and battery did not qualify under the elements or force clause of the ACCA, 18 U.S.C. § 924(e)(2)(B)(I), because under Massachusetts law the offense could be committed by a slight touching. Id. at 254. Turning to the residual clause, this Court in

41

*Holloway* held that because under Massachusetts law the offense of assault and battery could be accomplished by reckless, rather than intentional, conduct, it did not categorically qualify as a violent felony. The Court in *Holloway* pointed out *Begay's* observation that the enumerated offenses – burglary, arson, extortion, and crimes involving the use of explosives – typically involve purposeful, violent and aggressive conduct.

The reasoning of *Johnson* as applied by this Court in *Holloway* effectively undermines the Court's holding that ABDW is categorically a crime of violence. *See Glover*, 558 F.3d at 80-81. In analyzing the issue under *Begay*, the *Glover* court relied on *Commonwealth v. Ford*, 424 Mass. 709 (1997) to illustrate that Massachusetts assault and battery by means of a dangerous weapon necessarily required purposefulness. Notably, the Supreme Judicial Court's *Ford* decision—the essential underpinning for *Glover*—characterized the reckless form of assault and battery by means of a dangerous weapon as requiring the "intentional commission of a wanton or reckless act . . . causing physical or bodily injury to another" *quoting Commonwealth v. Burno*, 396 Mass. 622 (1986). Holloway, however, implicitly disavowed reliance on an intentional commission of a reckless act to confer categorical crime of violence status:

> [The government] argues that because the reckless battery offense requires the intentional commission of a wanton and reckless act' it is a purposeful offense. But while a defendant convicted of reckless battery may very well have purposefully or deliberately committed

> certain acts, the act for which he was convicted—the battery of
> another—needed to be neither purposeful nor deliberate for
> conviction. *Holloway*, 630 F.3d at 261-62. The import of the First
> Circuit's holding in this regard is manifested by its citation to *Burno*,
> a case that analyzing a conviction for ABDW, for support that intent
> to commit a reckless act was insufficient to confer categorical status.

Id. at 262 & n.7. In short, *Holloway* rejected the view implicit in *Glover*, that an intentional commission of a wanton and reckless act amounts to a purposeful offense. That rejection renders it fundamentally incompatible with *Glover's* unduly crabbed analysis of the Massachusetts assault and battery by means of a dangerous weapon statute.

This Court has held that the Massachusetts assault and battery statute, assault and battery on a police officer ("ABPO"), is categorically a crime of violence. *Dancy*, 640 F.3d at 469. In doing so, *Dancy* distinguished *Holloway* because the additional elements attendant to the crime of ABPO – that the person assaulted must be a police officer, that the officer must be engaged in his or her official duties, and that the defendant know that the victim of the assault is a police officer engaged in performance of his or her duties – served to "differentiate the mental state required for the ABPO crime from those required for simple AB" and "ensure that the conduct criminalized by the ABPO statute is 'purposeful,' which is different from the mental state required by the elements of the simple AB statute." Id. at 468. But ABDW and ABPO are manifestly different crimes:

43

*Holloway* is manifestly irreconcilable with *Glover* and supports the conclusion that the Massachusetts offense of ABDW is not subject to the categorical approach. This Court should ultimately overrule *Glover*, reverse the district court's conclusion that larceny from the person is categorically a crime of violence, and remand the matter to the district court for resentencing.

Mr. Wurie recognizes that *United States v. Dancy*, *surpa*, held that ABPO was a crime of violence under the residual clause. Mr. Wurie maintains that Massachusetts case law contemplates the offense can be committed in a reckless fashion. *See, e.g., Commonwealth v. Correia*, 737 N.E.2d 1264, 1266 (Mass.App.Ct. 2000), and therefore ABPO is not categorically a violent felony for ACCA purposes. The holding *Dancy* should be reconsidered.

**B.     Resisting Arrest**

Massachusetts law defines resisting arrest as (1) "using or threatening to use physical force or violence against the police officer or another"; or (2) "using any other means which creates a substantial risk of causing bodily injury to such police officer or another." M.G.L. c. 268, §32B(a).

Massachusetts courts have held that the resisting arrest statute criminalizes two distinct kinds of conduct. *Commonwealth v. Katykhin*, 59 Mass.App.Ct. 261, 263 (2003)(analyzing prongs one and two separately). *Katykhin* held that prong one does not require "that the Commonwealth show a substantial risk of causing

bodily injury to the police officer or another"; the offense is established where defendant "refused to bend or get into the cruiser," "began to pull away," and started a "tug of war." *Id*.

The prong-two offense is established by arm-stiffening. *Commonwealth v. Grandison*, 433 Mass. 135, 144-145 (2001); *Commonwealth v. Maylott*, 65 Mass.App.Ct. 466, 469-470 (2006). It might also be established by flight on foot. *Commonwealth v. Montoya*, 457 Mass. 102, 104 (2010).

As the government did not produce *Shepard*-approved proof of a prong-one offense, Mr. Wurie's resisting-arrest conviction cannot be a crime of violence under ACCA's force clause. Since resisting arrest is not an enumerated felony under 18 U.S.C. § 924(e)(2)(B)(ii)'s residual clause, the question is whether "using any other means which creates a substantial risk of causing bodily injury to the police officer or another" under prong two of the Massachusetts statute "involves conduct that presents a serious potential risk of physical injury to another" for purposes of ACCA's residual clause. It does not.

In *Begay*, the Supreme Court explained that the ACCA did not cover every offense presenting a serious risk of physical injury to another, only those crimes similar to the enumerated offenses (burglary, arson, extortion, or offenses involving explosives). An offense is similar in kind to the enumerated offenses if it involves "purposeful, violent, and aggressive conduct." 553 U.S. at 145.

The Supreme Court's *Chambers* decision rejected the view that all escape-like crimes are violent felonies under the ACCA. *Id*. at 126-28. Prong two of resisting arrest does not require that defendant act with "violent force" "capable of causing physical pain or injury to another person." *Johnson*, 130 S.Ct. at 1271. Prong-two Massachusetts resisting arrest is not similar in kind to the offenses enumerated in the residual clause, as *Begay* requires.

The prong-two offense is more accurately described as evasive conduct. *Chambers*, 555 U.S. at 128-129 (Illinois failure-to-report provision does not qualify under ACCA residual clause, as provision criminalizes what "amounts to a form of inaction, a far cry from the 'purposeful,' 'violent,' and 'aggressive' conduct potentially at issue" in enumerated felonies). An officer's possible reaction to such conduct should not be deemed to transform essentially evasive conduct into aggressive and violent conduct, particularly since the Massachusetts statute does not require that defendant's conduct incite such a response.

*Sykes v. United States*, 131 S.Ct. 2267 (2011), does not require a different result. There, the Court held that intentional vehicular flight from an officer under Indiana law is a violent felony under the ACCA residual clause, stating that "[r]isk of violence is inherent to vehicle flight." Id. at 2274.

Mr. Wurie recognizes that this Court has previously rejected his argument and has affirmed that resisting arrest is categorically a crime of violence. *United*

46

*States v. Weekes*, 611 F.3d 68 (1st Cir. 2010); *Almenas*, 553 F.3d 27.  Mr. Wurie

submits that *Almenas* and later *Weekes* were erroneously decided.  *Almenas*

rested, in part, upon the fact that Massachusetts appellate courts have defined such

conduct as arm-stiffening "to create a substantial risk of injury to another."  553

F.3d at 35 (*citing Grandison*, 433 Mass. at 144-145; *Maylott*, 65 Mass. App. Ct. at

469-470).  But for purposes of defining the elements of the ACCA that

determination is a question of federal law.  *See Johnson*, 130 S.Ct. at 1269 ("[t]he

meaning of 'physical force' in §924(e)(2)(B)(I) is a question of federal law, not

state law.  And in answering that question we are not bound by a state court's

interpretation of a similar—or even identical—state statute.").

In discussing the fact that resisting arrest may be accomplished by flight,

conduct it conceded "is neither aggressive nor violent," *Almenas* held that "the

focus is on the mine-run of conduct which falls within the heartland of the

statute."  553 F.3d at 35 n.9 (internal quotation marks and citation omitted).

However, Almenas did not define either the mine-run of conduct, or a

methodology for establishing that mine-run.

Consequently, this Court should ultimately hold that prong-two

Massachusetts resisting arrest does not categorically present a substantial risk of

physical injury as a matter of federal law.  *Almenas* and *Weekes* should be

reconsidered.

47

### C.    Larceny From the Person

The Massachusetts offense of larceny from a person in violation of M.G.L. c. 266, § 25(b) does not, by either its elements or its definition, fall within the category of offenses included in 18 U.S.C. § 924(e)(2)(B).  As this Court has previously recognized, the statute does not fall within 18 U.S.C. § 924(e)(2)(B)(I) because it does not include as an element the use, attempted use, or threatened use of physical force against the person of another.  *DeJesus*, 984 F.2d at 24.  In viewing whether the crime of larceny from a person is encompassed by the residual clause of 18 U.S.C. § 924(e)(2)(B)(ii), the Court must look to the Massachusetts state court interpretation of the violation of state law for the elements of the state offense. *See Johnson*, 130 S.Ct. at 1269.

Massachusetts defines the offense of larceny from the person as "stealing from the person of another."  M.G.L. c. 266, § 25(b).  In order to prove that an individual committed the crime of larceny from a person, the Commonwealth must prove four elements: (1) that the defendant took and carried away property; (2) that the property was owned or possessed by someone other than the defendant; (3) that the defendant took the property from someone who owned or possessed it or from such a person's area of control; and (4) that the defendant did so with the intent to deprive that person of the property permanently.  Model Jury Instruction for Use in the District Courts 8.560 (A.4); *see Commonwealth v. Subilosky*, 352 Mass. 153,

166 (1967).  Thus, there is no requirement under the Massachusetts statute that the item taken be in contact with the victim or that it be in contact with some other article that is in contact with the victim.  Therefore, there is nothing inherent in the larceny from a person statute that would suggest that there is a risk of a violent struggle when the object is taken from the person.   Indeed, the unarguably nonviolent offenses of pick-pocketing and purse snatching are paradigmatic examples of larceny from the person offenses.  Massachusetts courts have said that "pickpocketing characteristically involves stealth and a lack of awareness of the taking by the victim." *Commonwealth v. Davis*, 7 Mass.App.Ct. 9, 11 (1979).  In the context of purse snatching, the Massachusetts courts take a minority position on the minimal amount of force required to convert a larceny into the more serious offense of robbery.  Where the "actual force used is sufficient to produce awareness . . . the requisite degree of force is present to make the crime robbery" rather than larceny. *Commonwealth v. Jones*, 362 Mass. 83, 89 (1972).  Force so minimal that a victim is unaware of it cannot sensibly be deemed "violent."  These methods of commission encompassed by the larceny from a person statute are a far cry from the type of aggressive offenses that tend to "show an increased likelihood that the offender is the kind of person who might deliberately point the gun and pull the trigger" that were contemplated by the Legislature in enacting the ACCA. *Begay*, 553 at 146.

Thus, the district court erred in finding that the defendant's conviction for the crime of larceny from a person qualified as a predicate offense that required the imposition of a fifteen-year mandatory minimum sentence pursuant to the ACCA because it is not similar in kind or in the degree of risk posed to the enumerated offenses in 18 U.S.C. § 924(e)(2)(B)(ii). See *Begay*, 553 at 143. As the Supreme Court clearly states, not "every crime that 'presents a serious potential risk of physical injury to another'" is encompassed by the residual clause of 18 U.S.C. § 924(e)(2)(B)(ii). Id. at 142 (emphasis in original).

This Court recently rejected Mr. Wurie's argument and ruled that larceny from the person is categorically a crime of violence and reaffirmed its prior holding in *DeJesus*. *United States v. Rodriguez*, 659 F.3d 117 (1st Cir. 2011). Mr. Wurie respectfully submits that Rodriguez was erroneously decided. Relying on *Sykes*, 131 S.Ct. 2267, *Rodriguez* concluded that potential risk is the touchstone of the crime of violence analysis, and that purposeful commission of even the most nonviolent form of larceny from the person qualified because, inter alia, a victim "not aware at the moment of the taking could quickly become aware and an altercation follow." Id. at 120.

Sykes, however, actually supports the conclusion that Massachusetts larceny from the person is not a crime of violence. In finding the Indiana vehicular flight from a law enforcement officer to be a violent felony, the Court emphasized

features of the offense that are of necessity present - defiant flight in a vehicle from police attempting to stop the offender. *Id.* at 2273. *Sykes* likened the force used in the offense to that of arson, saying that arson "also entails intentional release of a destructive force dangerous to others." Id. In contrast, the Massachusetts larceny from the person offense involves no police, and typically or necessarily involves force so minimal - the paradigmatic pickpocketing or purse-snatching - that the victim is unaware of the taking at the time.

Finally, *Sykes* emphasized the importance of comparing the degree of risk of unenumerated offenses to that present in the examples of burglary, arson, or extortion, and use of explosives themselves. *Id*. at 2275 (generally levels of risks divide crimes that qualify as violent felonies from those that do not). This Court applied *Sykes's* direction by the dubious proposition that "[t]reating Massachusetts larceny as a category, the potential for violence is no less than burglary and arguably more." *Rodriguez*, 659 F.3d at 120. In so doing, this Court overstated the lack of violence that characterizes the ordinary, nonviolent larceny from a person scenario.

In sum, a conviction of larceny from a person as defined by Massachusetts law is not uniformly marked by the "purposeful, 'violent,' and 'aggressive' conduct" that is "characteristic of the armed career criminal" that would be necessary to bring it within the purview of the ACCA as a predicate offense. See

51

*Begay*, 553 U.S. at 144-45.  This Court should ultimately reconsider *Rodriguez*,

reverse the district court's conclusion that larceny from the person is categorically

a crime of violence, and remand the matter to the district court for resentencing.

## **CONCLUSION**

For the foregoing reasons, the judgment of the district court should be

vacated and the case should be remanded.

Respectfully submitted,

BRIMA WURIE,
by his attorney,

/s/ Ian Gold
Ian Gold
BBO No. 665948
Court of Appeals No. 82686
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
IAN_GOLD@FD.ORG

## <u>CERTIFICATE  OF  COMPLIANCE</u>

I, Ian Gold, certify Pursuant to Fed. R. App. P. 32(a)(7)(C) that this brief

contains 11, 996 words (excluding those parts exempted by Fed. R. App. P.

32(a)(7)(B)(iii)), as counted by the Microsoft Word system used to prepare the

brief.

/s/ Ian Gold

## <u>CERTIFICATE OF SERVICE</u>

I, Ian Gold, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, including counsel of record Jonathan Wortmann and Dina Chaitowitz, as identified on the Notice of Electronic Filing on May 22, 2012.

/s/ Ian Gold

**ADDENDUM**

<u>ADDENDUM</u>
<u>TABLE OF CONTENTS</u>

Memorandum and Order on Defendant's Motion to
Suppress Evidence, dated May 4, 2009 .......................................................... Add. 1

Judgment, dated June 30, 2011 ........................................................................ Add. 14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 08-10071-RGS

UNITED STATES OF AMERICA

v.

BRIMA WURIE

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

May 4, 2009

STEARNS, D.J.

On March 27, 2008, a Grand Jury returned a three-count Indictment against Brima Wurie charging him with: (i) felony possession of a firearm and ammunition; (ii) distribution of cocaine base (crack cocaine) within 1000 feet of a school; and (iii) possession of crack cocaine with intent to distribute. Wurie was arrested on September 5, 2007, on suspicion of selling a small quantity of drugs. He was transported to the Area C-6 station in South Boston. There, his personal property was inventoried. Information gleaned from one of Wurie's cell phones led officers to his apartment. Pursuant to a warrant, police seized 215 grams of crack cocaine and a loaded firearm from Wurie's apartment.

Wurie moves to suppress the evidence seized from his person incident to his arrest and later from his apartment, arguing that "police violated his constitutional rights as guaranteed to him by the Fourth, Sixth and Fourteenth Amendments," that the "stop and seizure were conducted without probable cause, without consent, without a properly issued search warrant, and without any other legal justification . . . [and, that] the seizure of his

personal belongings and later use by the police of his phone and keys were done in violation" of these same rights.[1]  The court heard argument on the motion on January 20, 2009.  At the conclusion of the hearing, the court granted Wurie leave to file a supplemental brief, but none has been forthcoming.

## BACKGROUND

As there are no disputed material facts, the court will rely on the factual recitations in the warrant affidavit and the parties' pleadings.[2]  Sergeant Detective Paul Murphy is a twenty-two year police veteran and the supervisor of the Area C-6 Drug Control Unit.  On September 5, 2007, shortly before 6:45 p.m., while patrolling in an unmarked vehicle, Murphy observed a man (later identified as Fred Wade), talking on a cell phone in the parking lot of a Lil Peach convenience store on Dorchester Avenue.  Wade was intently watching passing traffic.  A few minutes later, Murphy saw a white 2007 Nissan Altima sedan turn into the parking lot.  Wade got into the front passenger seat.  The only other occupant of the car was the driver (later identified as Wurie).  Wurie drove from the lot, turning left onto Dorchester Avenue in the direction of D Street.  Murphy followed.  Wurie

---

[1]The court will limit its discussion to Wurie's Fourth Amendment claim.  The protections of the Sixth Amendment apply to a defendant only *after* indictment.  Kirby v. Illinois, 406 U.S. 682, 688-689 (1972).  The reference to the Fourteenth Amendment is difficult to fathom.  The Fourth Amendment provides Wurie with an "explicit textual source of constitutional protection" against any unlawful police intrusion on his right of privacy.  Consequently, any Fourteenth Amendment claim is superfluous.  See Graham v. Connor, 490 U.S. 386, 395 (1989).

[2]The only relevant issue with respect to the seizure of the cocaine and firearm as will be seen is one of law, specifically, the propriety of the officers' warrantless examination of the call log of Wurie's cell phone.  But for the possible taint, the warrant affidavit fully satisfies the probable cause requirement of the Fourth Amendment.

2

drove approximately one hundred and fifty yards, made a U-turn, and returned to the Lil Peach.  Wade left the car and entered the Lil Peach.  Wurie then drove away.

Believing that he had witnessed a drug transaction,[3] Murphy broadcast the make, model, and license plate number of Wurie's car.  Accompanied by Officer Christopher Boyle, Murphy entered the Lil Peach and confronted Wade.  Two plastic bags, each containing an 8-ball (3.5 grams) of crack cocaine, were seized from Wade's left front pocket.  Wade stated that he had purchased the cocaine from "B."  He also told the officers that "B" lived in South Boston and sold crack cocaine in quantities no smaller than an 8-ball.

Officer Steven Smigliani, having heard Murphy's broadcast, spotted and followed the Altima.[4]  Murphy radioed Smigliani and told him what Wade had said.  Officer Smigliani waited for Wurie to park and exit his car.  He then arrested him for distributing cocaine.  Wurie was taken to the Area C-6 police station.  Police seized two cell phones, a key ring with keys, and $1,275 in cash from Wurie's person.

Approximately 5 to 10 minutes after Wurie was brought to the station, Officers Kevin Jones and Robert England, members of the C-6 Drug Control Unit, examined one of the cell phones seized from Wurie.  They observed numerous calls logged on the caller ID screen from "my house."  When the phone rang, the officers flipped it open, activating the

---

[3]According to Murphy, a popular method of selling drugs in South Boston is by car delivery, where the parties negotiate a price for the drugs over the phone, the buyer proceeds to an agreed-upon location, the dealer arrives in a car, and the parties consummate the sale in the car.  While completing the deal, the parties often drive a short distance to avoid police surveillance.

[4]The Altima had been rented earlier by Wurie.

backlight.  They observed a "wallpaper" photo of a young black female holding a baby.
They also saw that the "my house" calls originated from "617-315-7384."  Officer Jones,
using a police computer, typed the number into the website "AnyWho" (www.anywho.com).
The number was listed to "Manny Cristal" at 315 Silver Street in Boston.  The officers did
not answer the call or access any other information stored in the phone.

After Murphy gave Wurie a second set of <u>Miranda</u> warnings,[5] Wurie stated that he
lived at 51 Speedwell Street in Dorchester and that he was in South Boston "cruising
around."  He denied stopping in the Lil Peach parking lot, denied giving anyone a ride,
denied speaking with anyone in South Boston that day, and denied selling cocaine.  Based
on the large amount of cash Wurie was carrying, his two cell phones, the rented car, the
drugs found on Wade, and Wade's description of "B's" mode of drug dealing, Murphy
suspected that Wurie was selling 8-balls (a fairly large street-level quantity of crack) out
of a hidden mother cache.[6]  Murphy also believed that Wurie was lying about living in
Dorchester and that his true address was 315 Silver Street in South Boston.

Murphy and other Drug Control Unit officers proceeded to 315 Silver Street with the
key ring seized from Wurie.  There, they found three mailboxes outside the apartment
building's front door, one of which had the names "Cristal" and "Wurie" written on it.  The
lights in the first floor apartment were on.  Through the window, Murphy saw a young black
woman talking on the phone.  She appeared to be the same woman that Jones and

---

[5]Officer Smigliani had administered <u>Miranda</u> warnings to Wurie upon his arrest.

[6]According to Murphy, a telltale characteristic of a drug dealer is the use of two cell
phones – one for arranging drug deals and another for personal use, and the use of rental
cars to conduct business (to avoid forfeiture of their personal vehicles if caught).

4

England had observed in the cell phone's wallpaper photo.  Murphy used Wurie's keys to unlock the door to the front entrance of 315 Silver Street.  In the common hallway, one door led to a first floor apartment, another to an apartment on the second floor.  Murphy tried to unlock the door to the second floor apartment, using all of the keys on Wurie's key ring, but none worked.  He then tried the keys in the first floor apartment door.  One key unlocked the door.  Without opening the door, Murphy removed the key from the lock and knocked.  A young woman (later identified as Yolanda Walker), answered the door.  Murphy identified himself as a Boston Police officer and asked Walker to step into the hallway.  He could smell the distinct odor of burnt marijuana emanating from inside the apartment.  Walker told Murphy that she knew Wurie and that he occasionally stayed at the apartment.  She also admitted that he had been in the apartment the night before and earlier that day.  The officers then entered the apartment to "freeze" it while they obtained a search warrant.  Inside the apartment, the officers found a sleeping child who resembled the infant pictured on the cell phone's wallpaper.  When Murphy returned to the station to prepare the warrant affidavit, he asked Wurie why his keys opened the door to the first floor apartment of 315 Silver Street.  Wurie replied, "I don't know."

After obtaining and executing a search warrant, officers recovered from the master bedroom of the apartment 215 grams of crack cocaine, a Smith & Wesson .9 millimeter firearm loaded with five rounds of ammunition, six loose rounds of .40 caliber hollow point ammunition, four plastic bags of marijuana, photographs of Wurie and Walker and other

5

personal papers, drug paraphernalia, and $250 in cash.[7]

DISCUSSION

Probable Cause to Arrest

An arrest must be supported by probable cause for a search to be lawful. Beck v. Ohio, 379 U.S. 89, 91 (1964). "Probable cause" is a far less exacting standard than any test implying a degree of relative certainty, or even a "more likely than not" view of the facts. See United States v. Melvin, 596 F.2d 492, 495 (1st Cir. 1979). "[P]robable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense." Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992). Probable cause may be based on credible hearsay information that would not itself be admissible at trial. Draper v. United States, 358 U.S. 307, 311-312 (1959). "When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed." Beck, 379 U.S. at 96. In making this assessment, a court will be guided by the collective knowledge or "fellow officer" rule, that is, where police are engaged in a collaborative effort, the knowledge of each officer may be "pooled" in establishing probable cause. United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002). Finally, a court may consider an officer's training and experience in assessing probable cause. Conduct that

---

[7]The Bureau of Alcohol, Tobacco, Firearms and Explosives determined that the .9 millimeter firearm was stolen on April 5, 2005, during a burglary in Columbus, Georgia.

6

might be perceived as innocent by a casual onlooker may in the totality of the circumstances appear suspicious to a trained officer.  United States v. Arzivu, 534 U.S. 266, 273 (2002).

Based on his experience, his knowledge of the methods used by drug dealers, and his observations of the interaction between Ward and Wurie, Murphy reasonably believed that he had witnessed a drug transaction on September 5, 2007.  See United States v. Sokolow. 490 U.S. 1, 9 (1989).  When Ward admitted purchasing the crack cocaine found on his person from someone who could only have been Wurie, Murphy had probable cause to instruct Officer Smigliani to place Wurie under arrest.  See United States v. Harris, 403 U.S. 573, 583 (1971) (an informant's admissions of his own criminal involvement - his "declarations against penal interest" - carry their own inherent indicia of credibility).

The Seizure of Wurie's Keys and Cell Phones

"If an arrest is lawful, the arresting officers are entitled to search the individual apprehended pursuant to that arrest.  The permissible purposes of such a search include preservation of evidence . . . and seizure of destructible contraband."  United States v. Uricoechea-Casallas, 946 F.2d 162, 165 (1st Cir. 1991) (internal citations omitted).  A full search of the person, his effects, and the area within his immediate reach at the time of a lawful custodial arrest may be conducted without regard to any exigency or the seriousness of the offense, and regardless of any probability that the search will yield a weapon or evidence of the crime for which the person is arrested.  United States v. Robinson, 414 U.S. 218, 236 (1973).

7

The holding of United States v. Edwards, 415 U.S. 800, 803 (1974), that "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention," is extended by Illinois v. Lafayette, 462 U.S. 640 (1983), to a booking search, although on a theory of a search incident to custody. "[I]t is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any *container* or article in his possession, in accordance with established inventory procedures." Id. at 648 (emphasis added). Thus, it is irrelevant whether the keys and cell phones were taken from Wurie by Officer Smigliani immediately upon Wurie's arrest or were seized from his person at the booking (the record is not entirely clear on this point).

The "Search" of the Cell Phone

Neither the Supreme Court nor the First Circuit has directly considered the issue of whether a search incident to arrest may include a search of a cell phone's contents, and if it does, how thorough the search might be.[8]  It seems indisputable that a person has a subjective expectation of privacy in the contents of his or her cell phone. See, e.g., United States v. Finley, 477 F.3d 250, 259-260 (5th Cir. 2007) (defendant had a sufficient privacy

_____

[8]The issue is whether Officers Jones and England were entitled to look at the call log on Wurie's cell phone without a warrant.  No cognizable issue would be raised if the officers in fact examined Wurie's phone after it had been inventoried (again the record is not clear).  The prevailing rule does not bar police from taking a "second evidentiary look" at inventoried personal property whether in connection with the crime of arrest or an unrelated crime; United States v. Johnson, 820 F.2d 1065, 1072 (9th Cir. 1987); United States v. Jenkins, 496 F.2d 57, 73-74 (2d Cir. 1974); Wayne R. LaFave, 3 Search and Seizure, § 5.3(b) (4th ed. 2004).  See also United States v. Grill, 484 F.2d 990, 991 (5th Cir. 1973) (key found on arrestee's person and placed with inventoried property later retrieved and used to open the lock on a duffle bag; reasonable grounds to believe that the key would connect the defendant with the incriminating bag).

interest in his cell phone's call records and text messages to challenge their search; the search of the stored text messages, however, was permissible as incident to a valid arrest).  Decisions of district courts and Courts of Appeals (often analogizing cell phones to the earlier pager technology) trend heavily in favor of finding that the search incident to arrest or exigent circumstances exceptions apply to searches of the contents of cell phones.  See United States v. Mercado-Nava, 486 F. Supp. 2d 1271, 1277 (D. Kan. 2007) (the same exceptions apply to warrantless searches of cell phones under the Electronic Communications Privacy Act as any other warrantless search.); United States v. Deans, 549 F. Supp. 2d 1085, 1094 (D. Minn. 2008) (agreeing with the Fifth Circuit that, "if a cell phone is lawfully seized, officers may also search any data electronically stored in the device.");  United States v. Valdez, 2008 WL 360548, at *3 (E.D. Wis. Feb. 8, 2008) (search of defendant's phone was contemporaneous with his arrest and the officer was reasonably concerned that if he delayed, the information on the phone would be lost); United States v. Lottie, 2008 WL 150046, at *3 (N.D. Ind. Jan. 14, 2008) (warrantless search of a cell phone justified by exigent circumstances);  United States v. Dennis, 2007 WL 3400500, at *7 (E.D. Ky. Nov. 13, 2007) (search of a cell phone incident to valid arrest no different from the search of any other type of evidence seized incident to arrest); United States v. Parada, 289 F. Supp. 2d 1291, 1304 (D. Kan. 2003) (phone seized incident to valid arrest; exigent circumstances justified accessing cell phone's call records because continuing incoming calls would overwrite memory and destroy evidence); Cf. United States v. Morales-Ortiz, 376 F. Supp. 2d 1131 (D.N.M. 2004) (otherwise unlawful search of cell phone's memory for names and numbers was justified under the inevitable

9

discovery doctrine); <u>United States v. James</u>, 2008 WL 1925032 (E.D. Mo. April 29, 2008)

("[T]he automobile exception allows the search of the cell phone just as it allows a search

of other closed containers found in vehicles.").[9]  <u>See also</u> <u>United States v. Reyes</u>, 922 F.

Supp. 818, 834 (S.D.N.Y. 1996) (warrantless searches of the stored memory of two pagers

justified (i) as incident to arrest and (ii) by general consent);   <u>United States v. Chan</u>, 830

F. Supp. 531, 535-536 (N.D. Cal. 1993) (warrantless search of pager memory comparable

to a search of container contents; search was not so remote in time to invalidate it as a

search incident to arrest); <u>United States v. Diaz-Lizaraza</u>, 981 F.2d 1216, 1223 (11th Cir.

1993) (agents reasonably activated defendant's pager to confirm its number).  <u>Cf.</u> <u>United

States v. Thomas</u>, 114 F.3d 403, 404 n.2 (3d Cir. 1997) (noting in dicta that the retrieval

of a phone number from a pager found on defendant was a valid search incident to arrest).

      The search of Wurie's cell phone incident to his arrest was limited and reasonable.

The officers, having seen the "my house" notation on Wurie's caller identification screen,

reasonably believed that the stored phone number would lead them to the location of

---

[9]<u>But</u> <u>see</u>  <u>United States v. Wall</u>, 2008 WL 5381412, at *3-4 (S.D. Fla. Dec. 22, 2008)
(declining to follow <u>Finley</u>; exigent circumstances might justify a warrantless search of a
cell phone; but declining to allow a search of arrestee's cell phone incident to arrest;
likening information stored in cell phone to a sealed letter);  <u>United States v. Quintana</u>, 594
F. Supp. 2d 1291, 1299 (M.D. Fla. Jan 20, 2009) (officers may be justified in searching the
contents of a cell phone for evidence related to the crime of arrest, but "[w]hether a cell
phone may be searched incident to an arrest to prevent the destruction or concealment of
evidence of another crime is a different issue.");  <u>United States v. Park</u>, 2007 WL 1521573,
at *9 (N.D. Cal. May 23, 2007) (based on "the quantity and quality of information that can
be stored" a cell phone "should not be characterized as an element of an individual's
clothing or person [subject to search incident to arrest], but rather as a 'possession within
an arrestee's immediate control that has fourth amendment protection at the station
house.'").

10

Wurie's suspected drug stash.  See United States v. Sheehan, 583 F.2d 30, 32 (1st Cir.

1978) (copying the names and telephone numbers from a list found in arrestee's wallet

was proper under United States v. Edwards, as "it would seem to be equally respectable

police work to assume that checking out known associates of a suspect in a bank robbery

committed by several people might yield helpful information.").  Id.  I see no principled

basis for distinguishing a warrantless search of a cell phone from the search of other types

of personal containers found on a defendant's person that fall within the Edwards-

Lafayette exceptions to the Fourth Amendment's reasonableness requirements.  See e.g.

United States v. Rodriguez, 995 F.2d 776, 778 (7th Cir. 1993) (contents of an address

book in arrestee's wallet); United States v. Rust, 650 F.2d 927, 928 (8th Cir. 1981) (per

curiam) (arrestee's pockets); United States v. Garcia, 605 F.2d 349, 355 (7th Cir. 1979)

(hand-held luggage); United States v. Castro, 596 F.2d 674, 677 (5th Cir. 1979) (man's

wallet); United States v. Moreno, 569 F.2d 1049, 1052 (9th Cir. 1978) (woman's purse).

Briefly addressing the remaining issues, I see nothing unlawful in the use of Wurie's

key to enter the common hallway of the apartment building at 315 Silver Street;[10] the

insertion of Wurie's key in the lock of the apartment door to determine whether it fit,[11] or

[10]See United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998) ("It is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building.").

[11]See United States v. DeBardeleben, 740 F.2d 440, 445 (6th Cir. 1984) (insertion of keys in automobile locks to determine ownership did not infringe any significant Fourth Amendment interest); United States v. $109,179 in U.S. Currency, 228 F.3d 1080, 1087-1088 (9th Cir. 2000) (same); United States v. Lyons, 898 F.2d 210, 212-213 (1st Cir. 1990) (same, padlock on storage locker); Commonwealth v. Alvarez, 422 Mass. 198, 209-210

11

**ADD.**            **11**

the "freezing" of the apartment to maintain the status quo while police obtained a warrant.[12]

ORDER

For the foregoing reasons, Wurie's motion to suppress is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

_____

(1996) (exterior door lock of an apartment ); <u>Commonwealth v. DeJesus</u>, 439 Mass. 616, 627 n.10 (2003) (same); <u>State v. Church</u>, 430 S.E.2d 462, 466 (N.C. App. 1993) (garage door).

[12]Having smelled the odor of burnt marijuana, the officers had probable cause to believe that drugs were present. "The case law is consentient that when a law enforcement officer detects the odor of marijuana emanating from a confined area . . . that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area." <u>United States v. Staula</u>, 80 F.3d 596, 602 (1st Cir. 1996). It was also reasonable for their safety to enter and secure the apartment while they (commendably) waited for a warrant to arrive. "Securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of the dwelling or its contents." <u>Commonwealth v. Blake</u>, 413 Mass. 823, 829 (1992) (citing <u>Segura v. United States</u>, 468 U.S. 796, 810 (1984)). <u>See</u> also <u>Illinois v. McArthur</u>, 531 U.S. 326, 333-334 (2001). I do not, on the other hand, agree with the government that the entry of the apartment can be justified as a "protective sweep." <u>See</u> <u>United States v. Martins</u>, 413 F.3d 139, 149 (1st Cir. 2005). "The baseline rule is that police officers, in conjunction with an arrest on residential premises, may undertake a protective sweep so long as they can point to 'articulable facts which, taken together with the rational inferences from those facts,' would warrant a reasonably prudent officer in believing 'that the area harbor[s] an individual posing a danger.'" <u>Id.</u> (quoting <u>Maryland v. Buie</u>, 494 U.S. 325, 327 (1990) (emphasis added)). "[T]he key is the reasonableness of the belief that the officers' safety or the safety of others may be at risk." <u>Martins</u>, 413 F.3d at 150. A protective search "may extend only to a cursory inspection of those spaces where a person may be found," and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." <u>Id.</u>, at 335-336. The officers had no reasonable basis to believe that Walker or her infant child posed any danger to the officers' safety (as opposed to the possible destruction of evidence).

12

13

✎AO 245B(05-MA)     (Rev. 06/05) Judgment in a Criminal Case
Sheet 1 - D. Massachusetts - 10/05

# UNITED STATES DISTRICT COURT
## District of Massachusetts

UNITED STATES OF AMERICA
### V.
### Brima Wurie

**JUDGMENT IN A CRIMINAL CASE**

Case Number: **1: 08 CR 10071   - 001 - RGS**

USM Number: 24753-038

Ian Gold

Defendant's Attorney

☐ Additional documents attached

☐
## THE DEFENDANT:
☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)   1, 2, and 3 of Indictment
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:        Additional Counts - See continuation page ☐

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 922(g)(1) | Felon in Possession of Firearm and Ammunition | 09/05/07 | 1 |
| 21 USC § 841(a)(1) | Distribution of Cocaine Base/Distribution of Cocaine Base within 1000 Feet of a School | 09/05/07 | 2 |
| 21 USC § 841(a)(1) | Possession with Intent to Distribute Cocaine Base | 09/05/07 | 3 |

The defendant is sentenced as provided in pages 2 through ___10___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

06/29/11
Date of Imposition of Judgment

Signature of Judge

The Honorable Richard G. Stearns

Judge, U.S. District Court

Name and Title of Judge

6-30-11.

Date

**ADD.**                    **14**

🔎AO 245B(05-MA)     (Rev. 06/05) Judgment in a Criminal Case
                    Sheet 2 - D. Massachusetts - 10/05

DEFENDANT:  **Brima Wurie**                    Judgment — Page ___2___ of ___10___
CASE NUMBER: **1: 08 CR  10071    - 001  - RGS**

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a
total term of:          262        month(s)

as to Counts 1 and 3 and 240 months on Count 2, to be served concurrently.

[✓] The court makes the following recommendations to the Bureau of Prisons:

The defendant participate in all available substance abuse treatment, including, the 500-Hour Residential
Drug Abuse Program. The defendant participate in anger management counseling.

[✓] The defendant is remanded to the custody of the United States Marshal.

[ ] The defendant shall surrender to the United States Marshal for this district:

[ ] at _____ ☐ a.m.    ☐ p.m.    on _____ .

[ ] as notified by the United States Marshal.

[ ] The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

[ ] before 2 p.m. on _____ .

[ ] as notified by the United States Marshal.

[ ] as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____  to _____

a_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**ADD.**          **15**

✎AO 245B(05-MA) (Rev. 06/05) Judgment in a Criminal Case
     Sheet 3 - D. Massachusetts - 10/05

Judgment—Page 3 of 10

DEFENDANT: **Brima Wurie**
CASE NUMBER: **1: 08 CR 10071  - 001 - RGS**

## SUPERVISED RELEASE

☑ See continuation page

Upon release from imprisonment, the defendant shall be on supervised release for a term of :  60 month(s)

on each count, to be served concurrently.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed  104  tests per year, as directed by the probation officer.

☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☑ The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

**ADD.**   **16**

AO 245B(05-MA)     (Rev. 06/05) Judgment in a Criminal Case
Sheet 4A - Continuation Page - Supervised Release/Probation -10/05

DEFENDANT:     **Brima Wurie**

CASE NUMBER:  **1: 08  CR  10071   - 001  - RGS**

Judgment—Page ___4___ of ___10___

## ADDITIONAL☐ SUPERVISED RELEASE☐PROBATION TERMS

## Continuation of Conditions of ☑Supervised Release ☐ Probation

1. The defendant is to participate in a program for substance abuse counseling as directed by the U. S. Probation Office, which program may include testing, not to exceed 104 drug tests per year, to determine whether the defendant has reverted to the use of alcohol or drugs.  The defendant shall be required to contribute to the costs of services for such treatment based on the ability to pay or availability of third- party payment.

2. The defendant is to participate in an anger management treatment program as directed by the U. S. Probation Office. The defendant shall be required to contribute to the costs of services for such treatment based on the ability to pay or availability of third-party payment.

AO 245B(05-MA)    (Rev. 06/05) Judgment in a Criminal Case
                  Sheet 5 - D. Massachusetts - 10/05

DEFENDANT: **Brima Wurie**                                   Judgment — Page ___5___ of ___10___
CASE NUMBER: **1: 08 CR 10071  - 001  - RGS**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $ \$300.00 | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

☐ See Continuation Page

| **TOTALS** | $ ____\$0.00____ | $ ____\$0.00____ | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the  ☐ fine  ☐ restitution.

☐ the interest requirement for the  ☐ fine  ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**ADD.**                              **18**

AO 245B(05-MA)     (Rev. 06/05) Judgment in a Criminal Case
                   Sheet 6 - D. Massachusetts - 10/05

DEFENDANT:    **Brima Wurie**                                    Judgment — Page ___6___ of ___10___
CASE NUMBER: **1: 08 CR 10071   - 001 - RGS**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A** ☒ Lump sum payment of $ ___$300.00___ _____ due immediately, balance due

       ☐ not later than _____ , or
       ☐ in accordance ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several                                           ☐ See Continuation
                                                                    Page

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

**ADD.**                    **19**