No. 11-1792

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

————————

UNITED STATES OF AMERICA,
APPELLEE

v.

BRIMA WURIE,
DEFENDANT-APPELLANT

————————

ON APPEAL FROM A JUDGMENT IN A CRIMINAL CASE,
ENTERED IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

————————

GOVERNMENT'S PETITION FOR REHEARING EN BANC

————————

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

MICHAEL R. DREEBEN                   KELLY BEGG LAWRENCE
DEPUTY SOLICITOR GENERAL             ASSISTANT U.S. ATTORNEY
U.S. DEPARTMENT OF JUSTICE           JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
950 PENNSYLVANIA AVENUE              1 COURTHOUSE WAY
WASHINGTON, D.C. 20530               SUITE 9200
                                     BOSTON, MASSACHUSETTS 02210
                                     (617) 748-3162

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .......................................................................... ii

RULE 35(b)(1) STATEMENT ....................................................................1

STATEMENT OF THE CASE.....................................................................1

REASONS FOR GRANTING THE PETITION ...........................................6

A.    The Majority Decision Conflicts with Decisions of the Supreme Court Governing Searches of Items Seized from the Arrestee's Person .....................................................................................................8

B.    This Case Involves a Question of Exceptional Importance Because the Panel Decision Creates a Conflict With Other Circuits and The Highest Court of Massachusetts and Will Impede Numerous Investigations and Prosecutions.................................13

CONCLUSION ........................................................................................15

CERTIFICATE OF COMPLIANCE..........................................................16

CERTIFICATE OF SERVICE ..................................................................17

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Arizona v. Gant*,
556 U.S. 332 (2009) ................................................................7, 12

*Chimel v. California*,
  395 U.S. 752 (1969) ...............................................................4

*Commonwealth v. Berry*,
  463 Mass. 800, 979 N.E.2d 218 (2012).............................1, 14

*Commonwealth v. Phifer*,
  463 Mass. 790, 979 N.E.2d 210 (2012)..............................1, 14

*Hawkins v. State*,
  290 Ga. 785, 723 S.E.2d 924 (2012) ......................................14

*Maryland v. King*,
  133 S. Ct. 1958 (2013) ......................................... 5, 7, 9, 11-12

*People v. Diaz*,
  51 Cal. 4th 84, 244 P.3d 501,
  *cert. denied*, 132 S. Ct. 94 (2011)...........................................14

*Smallwood v. State*,
  38 Fla. L. Weekly S271, 113 So. 3d 724 (2013)....................14

*State v. Smith*,
  124 Ohio St. 3d 163, 920 N.E.2d 949 (2009).........................14

*Sylvan v. Briggs*,
  309 F. App'x 216 (10th Cir. 2009) .....................................1, 13

*Terry v. Ohio*,
  392 U.S. 1 (1968) ...................................................................11

*United States v. Chadwick*,
  433 U.S. 1 (1977), *abrogated on other grounds by*
  *California v. Acevedo*, 500 U.S. 565 (1991) ...........................9

*United States v. Curtis*,
   635 F.3d 704 (5th Cir.),
   *cert. denied,* 132 S. Ct. 191 (2011) ...................................................................1, 13

*United States v. Edwards*,
   415 U.S. 800 (1974) ...................................................................1, 6, 9, 11

*United States v. Flores-Lopez*,
   670 F.3d 803 (7th Cir. 2012) .......................................................1, 10, 13

*United States v. Knights*,
   534 U.S. 112 (2001) ...................................................................14

*United States v. Murphy*,
   552 F.3d 405 (4th Cir. 2009) ....................................................1, 13

*United States v. Robinson*,
   414 U.S. 218 (1973) ..............................................................1, 4, 6, 8-9

*United States v. Wurie*,
   612 F. Supp. 2d 104 (D. Mass. 2009).......................................3

*United States v. Wurie*,
   No. 11-1792, 2013 WL 2129119 (1st Cir. May 17, 2013).......................3

## RULES

Rule 35(b)(1)(A) ...............................................................................1

Rule 35 (b)(1)(B) ..............................................................................1

## OTHER AUTHORITIES

Apple Inc., "iCloud: Erase your device remotely,"
   http://support.apple.com/kb/ph2701 (last visited July 16, 2013) ......................10

## RULE 35(b)(1) STATEMENT

1.     **Rule 35(b)(1)(A).** The panel's categorical bar on searches of a cell phone incident to arrest conflicts with Supreme Court precedent permitting law-enforcement officers to conduct a warrantless search of any item found on the person of an arrestee. *See United States v. Robinson*, 414 U.S. 218 (1973); *United States v. Edwards*, 415 U.S. 800 (1974).

2.     **Rule 35(b)(1)(B).** This case involves an issue of exceptional importance because the panel decision conflicts with decisions of every federal court of appeals that has considered whether the contents of a cell phone may be searched incident to arrest, *United States v. Flores-Lopez*, 670 F.3d 803 (7th Cir. 2012); *United States v. Curtis*, 635 F.3d 704 (5th Cir.), *cert. denied*, 132 S. Ct. 191 (2011); *Sylvan v. Briggs*, 309 F. App'x 216 (10th Cir. 2009); *United States v. Murphy*, 552 F.3d 405 (4th Cir. 2009), as well as decisions of the highest court of a State within this circuit, *Commonwealth v. Phifer*, 463 Mass. 790, 979 N.E.2d 210 (2012); *Commonwealth v. Berry*, 463 Mass. 800, 979 N.E.2d 218 (2012). The decision also creates a substantial and unjustifiable obstacle to investigations and prosecutions of those arrested for distributing drugs and other serious offenses.

## STATEMENT OF THE CASE

1.     On September 5, 2007, a police officer saw the defendant, Brima Wurie, make an apparent drug sale by driving to meet a customer who had just

1

made a cell-phone call. A:2, 55.[1] After the transaction, the officer confronted the buyer and found two bags of crack cocaine in his pocket. A:2. The buyer said he bought the drugs from "B," the driver of the car, who was a crack dealer who lived in South Boston. A:2. Officers following the driver then arrested Wurie for distributing drugs and drove him to a nearby police station, where they seized two cell phones, a set of keys, and cash from his person. A:2-3.

Five to ten minutes later, officers noticed that one of Wurie's cell phones, a simple "flip" phone rather than a computer-like "smartphone," was repeatedly receiving calls from a number identified as "my house" on the phone's external screen. A:3. Minutes later, the officers opened the phone and saw a photo of a woman holding a baby set as the internal screen's "wallpaper." A:3. The officers pressed one button to access the phone's call log, then pressed another button to obtain the number for "my house." A:3. They did not access any other information contained in the phone. A:57.

The officers next typed the number into an online directory and learned that it was associated with an address on Silver Street in South Boston, not far from where Wurie had parked his car before he was arrested. A:3. After questioning Wurie, the officers drove to the Silver Street address, where they found a mailbox labeled with Wurie's name and observed a woman and child who looked like the

---

[1]Citations ("A:") are to the addendum provided with this petition.

2

people in the picture on Wurie's phone. The officers then obtained and executed a

search warrant for the Silver Street apartment and ultimately seized crack cocaine,

marijuana, cash, a firearm, and ammunition. A:4.

2.    Wurie was charged with being a felon in possession of a firearm and

ammunition (Count One); distributing crack cocaine (Count Two); and possessing

crack cocaine with intent to distribute (Count Three). He moved to suppress the

evidence obtained from the warrantless search of his cell phone, but the district

court denied the motion, holding that the search fell within the search-incident-to-

arrest exception to the Fourth Amendment's warrant requirement. *United States v.*

*Wurie*, 612 F. Supp. 2d 104 (D. Mass. 2009) (Stearns, J.); A:54-65. A jury

convicted Wurie of all three counts, and he was sentenced to 262 months in prison.

3.    A divided panel of this Court reversed the denial of Wurie's

suppression motion. The majority crafted a "bright-line rule" that "the search-

incident-to-arrest exception does not authorize the warrantless search of data on a

cell phone seized from an arrestee's person" in any circumstances. *United States v.*

*Wurie*, No. 11-1792, 2013 WL 2129119, at *11 (1st Cir. May 17, 2013); A:28

(subsequent citations to the addendum). The majority acknowledged that Supreme

Court precedent "speaks broadly" about the authority of law-enforcement officers

to conduct a full search of any object found on the person of an arrestee and has

never recognized exceptions based on the nature of the item seized. A:20 (citing

3

*United States v. Robinson*, 414 U.S. 218 (1973) (search of cigarette pack)). But it created an exception for cell phones because, in its view, cell-phone searches are never necessary to protect arresting officers or to preserve destructible evidence – the two general objectives of the search-incident-to-arrest exception that the Supreme Court identified in *Chimel* v. *California*, 395 U.S. 752, 762-63 (1969). A:15.

The majority also acknowledged that its holding conflicted with the published decisions of three other courts of appeals. A:11, 27. And it recognized that police may search the contents of traditional containers found on the person of an arrestee, such as briefcases and wallets, without inquiring into whether the search of that item is justified by the *Chimel* rationales. A:21. But it distinguished those situations on the ground that cell-phone searches resemble "general, evidence-gathering searches, not easily subject to any limiting principle," A:21, because of the "immense" storage capacity of cell phones and the "highly personal nature" of information that may be stored within them. A:17-18.[2]

---

[2]The majority concluded: "We therefore *reverse* the denial of Wurie's motion to suppress, *vacate* his conviction, and *remand* for further proceedings consistent with this opinion." A:32 (emphasis in original). Wurie's conviction for distributing crack cocaine (Count Two), however, is not affected by the motion to suppress. As the government pointed out in its principal brief at page 42 n.13, Wurie's guilt on the distribution charge was established by evidence (testimony by the officer who witnessed the drug sale and the drugs seized from the buyer) obtained prior to and independent of the warrantless search of his cell phone. Wurie's conviction on Count Two, therefore, should not be vacated. Accordingly,

Judge Howard dissented, noting that this Court "ha[s] long acknowledged that police officers can extract th[e] type of information [at issue here] from containers immediately associated with a person at the time of arrest." A:34. The majority's categorical bar on searches of cell phones, he explained, not only conflicts with Supreme Court precedent authorizing the warrantless search of any items found on an arrestee's person, but also is unsupportable on its own terms: "[E]ven if searches of items on an arrestee required *Chimel* justifications, I cannot see why cell phones fail to meet this standard if wallets, cigarette packages, address books, briefcases, and purses do." A:41-42. And whatever outer limits might exist for more intrusive cell-phone searches, Judge Howard maintained that the limited search of Wurie's call log did not cross any constitutional line. A:52.

4.    Seventeen days after the panel issued its decision, the Supreme Court held in *Maryland v. King*, 133 S. Ct. 1958 (2013), that law-enforcement officers may conduct warrantless DNA tests of persons arrested for serious offenses. *See id.* at 1980. In finding such searches reasonable under the Fourth Amendment, the Court relied on an arrestee's diminished expectation of privacy in his person and "the need for law enforcement officers in a safe and accurate way to process and identify the persons and possessions they must take into custody." *Id.* at 1970-1980.

---

at a minimum, the panel should clarify that its Judgment vacates only Counts One and Three. *See* Government's separately-filed *Motion to Clarify the Judgment*.

## <u>REASONS FOR GRANTING THE PETITION</u>

The unprecedented "bright-line rule" established by the panel majority – that the contents of a cell phone may never be searched incident to a lawful arrest without a warrant (absent another Fourth Amendment exception) – conflicts with Fourth Amendment principles long recognized by the Supreme Court and puts this circuit into conflict with three other circuits and the highest court of Massachusetts. This Court should vacate the panel's decision and rehear the case en banc.

A.    The Supreme Court has long held that the police may conduct a full search of any items found on an arrestee's person, a principle based in substantial part on a person's diminished expectation of privacy in his person once he has been lawfully arrested. *See United States v. Robinson*, 414 U.S. 218 (1973); *United States v. Edwards*, 415 U.S. 800 (1974). The Supreme Court has never suggested that courts may fashion exceptions to that categorical rule if they conclude that the *Chimel* rationales are not implicated by particular items. And even if such exceptions were permissible, evidence stored on a cell phone is, if anything, more susceptible to destruction than the contents of traditional containers like briefcases and wallets because of techniques like remote wiping and automatic disabling.

To the extent that some cell phones may implicate more serious privacy concerns than traditional containers, those concerns are not present in this case, which involved a brief examination of the call log of a flip phone. In cases

6

involving more intrusive searches of computer-like phones, the core Fourth Amendment requirement of reasonableness protects against unwarranted invasions of privacy, as the Supreme Court has repeatedly stated. But a categorical exception for cell phones cannot be reconciled with the settled rule that officers need not obtain a warrant before searching items found on an arrestee.

Even assuming that the search of the contents of a cell phone does not fall within the categorical search-incident-to-arrest exception, that would not justify the majority's blanket prohibition on such searches. As the Supreme Court recognized in *Arizona v. Gant*, 556 U.S. 332 (2009), in the context of a vehicle search incident to arrest, officers may search even an area outside the reach of an arrestee "when it is reasonable to believe that evidence of the offense of arrest might be found," *id.* at 335, which was true here. And the reasoning of the Supreme Court's intervening decision in *Maryland v. King*, 133 S. Ct. 1958 (2013), supports the view that a limited cell-phone search aimed at identifying an arrestee comports with the Fourth Amendment.

B.     The majority's decision conflicts with the published decisions of the Fourth, Fifth, and Seventh Circuits, each of which has permitted the warrantless search of a cell phone incident to arrest. It also conflicts with decisions of the Supreme Judicial Court of Massachusetts, effectively subjecting law-enforcement officers in Massachusetts to two different legal regimes.

7

The majority's categorical bar, moreover, will impede the investigation and prosecution of numerous criminal offenses. The rapid development of new communication and computing technologies ensures that the legal issues presented in this case will recur in future cases, and the majority's decision provides scant guidance to law-enforcement officers and courts about what other items seized from an arrestee's person may be searched incident to a lawful arrest.

## A. THE MAJORITY DECISION CONFLICTS WITH DECISIONS OF THE SUPREME COURT GOVERNING SEARCHES OF ITEMS SEIZED FROM THE ARRESTEE'S PERSON.

1.    The majority's "bright-line rule" cannot be reconciled with the Supreme Court's decisions in *Robinson* and *Edwards*. Those cases established the opposite bright-line rule: that a lawful arrest authorizes the police to search any item found on the person of an arrestee. The panel majority acknowledged that *Robinson* "sp[oke] broadly" and that the Supreme Court has never suggested that courts of appeals are empowered to fashion exceptions to *Robinson* based on their view that particular categories of items do not sufficiently implicate the *Chimel* rationales. A:20. To the contrary, the Supreme Court has instructed that "[t]he authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." *Robinson*, 414

U.S. at 235. That is because the search-incident-to-arrest exception is largely justified by the "reduced expectations of privacy caused by the arrest." *United States v. Chadwick*, 433 U.S. 1, 16 n.10 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991); *Edwards*, 415 U.S. at 808-09; *see also King*, 133 S. Ct. at 1978. That reduced expectation of privacy applies equally to the contents of a cell phone as it does to the contents of other containers that courts have consistently held to fall within the search-incident-to-arrest exception, such as pagers, wallets, purses, address books, and briefcases. *See* Gov't Br. at 19-20.

Rather than applying this settled law, the majority relied on Supreme Court decisions addressing a different question: whether the police may search items found in the vicinity of an arrestee but *not* on his person. A:21-22. As Judge Howard observed in dissent, however, the Supreme Court has drawn a "sharp distinction," A:43, between searches involving items found on the person, which require no justification beyond the fact of a lawful arrest, and items found in the vicinity of the person, which require a demonstrated need to disarm the arrestee or preserve destructible evidence. A:43-46. Because the police seized Wurie's cell phone from his person, not from his car or his bedside table, the search of its call log required no additional justification.

Even if, as the majority believed, *Robinson* and *Edwards* permit courts to create exceptions for categories of searches that are never necessary to protect

officer safety or prevent the destruction of evidence, the majority's holding would be erroneous. The risk of evidence destruction, in fact, is far greater for cell phones than for traditional containers like briefcases, which can be secured by the police with no risk that their contents will be destroyed, because evidence contained on a cell phone can be destroyed by techniques like call-log overwriting or remote wiping. *See United States v. Flores-Lopez*, 670 F.3d 803, 808-809 (7th Cir. 2012) (Posner, J.); *see also* "iCloud: Erase your device remotely," http://support.apple.com/kb/ph2701 (last visited July 16, 2013). The majority dismissed those risks as "remote" because the government can take measures to prevent them. A:23-25.[3] But as Judge Howard pointed out, the same could be said for any item found on an arrestee: "Drugs do not disappear into thin air; weapons do not flee of their own accord." A:47. The majority's analysis thus amounts to a wholesale rejection of the Supreme Court's settled precedent in this area.

2.     The majority opinion appeared to rest not on the application of any established Fourth Amendment principles, but rather on the concern that cell phone searches are not "self-limiting," by which the majority appeared to mean that computer-like cell phones can contain a large amount of personal information.

---

[3]Because Wurie never argued in the district court that the search of his phone was not justified because there was no risk of destruction of evidence, the record is undeveloped as to whether evidence destruction was a concern on the particular facts of this case. The record is also undeveloped on whether the police can feasibly take countermeasures. *See also Flores-Lopez*, 670 F.3d at 810 (discussing burden of Faraday bags and mirror-copying technology).

A:21. But nothing in Supreme Court precedent justifies addressing that concern through the blanket prohibition that the majority imposed. Rather, the Supreme Court has made clear that although a valid search incident to arrest does not require a warrant, that "does not leave law enforcement officials subject to no restraints," because the search "'must (still) be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.'" *Edwards*, 415 U.S. at 808 n.9 (quoting *Terry* v. *Ohio*, 392 U.S. 1, 20 (1968)).

Thus, while arrestees have a substantially reduced expectation of privacy, *King*, 133 S. Ct. at 1978, certain cell-phone searches might be so intrusive as to be unreasonable – just as a thorough search of a personal diary might be unreasonable in a particular case. But the search here did not approach that line. As Judge Howard explained, the officers "conducted a focused and limited search of Wurie's electronic call log," and "[i]f the information that they sought had been written on a piece of paper, as opposed to stored electronically, there would be no question that the police acted constitutionally." A:37-38.

3.     Even if the search of the contents of a cell phone does not fall within the categorical search-incident-to-arrest exception, the majority erred in holding that warrantless cell-phone searches are never permissible (absent exigent circumstances or another Fourth Amendment exception). The Supreme Court has made clear in the vehicle-search context, for example, that officers may always

search a vehicle "when it is reasonable to believe that evidence of the offense of arrest might be found," even if the vehicle is no longer within reaching distance of the arrestee (and so there is no possibility of the destruction of evidence or injury to officers). *Gant*, 556 U.S. at 335, 343. That reasoning supports the search of the contents of a cell phone where, as here, the police have reason to believe that it might contain or lead to evidence of the offense of arrest.[4] *See King*, 133 S. Ct. at 1982 (Scalia, J., dissenting, joined by Ginsburg, Sotomayor, and Kagan, J.J.) ("The objects of a search incident to arrest must be either (1) weapons or evidence that might easily be destroyed, or (2) *evidence relevant to the crime of arrest*.") (emphasis added). Although the government raised that argument before the panel, *see* Gov't Br. at 40, the majority did not address it.

Moreover, the Supreme Court's decision in *King*, decided after the panel issued its decision, provides an independent justification for the search in this case. In upholding the warrantless DNA testing of those arrested for serious offenses, *King* relied on the government's important interest in identifying an arrestee, including verifying his name and determining his criminal history, and the arrestee's diminished expectation of privacy in his person. *See* 133 S. Ct. at 1971. Like a DNA test, the search of a cell phone's call log can provide critical

---

[4]The district court found that "[t]he officers, having seen the 'my house' notation on Wurie's caller identification screen, reasonably believed that the stored phone number would lead them to the location of Wurie's suspected drug stash." A:63-64.

information about an arrestee's true identity, such as his name and address. Given that the panel did not have the opportunity to consider the analysis set forth in *King*, rehearing is appropriate to ensure that this Court's decisions conform to the Fourth Amendment principles articulated by the Supreme Court.

**B.    THIS CASE INVOLVES A QUESTION OF EXCEPTIONAL IMPORTANCE BECAUSE THE PANEL DECISION CREATES A CONFLICT WITH OTHER CIRCUITS AND THE HIGHEST COURT OF MASSACHUSETTS AND WILL IMPEDE NUMEROUS INVESTIGATIONS AND PROSECUTIONS.**

1.    As the majority acknowledged, its categorical rule conflicts with the published decisions of three other courts of appeals and an unpublished decision of the only other court of appeals to have addressed the issue. A:11. Applying the principles set forth in *Robinson* and *Edwards*, the Fourth and Fifth Circuits have held that the warrantless search of the contents of a cell phone found on the arrestee's person does not violate the Fourth Amendment. *See United States v. Curtis*, 635 F.3d 704, 711-14 (5th Cir.), *cert. denied*, 132 S. Ct. 191 (2011); *United States v. Murphy*, 552 F.3d 405, 410-12 (4th Cir. 2009); *see also Sylvan v. Briggs*, 309 F. App'x 216, 225 (10th Cir. 2009). The Seventh Circuit has permitted law-enforcement officers to search a cell phone to determine the phone's own number, while suggesting that a balancing approach might apply to more intrusive searches. *See Flores-Lopez*, 670 F.3d at 809-10. The categorical bar adopted by the majority conflicts with all of those holdings. That outlier position by a divided panel should not become the law of this circuit without review by the full Court.

13

2.     The need for en banc review is particularly pressing because the majority's holding conflicts with decisions of the Supreme Judicial Court of Massachusetts, which has concluded that a search of a cell phone's call log incident to arrest is authorized by *Robinson* and *Edwards*. *See Commonwealth v. Phifer*, 463 Mass. 790, 979 N.E.2d 210 (2012); *Commonwealth v. Berry*, 463 Mass. 800, 979 N.E.2d 218 (2012); *cf. United States* v. *Knights*, 534 U.S. 112, 116 (2001) (resolving conflict between Ninth Circuit and Supreme Court of California on Fourth Amendment question).[5] The majority's rule thus effectively subjects law-enforcement officers in Massachusetts to two different legal regimes depending on which sovereign ultimately prosecutes. Given that federal prosecutions often rely on evidence obtained by state police, the majority's holding effectively puts officers in the difficult position of having to predict whether an arrestee will be prosecuted by federal or Massachusetts authorities in deciding whether to immediately examine the contents of a cell phone found on his person.

3.     If allowed to stand, the majority's rule will impose serious and unjustified obstacles to law enforcement. The ubiquity of cell phones and their use to facilitate criminal activity makes cell phone seizures incident to arrest an

---

[5]The Georgia and California high courts have likewise upheld limited cell phone searches incident to arrest. *Hawkins v. State*, 290 Ga. 785, 723 S.E.2d 924 (2012); *People v. Diaz*, 51 Cal. 4th 84, 244 P.3d 501, *cert. denied*, 132 S. Ct. 94 (2011). The Florida and Ohio Supreme Courts have adopted the same bright-line rule as the panel majority. *See Smallwood v. State*, 38 Fla. L. Weekly S271, 113 So. 3d 724 (2013); *State v. Smith*, 124 Ohio St. 3d 163, 920 N.E.2d 949 (2009).

important tool for law enforcement. The majority's novel holding will reduce officers' ability to quickly obtain information contained on cell phones that may be necessary to accomplish critical law-enforcement objectives, such as identifying arrestees, apprehending their confederates, halting ongoing criminal activity, and preventing destruction of evidence. Moreover, the majority's articulation of a new "categor[y] of searc[h] that cannot ever be justified under *Chimel*," A:21, creates uncertainty for police officers, prosecutors, and trial judges confronted with the question whether, despite existing law authorizing searches of wallets, purses, and briefcases (among other things), other items seized from an arrestee may be categorically excluded from the search-incident-to-arrest exception – a particularly important issue as settled Fourth Amendment principles are applied to new technologies.

## <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court grant the government's petition for en banc review.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

MICHAEL R. DREEBEN                    By:    */s/ Kelly Begg Lawrence*
Deputy Solicitor General                            KELLY BEGG LAWARENCE
U.S. Department of Justice                          Assistant U.S. Attorney

15

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the page limitation of Fed. R. App. P. 35(b)(2) because it contains **15 pages**, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced, serif typeface using Times New Roman 14 point, in Microsoft Word.


 */s/ Kelly Begg Lawrence*
Assistant U.S. Attorney Kelly Begg Lawrence
Dated: July 16, 2013

16

## <u>CERTIFICATE OF SERVICE</u>

I, Kelly Begg Lawrence, Assistant U.S. Attorney, hereby certify that on July 16, 2013, I electronically served a copy of the foregoing document on the following registered participant of the CM/ECF system: Ian Gold, Esq., Federal Public Defender Office, 51 Sleeper Street, 5th Floor, Boston, MA 02210.

*/s/ Kelly Begg Lawrence*
KELLY BEGG LAWRENCE

No. 11-1792

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

**UNITED STATES OF AMERICA,**
**Appellee**

**v.**

**BRIMA WURIE,**
**Defendant-Appellant**

_____

### ADDENDUM TABLE OF CONTENTS

1.    The panel opinion ........................................................................A:01

2.    The district court opinion .........................................................A:54

# United States Court of Appeals
## For the First Circuit

No. 11-1792

UNITED STATES OF AMERICA,

Appellee,

v.

BRIMA WURIE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Stahl, and Lipez,
Circuit Judges.

Ian Gold, Assistant Federal Public Defender, for appellant.
Michael R. Dreeben, Attorney, United States Department of
Justice, with whom Carmen M. Ortiz, United States Attorney, and
Kelly Begg Lawrence, Assistant United States Attorney, were on
brief for appellee.

May 17, 2013

**A:1**

STAHL, **Circuit Judge**.  This case requires us to decide whether the police, after seizing a cell phone from an individual's person as part of his lawful arrest, can search the phone's data without a warrant.  We conclude that such a search exceeds the boundaries of the Fourth Amendment search-incident-to-arrest exception.  Because the government has not argued that the search here was justified by exigent circumstances or any other exception to the warrant requirement, we reverse the denial of defendant-appellant Brima Wurie's motion to suppress, vacate his conviction, and remand his case to the district court.

## I. Facts & Background

On the evening of September 5, 2007, Sergeant Detective Paul Murphy of the Boston Police Department (BPD) was performing routine surveillance in South Boston.  He observed Brima Wurie, who was driving a Nissan Altima, stop in the parking lot of a Lil Peach convenience store, pick up a man later identified as Fred Wade, and engage in what Murphy believed was a drug sale in the car.  Murphy and another BPD officer subsequently stopped Wade and found two plastic bags in his pocket, each containing 3.5 grams of crack cocaine.  Wade admitted that he had bought the drugs from "B," the man driving the Altima.  Wade also told the officers that "B" lived in South Boston and sold crack cocaine.

Murphy notified a third BPD officer, who was following the Altima.  After Wurie parked the car, that officer arrested

-2-

**A:2**

Wurie for distributing crack cocaine, read him <u>Miranda</u> warnings, and took him to the police station.  When Wurie arrived at the station, two cell phones, a set of keys, and $1,275 in cash were taken from him.

Five to ten minutes after Wurie arrived at the station, but before he was booked, two other BPD officers noticed that one of Wurie's cell phones, a gray Verizon LG phone, was repeatedly receiving calls from a number identified as "my house" on the external caller ID screen on the front of the phone.  The officers were able to see the caller ID screen, and the "my house" label, in plain view.  After about five more minutes, the officers opened the phone to look at Wurie's call log.  Immediately upon opening the phone, the officers saw a photograph of a young black woman holding a baby, which was set as the phone's "wallpaper."  The officers then pressed one button on the phone, which allowed them to access the phone's call log.  The call log showed the incoming calls from "my house."  The officers pressed one more button to determine the phone number associated with the "my house" caller ID reference.

One of the officers typed that phone number into an online white pages directory, which revealed that the address associated with the number was on Silver Street in South Boston, not far from where Wurie had parked his car just before he was arrested.  The name associated with the address was Manny Cristal.

-3-

**A:3**

Sergeant Detective Murphy then gave Wurie a new set of Miranda warnings and asked him a series of questions. Wurie said, among other things, that he lived at an address on Speedwell Street in Dorchester and that he had only been "cruising around" in South Boston. He denied having stopped at the Lil Peach store, having given anyone a ride, and having sold crack cocaine.

Suspecting that Wurie was a drug dealer, that he was lying about his address, and that he might have drugs hidden at his house, Murphy took Wurie's keys and, with other officers, went to the Silver Street address associated with the "my house" number. One of the mailboxes at that address listed the names Wurie and Cristal. Through the first-floor apartment window, the officers saw a black woman who looked like the woman whose picture appeared on Wurie's cell phone wallpaper. The officers entered the apartment to "freeze" it while they obtained a search warrant. Inside the apartment, they found a sleeping child who looked like the child in the picture on Wurie's phone. After obtaining the warrant, the officers seized from the apartment, among other things, 215 grams of crack cocaine, a firearm, ammunition, four bags of marijuana, drug paraphernalia, and $250 in cash.

Wurie was charged with possessing with intent to distribute and distributing cocaine base and with being a felon in possession of a firearm and ammunition. He filed a motion to suppress the evidence obtained as a result of the warrantless

-4-

**A:4**

search of his cell phone; the parties agreed that the relevant facts were not in dispute and that an evidentiary hearing was unnecessary.  The district court denied Wurie's motion to suppress, United States v. Wurie, 612 F. Supp. 2d 104 (D. Mass. 2009), and, after a four-day trial, the jury found Wurie guilty on all three counts.  He was sentenced to 262 months in prison.  This appeal followed.

## II. Analysis

In considering the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo.  United States v. Kearney, 672 F.3d 81, 88-89 (1st Cir. 2012).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The amendment grew out of American colonial opposition to British search and seizure practices, most notably the use of writs of assistance, which gave customs officials broad latitude to search houses, shops, cellars, warehouses, and other places for smuggled goods.  The Honorable M. Blane Michael, Reading the Fourth Amendment: Guidance from the Mischief that Gave it Birth, 85 N.Y.U.

L. Rev. 905, 907-09 (2010); <u>see</u> <u>generally</u> William J. Cuddihy, <u>The</u> <u>Fourth Amendment: Origins and Original Meaning 602-1791</u> (2009).

James Otis, a lawyer who challenged the use of writs of assistance in a 1761 case, famously described the practice as "plac[ing] the liberty of every man in the hands of every petty officer" and sounded two main themes: the need to protect the privacy of the home (what he called the "fundamental . . . Privilege of House"), Michael, <u>supra</u>, at 908 (citations and internal quotation marks omitted), and "the inevitability of abuse when government officials have the sort of unlimited discretion sanctioned by the writ," <u>id.</u> at 909. The Supreme Court has described Otis's argument as "perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country." <u>Boyd</u> v. <u>United States</u>, 116 U.S. 616, 625 (1886).

Today, a warrantless search is <u>per se</u> unreasonable under the Fourth Amendment, unless one of "a few specifically established and well-delineated exceptions" applies. <u>Arizona</u> v. <u>Gant</u>, 556 U.S. 332, 338 (2009) (quoting <u>Katz</u> v. <u>United States</u>, 389 U.S. 347, 357 (1967)) (internal quotation marks omitted). One of those exceptions allows the police, when they make a lawful arrest, to search "the arrestee's person and the area within his immediate control." <u>Id.</u> at 339 (quoting <u>Chimel</u> v. <u>California</u>, 395 U.S. 752, 763 (1969)) (internal quotation marks omitted). In recent years,

courts have grappled with the question of whether the search-incident-to-arrest exception extends to data within an arrestee's cell phone.[1]

## A. The legal landscape

The modern search-incident-to-arrest doctrine emerged from <u>Chimel</u> v. <u>California</u>, 395 U.S. 752 (1969), in which the Supreme Court held that a warrantless search of the defendant's entire house was not justified by the fact that it occurred as part of his valid arrest. The Court found that the search-incident-to-arrest exception permits an arresting officer "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction" and to search "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." <u>Id.</u> at 763. The justifications underlying the exception, as articulated in <u>Chimel</u>, were protecting officer safety and ensuring the preservation of evidence. <u>Id.</u>

Four years later, in <u>United States</u> v. <u>Robinson</u>, 414 U.S. 218 (1973), the Supreme Court examined how the search-incident-to-arrest exception applies to searches of the person. Robinson was arrested for driving with a revoked license, and in conducting a

---

[1] On appeal, Wurie does not challenge the seizure of his phone, and he concedes that, under the plain view exception, <u>see United States</u> v. <u>Paneto</u>, 661 F.3d 709, 713-14 (1st Cir. 2011), the officers were entitled to take notice of any information that was visible to them on the outside of the phone and on its screen (including, in this case, the incoming calls from "my house").

-7-

**A:7**

pat down, the arresting officer felt an object that he could not identify in Robinson's coat pocket. Id. at 220-23. He removed the object, which turned out to be a cigarette package, and then felt the package and determined that it contained something other than cigarettes. Upon opening the package, the officer found fourteen capsules of heroin. Id. at 223. The Court held that the warrantless search of the cigarette package was valid, explaining that the police have the authority to conduct "a full search of the person" incident to a lawful arrest. Id. at 235.

Robinson reiterated the principle, discussed in Chimel, that "[t]he justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." Id. at 234. However, the Court also said the following:

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.

Id. at 235.

-8-

**A:8**

The following year, the Court decided <u>United States</u> v. <u>Edwards</u>, 415 U.S. 800 (1974).  Edwards was arrested on suspicion of burglary and detained at a local jail.  After his arrest, police realized that Edwards's clothing, which he was still wearing, might contain paint chips tying him to the burglary.  The police seized the articles of clothing and examined them for paint fragments. <u>Id.</u> at 801-02.  The Court upheld the search, concluding that once it became apparent that the items of clothing might contain destructible evidence of a crime, "the police were entitled to take, examine, and preserve them for use as evidence, just as they are normally permitted to seize evidence of crime when it is lawfully encountered."  <u>Id.</u> at 806.

The Court again addressed the search-incident-to-arrest exception in <u>United States</u> v. <u>Chadwick</u>, 433 U.S. 1 (1977), <u>abrogated on other grounds by</u> <u>California</u> v. <u>Acevedo</u>, 500 U.S. 565 (1991), this time emphasizing that not all warrantless searches undertaken in the context of a custodial arrest are constitutionally reasonable.  In <u>Chadwick</u>, the defendants were arrested immediately after having loaded a footlocker into the trunk of a car.  <u>Id.</u> at 3-4.  The footlocker remained under the exclusive control of federal narcotics agents until they opened it, without a warrant and about an hour and a half after the defendants were arrested, and found marijuana in it.  <u>Id.</u> at 4-5.  The Court invalidated the search, concluding that the justifications for the

-9-

**A:9**

search-incident-to-arrest exception -- the need for the arresting officer "[t]o safeguard himself and others, and to prevent the loss of evidence" -- were absent. Id. at 14. The search "was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody" and therefore could not "be viewed as incidental to the arrest or as justified by any other exigency." Id. at 15.

Finally, there is the Supreme Court's recent decision in Arizona v. Gant, 556 U.S. 332 (2009). Gant involved the search of an arrestee's vehicle, which is governed by a distinct set of rules, see id. at 343, but the Court began with a general summary of the search-incident-to-arrest doctrine. Once again, the Court reiterated the twin rationales underlying the exception, first articulated in Chimel: "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." Id. at 339 (citing Chimel, 395 U.S. at 763). Relying on those safety and evidentiary justifications, the Court found that a search of a vehicle incident to arrest is lawful "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." Id. at 343.[2]

---

[2] The Court also concluded, "[a]lthough it does not follow from Chimel," that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Gant, 556 U.S. at 343 (citation and internal quotation marks omitted).

-10-

Courts have struggled to apply the Supreme Court's search-incident-to-arrest jurisprudence to the search of data on a cell phone seized from the person. The searches at issue in the cases that have arisen thus far have involved everything from simply obtaining a cell phone's number, United States v. Flores-Lopez, 670 F.3d 803, 804 (7th Cir. 2012), to looking through an arrestee's call records, United States v. Finley, 477 F.3d 250, 254 (5th Cir. 2007), text messages, id., or photographs, United States v. Quintana, 594 F. Supp. 2d 1291, 1295-96 (M.D. Fl. 2009).

Though a majority of these courts have ultimately upheld warrantless cell phone data searches, they have used a variety of approaches. Some have concluded that, under Robinson and Edwards, a cell phone can be freely searched incident to a defendant's lawful arrest, with no justification beyond the fact of the arrest itself. E.g., People v. Diaz, 244 P.3d 501 (Cal. 2011). Others have, to varying degrees, relied on the need to preserve evidence on a cell phone. E.g., United States v. Murphy, 552 F.3d 405, 411 (4th Cir. 2009); Finley, 477 F.3d at 260; Commonwealth v. Phifer, 979 N.E.2d 210, 213-16 (Mass. 2012). The Seventh Circuit discussed the Chimel rationales more explicitly in Flores-Lopez, assuming that warrantless cell phone searches must be justified by a need to protect arresting officers or preserve destructible evidence, 670 F.3d at 806-07, and finding that evidence preservation concerns

-11-

**A:11**

outweighed the invasion of privacy at issue in that case, because the search was minimally invasive, id. at 809.

A smaller number of courts have rejected warrantless cell phone searches, with similarly disparate reasoning. In United States v. Park, No. CR 05-375 SI, 2007 WL 1521573 (N.D. Cal. May 23, 2007), for example, the court concluded that a cell phone should be viewed not as an item immediately associated with the person under Robinson and Edwards but as a possession within an arrestee's immediate control under Chadwick, which cannot be searched once the phone comes into the exclusive control of the police, absent exigent circumstances, id. at *8. In State v. Smith, 920 N.E.2d 949 (Ohio 2009), the Ohio Supreme Court distinguished cell phones from other "closed containers" that have been found searchable incident to an arrest and concluded that, because an individual has a high expectation of privacy in the contents of her cell phone, any search thereof must be conducted pursuant to a warrant, id. at 955. And most recently, in Smallwood v. State, __ So. 3d __, 2013 WL 1830961 (Fla. May 2, 2013), the Florida Supreme Court held that the police cannot routinely search the data within an arrestee's cell phone without a warrant, id. at *10. The court read Gant as prohibiting a search once an arrestee's cell phone has been removed from his person, which forecloses the ability to use the phone as a weapon or to destroy evidence contained therein. Id.

-12-

**A:12**

**B.  Our vantage point**

We begin from the premise that, in the Fourth Amendment context, "[a] single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." Dunaway v. New York, 442 U.S. 200, 213-14 (1979).  The Supreme Court has therefore rejected "inherently subjective and highly fact specific" rules that require "ad hoc determinations on the part of officers in the field and reviewing courts" in favor of clear ones that will be "readily understood by police officers." Thornton v. United States, 541 U.S. 615, 623 (2004); see also New York v. Belton, 453 U.S. 454, 458 (1981) ("A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be literally impossible of application by the officer in the field." (citation and internal quotation marks omitted)).  As a result, when it upheld the warrantless search of the cigarette pack in Robinson, "the Court hewed to a straightforward rule, easily applied, and predictably enforced." Belton, 453 U.S. at 459.  Thus, we find it necessary to craft a bright-line rule that applies to all warrantless cell phone

-13-

**A:13**

searches, rather than resolving this case based solely on the particular circumstances of the search at issue.[3]

The government seems to agree, urging us to find that a cell phone, like any other item carried on the person, can be thoroughly searched incident to a lawful arrest.[4] The government's reasoning goes roughly as follows: (1) Wurie's cell phone was an item immediately associated with his person, because he was carrying it on him at the time of his arrest (or at least he does not argue otherwise); (2) such items can be freely searched without any justification beyond the fact of the lawful arrest, see Robinson, 414 U.S. at 235; (3) the search can occur even after the defendant has been taken into custody and transported to the

---

[3] The dissent, advocating a case-by-case, fact-specific approach, relies on Missouri v. McNeely, 133 S. Ct. 1552 (2013), which rejected a per se rule for warrantless blood tests of drunk drivers. But McNeely involved the exigent circumstances exception to the warrant requirement, and courts must "evaluate each case of alleged exigency based 'on its own facts and circumstances.'" Id. at 1559 (quoting Go-Bart Importing Co. v. United States, 282 U.S. 344, 357 (1931)). The Supreme Court explicitly distinguished the exigency exception, which "naturally calls for a case-specific inquiry," from the search-incident-to-arrest exception, which "appl[ies] categorically." Id. at 1559 n.3.

[4] It is worth noting three things that the government is not arguing in this case. First, it does not challenge the district court's finding that what occurred here was a Fourth Amendment search. See Wurie, 612 F. Supp. 2d at 109 ("It seems indisputable that a person has a subjective expectation of privacy in the contents of his or her cell phone."). Second, the government does not suggest that Wurie's expectation of privacy was in any way reduced because his phone was apparently not password-protected. Third, it does not claim that this was an inventory search. See Illinois v. Lafayette, 462 U.S. 640 (1983).

-14-

station house, see Edwards, 415 U.S. at 803;[5] and (4) there is no
limit on the scope of the search, other than the Fourth Amendment's
core reasonableness requirement, see id. at 808 n.9.[6]

This "literal reading of the Robinson decision," Flores-
Lopez, 670 F.3d at 805, fails to account for the fact that the
Supreme Court has determined that there are categories of searches
undertaken following an arrest that are inherently unreasonable
because they are never justified by one of the Chimel rationales:
protecting arresting officers or preserving destructible evidence.

_____

[5] It is not clear from the record how much time passed between
Wurie's arrest and the search of his cell phone at the station
house. Nonetheless, because Wurie has not raised the argument, we
need not decide whether the government is correct that, under
Edwards, the search here was "incident to" Wurie's arrest, despite
the delay. See 415 U.S. at 803 ("[S]earches and seizures that
could be made on the spot at the time of arrest may legally be
conducted later when the accused arrives at the place of
detention.").

[6] The government has also suggested a more limited way for us
to resolve this case: by holding that this particular search was
lawful under United States v. Sheehan, 583 F.2d 30 (1st Cir. 1978).
But Sheehan was a seizure case, not a search case, and "[i]t is
extremely important to distinguish a search of the person from a
seizure of objects found in that search." 3 Wayne R. LaFave,
Search & Seizure § 5.2(j), at 185 (5th ed. 2012). The defendant in
Sheehan conceded that "the search of his wallet was legal"; he
challenged only the seizure of a list of names and telephone
numbers in the wallet. 583 F.2d at 31. Because the list was not
"a fruit, instrumentality, or contraband, probative of a crime,"
but rather "mere evidence," we analyzed whether probable cause
existed to support the seizure. Id. (citing Warden v. Hayden, 387
U.S. 294 (1967)). The lawfulness of a search of the person
incident to arrest, however, does not turn on the likelihood that
evidence of the crime of arrest will be discovered. See Robinson,
414 U.S. at 234. The Supreme Court did articulate such a rule in
Gant but limited it to the vehicle context. 556 U.S. at 343.

-15-

**A:15**

E.g., Gant, 556 U.S. 332; Chadwick, 433 U.S. 1. As we explain below, this case therefore turns on whether the government can demonstrate that warrantless cell phone searches, as a category, fall within the boundaries laid out in Chimel.

The government admitted at oral argument that its interpretation of the search-incident-to-arrest exception would give law enforcement broad latitude to search any electronic device seized from a person during his lawful arrest, including a laptop computer or a tablet device such as an iPad. The search could encompass things like text messages, e.g., Finley, 477 F.3d at 254, emails, e.g., People v. Nottoli, 130 Cal. Rptr. 3d 884, 894 (Cal. Ct. App. 2011), or photographs, e.g., Quintana, 594 F. Supp. 2d at 1295-96, though the officers here only searched Wurie's call log. Robinson and Edwards, the government claims, compel such a finding.

We suspect that the eighty-five percent of Americans who own cell phones and "use the devices to do much more than make phone calls," Maeve Duggan & Lee Rainie, Cell Phone Activities 2012, Pew Internet & American Life Project, 2 (Nov. 25, 2012), http://pewinternet.org/~/media//Files/Reports/2012/PIP_CellActivities_11.25.pdf, would have some difficulty with the government's view that "Wurie's cell phone was indistinguishable from other kinds of personal possessions, like a cigarette package, wallet, pager, or address book, that fall within the search incident to

-16-

**A:16**

arrest exception to the Fourth Amendment's warrant requirement."[7]
In reality, "a modern cell phone is a computer," and "a computer
. . . is not just another purse or address book."  Flores-Lopez,
670 F.3d at 805.  The storage capacity of today's cell phones is
immense.  Apple's iPhone 5 comes with up to sixty-four gigabytes of
storage, see Apple, iPhone, Tech Specs, http://www.apple.com/iphone
/specs.html (last visited May 16, 2013), which is enough to hold
about "four million pages of Microsoft Word documents," Charles E.
MacLean, But, Your Honor, a Cell Phone is Not a Cigarette Pack: An
Immodest Call for a Return to the Chimel Justifications for Cell
Phone Memory Searches Incident to Lawful Arrest, 6 Fed. Cts. L.
Rev. 37, 42 (2012).[8]

---

[7] See, e.g., United States v. Ortiz, 84 F.3d 977, 984 (7th
Cir. 1996) (pager); United States v. Uricoechea-Casallas, 946 F.2d
162, 166 (1st Cir. 1991) (wallet); United States v. Holzman, 871
F.2d 1496, 1504-05 (9th Cir. 1989) (address book), overruled on
other grounds by Horton v. California, 496 U.S. 128 (1990); United
States v. Burnette, 698 F.2d 1038, 1049 (9th Cir. 1983) (purse);
United States v. Eatherton, 519 F.2d 603, 610-11 (1st Cir. 1975)
(briefcase).

[8] We are also cognizant of the fact that "[m]obile devices
increasingly store personal user data in the cloud instead of on
the device itself," which "allows the data to be accessed from
multiple devices and provides backups."  James E. Cabral et al.,
Using Technology to Enhance Access to Justice, 26 Harv. J.L. &
Tech. 241, 268 (2012).  Though the government insisted at oral
argument that it was not seeking a rule that would permit access to
information stored in the cloud, we believe that it may soon be
impossible for an officer to avoid accessing such information
during the search of a cell phone or other electronic device,
which could have additional privacy implications.  See United States v.
Cotterman, 709 F.3d 952, 965 (9th Cir. 2013) (en banc) ("With the
ubiquity of cloud computing, the government's reach into private
data becomes even more problematic.").

-17-

That information is, by and large, of a highly personal nature: photographs, videos, written and audio messages (text, email, and voicemail), contacts, calendar appointments, web search and browsing history, purchases, and financial and medical records. See United States v. Cotterman, 709 F.3d 952, 957 (9th Cir. 2013) (en banc) ("The papers we create and maintain not only in physical but also in digital form reflect our most private thoughts and activities.").[9] It is the kind of information one would previously have stored in one's home and that would have been off-limits to officers performing a search incident to arrest. See Chimel, 395 U.S. 752. Indeed, modern cell phones provide direct access to the home in a more literal way as well; iPhones can now connect their owners directly to a home computer's webcam, via an application called iCam, so that users can monitor the inside of their homes remotely. Flores-Lopez, 670 F.3d at 806. "At the touch of a button a cell phone search becomes a house search, and that is not a search of a 'container' in any normal sense of that word, though a house contains data." Id.

In short, individuals today store much more personal information on their cell phones than could ever fit in a wallet, address book, briefcase, or any of the other traditional containers

---

[9] For cases demonstrating the potential for abuse of private information contained in a modern cell phone, see, for example, Schlossberg v. Solesbee, 844 F. Supp. 2d 1165 (D. Or. 2012), and Newhard v. Borders, 649 F. Supp. 2d 440 (W.D. Va. 2009).

that the government has invoked. See id. at 805 (rejecting the idea that a cell phone can be compared to other items carried on the person, because today's cell phones are "quite likely to contain, or provide ready access to, a vast body of personal data").[10] Just as customs officers in the early colonies could use writs of assistance to rummage through homes and warehouses, without any showing of probable cause linked to a particular place or item sought, the government's proposed rule would give law enforcement automatic access to "a virtual warehouse" of an individual's "most intimate communications and photographs without probable cause" if the individual is subject to a custodial arrest, even for something as minor as a traffic violation. Matthew E. Orso, Cellular Phones, Warrantless Searches, and the New Frontier of Fourth Amendment Jurisprudence, 50 Santa Clara L. Rev. 183, 211 (2010). We are reminded of James Otis's concerns about "plac[ing] the liberty of every man in the hands of every petty officer." Michael, supra, at 908 (citation and internal quotation marks omitted).

---

[10] The record here does not reveal the storage capacity of Wurie's cell phone, but that is of no significance, for two reasons. First, "[e]ven the dumbest of modern cell phones gives the user access to large stores of information." Flores-Lopez, 670 F.3d at 806. Second, neither party has suggested that our holding today should turn on the specific features of Wurie's cell phone, and we find such a rule unworkable in any event. See Thornton, 541 U.S. at 623; Murphy, 552 F.3d at 411 ("[T]o require police officers to ascertain the storage capacity of a cell phone before conducting a search would simply be an unworkable and unreasonable rule.").

-19-

A:19

It is true that Robinson speaks broadly, and that the Supreme Court has never found the constitutionality of a search of the person incident to arrest to turn on the kind of item seized or its capacity to store private information.  In our view, however, what distinguishes a warrantless search of the data within a modern cell phone from the inspection of an arrestee's cigarette pack or the examination of his clothing is not just the nature of the item searched, but the nature and scope of the search itself.

In Gant, the Court emphasized the need for "the scope of a search incident to arrest" to be "commensurate with its purposes," which include "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy."  556 U.S. at 339; see also Chimel, 395 U.S. at 762-63 ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use . . . [and] to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.").  Inspecting the contents of a cigarette pack can (and, in Robinson, did) preserve destructible evidence (heroin capsules).  It is also at least theoretically necessary to protect the arresting officer, who does not know what he will find inside the cigarette pack.  Examining the clothing an arrestee is wearing can (and, in Edwards, did) preserve destructible evidence (paint chips).  Thus, the searches

-20-

at issue in <u>Robinson</u> and <u>Edwards</u> were the kinds of reasonable, self-limiting searches that do not offend the Fourth Amendment, even when conducted without a warrant. The same can be said of searches of wallets, address books, purses, and briefcases, which are all potential repositories for destructible evidence and, in some cases, weapons.

When faced, however, with categories of searches that cannot ever be justified under <u>Chimel</u>, the Supreme Court has taken a different approach. In <u>Chadwick</u>, the Court struck down warrantless searches of "luggage or other personal property not immediately associated with the person of the arrestee" that the police have "reduced . . . to their exclusive control," because such searches are not necessary to preserve destructible evidence or protect officer safety. 433 U.S. at 15. Similarly, in <u>Gant</u>, the Court concluded that searching the passenger compartment of a vehicle once the arrestee has been secured and confined to a police car neither preserves destructible evidence nor protects officer safety. 556 U.S. at 335; <u>see also id.</u> at 339 ("If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply."). The searches at issue in <u>Chadwick</u> and <u>Gant</u> were general, evidence-gathering searches, not easily subject to any limiting principle, and the Fourth Amendment permits such searches

-21-

only pursuant to a lawful warrant.  See Thornton, 541 U.S. at 632 (Scalia, J., concurring) ("When officer safety or imminent evidence concealment or destruction is at issue, officers should not have to make fine judgments in the heat of the moment.  But in the context of a general evidence-gathering search, the state interests that might justify any overbreadth are far less compelling.").

We therefore find it necessary to ask whether the warrantless search of data within a cell phone can ever be justified under Chimel.  See Flores-Lopez, 670 F.3d at 806-10 (considering whether either of the Chimel rationales applies to cell phone data searches); cf. United States v. Ortiz, 84 F.3d 977, 984 (7th Cir. 1996) (upholding the warrantless search of a pager incident to arrest because of the risk of destruction of evidence). The government has provided little guidance on that question. Instead, it has hewed to a formalistic interpretation of the case law, forgetting that the search-incident-to-arrest doctrine does not describe an independent right held by law enforcement officers, but rather a class of searches that are only reasonable in the Fourth Amendment sense because they are potentially necessary to preserve destructible evidence or protect police officers.  Indeed, the  government has included just one, notably tentative footnote in its brief attempting to place warrantless cell phone data searches within the Chimel boundaries.  We find ourselves unconvinced.

-22-

**A:22**

The government does not argue that cell phone data searches are justified by a need to protect arresting officers. Wurie concedes that arresting officers can inspect a cell phone to ensure that it is not actually a weapon, see Flores-Lopez, 670 F.3d at 806 ("One can buy a stun gun that looks like a cell phone."), but we have no reason to believe that officer safety would require a further intrusion into the phone's contents.  As we mentioned earlier, the officer who conducted the search in Robinson had no idea what he might find in the cigarette pack, which therefore posed a safety risk.  The officers who searched Wurie's phone, on the other hand, knew exactly what they would find therein: data. They also knew that the data could not harm them.

The government has, however, suggested that the search here was "arguably" necessary to prevent the destruction of evidence.  Specifically, the government points to the possibility that the calls on Wurie's call log could have been overwritten or the contents of his phone remotely wiped if the officers had waited to obtain a warrant.[11]  The problem with the government's argument

---

[11]  The government and our dissenting colleague have also suggested that Wurie's failure to answer calls or to return home after the drug deal might have alerted others to the fact of his arrest and caused them to destroy or conceal evidence (presumably the drug stash later discovered at his home).  That is mere speculation, and it is also a possibility present in almost every instance of a custodial arrest; we do not think that such concerns should always justify the search of a cell phone or other electronic device.  Furthermore, the risk of destruction, as we understand it, attaches to the evidence that the arrestee is actually carrying on his person -- not to evidence being held or

-23-

is that it does not seem to be particularly difficult to prevent overwriting of calls or remote wiping of information on a cell phone today. Arresting officers have at least three options. First, in some instances, they can simply turn the phone off or remove its battery. See Flores-Lopez, 670 F.3d at 808; Diaz, 244 P.3d at 515 n.24 (Werdegar, J., dissenting). Second, they can put the phone in a Faraday enclosure, a relatively inexpensive device "formed by conducting material that shields the interior from external electromagnetic radiation." MacLean, supra, at 50 (citation and internal quotation marks omitted); see also Flores-Lopez, 670 F.3d at 809. Third, they may be able "to 'mirror' (copy) the entire cell phone contents, to preserve them should the phone be remotely wiped, without looking at the copy unless the original disappears." Flores-Lopez, 670 F.3d at 809.

Indeed, if there is a genuine threat of remote wiping or overwriting, we find it difficult to understand why the police do not routinely use these evidence preservation methods, rather than risking the loss of the evidence during the time it takes them to search through the phone. Perhaps the answer is in the government's acknowledgment that the possibility of remote wiping

---

guarded elsewhere by a co-conspirator. See Gant, 556 U.S. at 339 (describing the need to safeguard "any evidence of the offense of arrest that an arrestee might conceal or destroy" (emphasis added)); Chimel, 395 U.S. at 763 ("In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." (emphasis added)).

-24-

here was "remote" indeed. Weighed against the significant privacy implications inherent in cell phone data searches, we view such a slight and truly theoretical risk of evidence destruction as insufficient. While the measures described above may be less convenient for arresting officers than conducting a full search of a cell phone's data incident to arrest, the government has not suggested that they are unworkable, and it bears the burden of justifying its failure to obtain a warrant. See United States v. Jeffers, 342 U.S. 48, 51 (1951). "[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 393 (1978).

Instead of truly attempting to fit this case within the Chimel framework, the government insists that we should disregard the Chimel rationales entirely, for two reasons.

First, the government emphasizes that Robinson rejected the idea that "there must be litigated in each case the issue of whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest." 414 U.S. at 235. That holding was predicated on an assumption, clarified in Chadwick, that "[t]he potential dangers lurking in all custodial arrests" are what "make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or

-25-

**A:25**

destructible evidence may be involved." 433 U.S. at 14-15. For the reasons we just discussed, that assumption appears to be incorrect in the case of cell phone data searches. More importantly, however, we are not suggesting a rule that would require arresting officers or reviewing courts to decide, on a case-by-case basis, whether a particular cell phone data search is justified under Chimel. Rather, we believe that warrantless cell phone data searches are categorically unlawful under the search-incident-to-arrest exception, given the government's failure to demonstrate that they are ever necessary to promote officer safety or prevent the destruction of evidence. We read Robinson as compatible with such a finding.

Second, the government places great weight on a footnote at the end of Chadwick stating that searches of the person, unlike "searches of possessions within an arrestee's immediate control," are "justified by . . . reduced expectations of privacy caused by the arrest." 433 U.S. at 16 n.10. The government reads that footnote as establishing an unlimited principle that searches of items carried on the person require no justification whatsoever beyond a lawful arrest, making Chimel irrelevant in this context. The Chadwick footnote is surely meant to reference similar language in Robinson explaining that, because the "custodial arrest of a suspect based on probable cause is a reasonable intrusion under the

-26-

**A:26**

Fourth Amendment[,] . . . a search incident to the arrest requires no additional justification."  414 U.S. at 235.

Yet the Court clearly stated in Robinson that "[t]he authority to search the person incident to a lawful custodial arrest" is "based upon the need to disarm and to discover evidence," id., and Chadwick did not alter that rule.  When the Court decided Robinson in 1973 and Chadwick in 1977, any search of the person would almost certainly have been the type of self-limiting search that could be justified under Chimel.  The Court, more than thirty-five years ago, could not have envisioned a world in which the vast majority of arrestees would be carrying on their person an item containing not physical evidence but a vast store of intangible data -- data that is not immediately destructible and poses no threat to the arresting officers.

In the end, we therefore part ways with the Seventh Circuit, which also applied the Chimel rationales in Flores-Lopez. Though the court described the risk of evidence destruction as arguably "so slight as to be outweighed by the invasion of privacy from the search," it found that risk to be sufficient, given the minimal nature of the intrusion at issue (the officers had only searched the cell phone for its number).  Flores-Lopez, 670 F.3d at 809.  That conclusion was based, at least in part, on Seventh Circuit precedent allowing a "minimally invasive" warrantless

-27-

search.  Id. at 807 (citing United States v. Concepcion, 942 F.2d 1170 (7th Cir. 1991)).

    We are faced with different precedent and different facts, but we also see little room for a case-specific holding, given the Supreme Court's insistence on bright-line rules in the Fourth Amendment context.  See, e.g., Thornton, 541 U.S. at 623. A series of opinions allowing some cell phone data searches but not others, based on the nature and reasonableness of the intrusion, would create exactly the "inherently subjective and highly fact specific" set of rules that the Court has warned against and would be extremely difficult for officers in the field to apply.  Id. Thus, while the search of Wurie's call log was less invasive than a search of text messages, emails, or photographs, it is necessary for all warrantless cell phone data searches to be governed by the same rule.  A rule based on particular instances in which the police do not take full advantage of the unlimited potential presented by cell phone data searches would prove impotent in those cases in which they choose to exploit that potential.

    We therefore hold that the search-incident-to-arrest exception does not authorize the warrantless search of data on a cell phone seized from an arrestee's person, because the government has not convinced us that such a search is ever necessary to protect arresting officers or preserve destructible evidence.  See Chimel, 395 U.S. at 763.  Instead, warrantless cell phone data

-28-

**A:28**

searches strike us as a convenient way for the police to obtain information related to a defendant's crime of arrest -- or other, as yet undiscovered crimes -- without having to secure a warrant. We find nothing in the Supreme Court's search-incident-to-arrest jurisprudence that sanctions such a "general evidence-gathering search." Thornton, 541 U.S. at 632 (Scalia, J., concurring).[12]

There are, however, other exceptions to the warrant requirement that the government has not invoked here but that might justify a warrantless search of cell phone data under the right conditions. Most importantly, we assume that the exigent circumstances exception would allow the police to conduct an immediate, warrantless search of a cell phone's data where they have probable cause to believe that the phone contains evidence of a crime, as well as a compelling need to act quickly that makes it impracticable for them to obtain a warrant -- for example, where the phone is believed to contain evidence necessary to locate a kidnapped child or to investigate a bombing plot or incident. See United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995) (discussing the exigent circumstances exception).

---

[12] We acknowledge that we may have to revisit this issue in the years to come, if further changes in technology cause warrantless cell phone data searches to become necessary under one or both of the Chimel rationales.

## C.  The good-faith exception

That leaves only the government's belated argument, made for the first time in a footnote in its brief on appeal, that suppression is inappropriate here under the good-faith exception to the exclusionary rule.  See United States v. Leon, 468 U.S. 897 (1984).  The government bears the "heavy burden" of proving that the good-faith exception applies, United States v. Syphers, 426 F.3d 461, 468 (1st Cir. 2005), and it did not invoke the exception before the district court.

This is not a case in which an intervening change in the law made the good-faith exception relevant only after the district court issued its opinion.  E.g., Davis v. United States, 131 S. Ct. 2419, 2425-26 (2011); United States v. Sparks, 711 F.3d 58, 61-62 (1st Cir. 2013); United States v. Lopez, 453 F. App'x 602, 605 (6th Cir. 2011); see also United States v. Curtis, 635 F.3d 704, 713-14 (5th Cir. 2011) (applying the good-faith exception "to a search that was legal at the time it was conducted but has been rendered illegal by an intervening change in the law"); United States v. McCane, 573 F.3d 1037, 1044 (10th Cir. 2009) (finding that "a police officer who undertakes a search in reasonable reliance upon the settled case law of a United States Court of Appeals, even though the search is later deemed invalid by Supreme Court decision, has not engaged in misconduct").  The government emphasizes that we may affirm the district court's suppression

-30-

**A:30**

ruling on any ground made manifest by the record. <u>United States</u> v.
<u>Doe</u>, 61 F.3d 107, 111-12 (1st Cir. 1995). In this case, however,
we do not believe that ground should be one with respect to which
the government bore the burden of proof and entirely failed to
carry that burden below, despite the fact that the issue was ripe
for the district court's review.[13]

### III. Conclusion

Since the time of its framing, "the central concern
underlying the Fourth Amendment" has been ensuring that law
enforcement officials do not have "unbridled discretion to rummage
at will among a person's private effects." <u>Gant</u>, 556 U.S. at 345;
<u>see also</u> <u>Chimel</u>, 395 U.S. at 767-68. Today, many Americans store
their most personal "papers" and "effects," U.S. Const. amend. IV,
in electronic format on a cell phone, carried on the person.
Allowing the police to search that data without a warrant any time
they conduct a lawful arrest would, in our view, create "a serious
and recurring threat to the privacy of countless individuals."
<u>Gant</u>, 556 U.S. at 345; <u>cf.</u> <u>United States</u> v. <u>Jones</u>, 132 S. Ct. 945,
950 (2012) ("At bottom, we must 'assur[e] preservation of that
degree of privacy against government that existed when the Fourth

---

[13] The government invokes <u>United States</u> v. <u>Grupee</u>, 682 F.3d
143, 148 (1st Cir. 2012), in which we addressed the good-faith
exception despite the fact that the district court had not done so
in its opinion. However, the record in that case reveals that the
government had raised the good-faith exception below; the district
court simply did not reach it.

Amendment was adopted.'" (quoting <u>Kyllo</u> v. <u>United States</u>, 533 U.S.
27, 34 (2001))).

We therefore <u>reverse</u> the denial of Wurie's motion to
suppress, <u>vacate</u> his conviction, and <u>remand</u> for further proceedings
consistent with this opinion.

**-Dissenting Opinion Follows-**

-32-

**A:32**

HOWARD, <u>Circuit Judge</u>, **dissenting**.  Undoubtedly, most of us would prefer that the information stored in our cell phones be kept from prying eyes, should a phone be lost or taken from our hands by the police during an arrest.  One could, individually, take protective steps to enhance the phone's security settings with respect to that information, or for that matter legislation might be enacted to make such unprotected information off-limits to finders or to the police unless they first obtain a warrant to search the phone.  But the question here is whether the Fourth Amendment <u>requires</u> this court to abandon long-standing precedent and place such unprotected information contained in cell phones beyond the reach of the police when making a custodial arrest.  I think that we are neither required nor authorized to rule as the majority has.

Instead, this case requires us to apply a familiar legal standard to a new form of technology.  This is an exercise we must often undertake as judges, for the Constitution is as durable as technology is disruptive.   In this exercise, consistency is a virtue.  Admittedly, when forced to confront the boundaries not only of the Fourth Amendment, but also of the technology in question, it is not surprising that we would look beyond the case at hand and theorize about the long-term effects of our decision.  Yet the implications of our decisions, while important, are ancillary to our constitutionally defined power to resolve each

-33-

**A:33**

case as it appears before us. Having scrutinized the relevant Supreme Court decisions, as well as our own precedent, I find no support for Wurie's claim that he had a constitutional right protecting the information obtained during the warrantless search. Nor do I believe that we possess the authority to create such a right. Therefore, I respectfully dissent.

The facts are clear: the police conducted a valid custodial arrest of Wurie; the cell phone was on Wurie's person at the time of the arrest; after seeing repeated calls to Wurie's cell phone from "my house," the police flipped it open and, pressing two buttons, retrieved the associated number.

We have long acknowledged that police officers can extract this type of information from containers immediately associated with a person at the time of arrest. In United States v. Sheehan, 583 F.2d 30 (1st Cir. 1978), police arrested a suspected bank robber and then searched his wallet, which included a piece of paper bearing several names and telephone numbers. Id. at 30-31. The police officers copied this piece of paper, which action Sheehan challenged as an unconstitutional seizure. The claim is made that Sheehan is inapposite to the present case because it concerned a challenge to the seizure, not the search. We, however, did not address the warrantless search in Sheehan because its legality was beyond dispute. Judge Coffin, for the court, noted as an initial matter that "[a]ppellant concedes, as he

-34-

**A:34**

must, that his arrest was lawful and that therefore the search of his wallet was legal." Id. (emphasis added).  It is not as though Sheehan left the legality of the search unresolved; rather, the court considered the issue uncontroversial, and therefore provided no elaboration.  See also United States v. Uricoechea-Casallas, 946 F.2d 162, 165-66 (1st Cir. 1991) (upholding the warrantless search of a wallet incident to a custodial arrest).

Sheehan was no outlier.  Courts have regularly upheld warrantless searches of nearly identical information in a range of "containers." E.g., United States v. Ortiz, 84 F.3d 977, 984 (7th Cir. 1996) (telephone numbers from a pager); United States v. Rodriguez, 995 F.2d 776, 778 (7th Cir. 1993) (address book kept inside a wallet); United States v. Molinaro, 877 F.2d 1341, 1346-47 (7th Cir. 1989) (phone numbers on slips of paper found in a wallet); United States v. Holzman, 871 F.2d 1496, 1504-05 (9th Cir. 1989) (address book), abrogated on other grounds by Horton v. California, 496 U.S. 128 (1990).

The police officers' limited search of one telephone number in Wurie's call log was even less intrusive than the searches in these cases.  The police observed, in plain view, multiple calls from "my house" -- a shorthand similar to what millions of cell phone owners use to quickly identify calls instead of the number assigned by the service provider -- to Wurie's cell phone.  Only then did they initiate their search and only for the

-35-

A:35

limited purpose of retrieving the actual phone number associated with "my house." The police did not rummage through Wurie's cell phone, unsure of what they could find. Before they had even begun their search, they knew who was calling Wurie and how many times the person had called. The additional step of identifying the actual telephone number hardly constituted a further intrusion on Wurie's privacy interests, especially since that information is immediately known to the third-party telephone company. See United States v. Flores-Lopez, 670 F.3d 803, 807 (7th Cir. 2012) (holding that the police could retrieve an arrestee's cell phone number from his phone without a warrant, in part, because "the phone company knows a phone's number as soon as the call is connected to the telephone network; and obtaining that information from the phone company isn't a search because by subscribing to the telephone service the user of the phone is deemed to surrender any privacy interest he may have had in his phone number") (citing Smith v. Maryland, 442 U.S. 735, 742-43 (1979)); see also Matthew E. Orso, Cellular Phones, Warrantless Searches, and the New Frontier of Fourth Amendment Jurisprudence, 50 Santa Clara L. Rev. 183, 210 (suggesting a rule that permits the warrantless search of "call lists and text message addressees" pursuant to an arrest). This case fits easily within existing precedent.

Nor are there any other persuasive grounds for distinguishing this case from our previous decisions. That the

-36-

container the police searched was a cell phone is not, by itself,
dispositive, for "a constitutional distinction between 'worthy' and
'unworthy' containers would be improper." United States v. Ross,
456 U.S. 798, 822 (1982). We made a similar observation in United
States v. Eatherton, 519 F.2d 603 (1st Cir. 1975), where we upheld
the warrantless search of a briefcase incident to an arrest. Id.
at 610-11. We recognized that a briefcase had some unique
characteristics, but explicitly rejected any analysis turning on
the nature of the searched container: "While a briefcase may be a
different order of container from a cigarette box, it is not easy
to rest a principled articulation of the reach of the fourth
amendment upon the distinction. . . . [W]hile [such a distinction]
may have analytical appeal, it does not presently represent the
law." Id. at 610 (citations omitted).

Even assuming that cell phones possess unique attributes
that we must consider as part of our analysis, none of those
attributes are present in this case. Though we do not know the
storage capacity of Wurie's cell phone, we know that the police did
not browse through voluminous data in search of general evidence.
Nor did they search the "cloud,"[14] or other applications containing
particularly sensitive information. Instead, they conducted a

---

[14] The government does not claim a right to conduct warrantless
searches of information in the cloud. This is an important
concession, for it suggests that the government accepts that there
are limits to searches of items found on custodial arrestees. I
discuss my view of those limits later.

-37-

focused and limited search of Wurie's electronic call log. If the information that they sought had been written on a piece of paper, as opposed to stored electronically, there would be no question that the police acted constitutionally, so I see no reason to hold otherwise in this case. The constitutionality of a search cannot turn solely on whether the information is written in ink or displayed electronically.

The issue of warrantless cell phone searches has come before a number of circuits. E.g., Flores-Lopez, 670 F.3d at 803-10; United States v. Curtis, 635 F.3d 704, 712 (5th Cir. 2011); Silvan W. v. Briggs, 309 F. App'x 216, 225 (10th Cir. 2009) (unpublished); United States v. Murphy, 552 F.3d 405, 411 (4th Cir. 2009). None of them have adopted the majority's categorical bar on warrantless cell phone searches. Instead, they unanimously have concluded that the cell phone searches before them did not violate the Fourth Amendment.

I reach the same conclusion here. Wurie's cell phone was on his person at the time of the arrest. The information that the police looked at was of a character that we have previously held searchable during a custodial arrest. Wurie has made no convincing argument for why this search is any different than the search for phone numbers kept in a wallet or an address book. Thus, I see no reason to look for complications where none exist; Wurie has not shown a violation of his Fourth Amendment rights.

-38-

**A:38**

In my view, there is another rationale, apparent from the record, for upholding this search:  the risk that others might have destroyed evidence after Wurie did not answer his phone.  Wurie received repeated calls from "my house" in the span of a few minutes after his arrest.  His failure to answer these phone calls could have alerted Wurie's confederates to his arrest, prompting them to destroy further evidence of his crimes.  The majority asserts that this scenario would be present "in almost every instance of a custodial arrest," giving police an ever-ready justification to search cell phones.  Supra at 23 n.11.  On the contrary, the justification is based on the specific facts of this case.  The fact that "my house" repeatedly called Wurie's cell phone provided an objective basis for enhanced concern that evidence might be destroyed and thus gave the police a valid reason to inspect the phone.  See United States v. Chimel, 395 U.S. 752, 762-63 (1969).

This additional reason for affirmance is not a novel one.  United States v. Gomez, 807 F. Supp. 2d 1134 (S.D. Fla. 2011), presents a comparable example.  In that case, police officers, after observing multiple phone calls from the same number to an arrested drug dealer's cell phone, first answered the ringing cell phone and thereafter communicated to the caller via text message while posing as the arrestee, which led to the discovery of additional evidence.  Id. at 1139.  The district court denied a

-39-

**A:39**

motion to suppress this evidence, holding the police acted according to "the exigencies commensurate with the Defendant's ringing cell phone." Id. at 1152; see also United States v. De La Paz, 43 F. Supp. 2d 370, 375-76 (S.D.N.Y. 1999) (admitting evidence -- under the exigent circumstances exception -- obtained when the police answered an arrestee's cell phone and heard multiple callers identify the arrestee by his drug dealer moniker). The police action in this case is analogous -- arguably less invasive -- and a further reason why Wurie's constitutional challenge founders on the specific facts of this case.

Granted, my fact-specific view does not comport with the all-or-nothing approach adopted by the majority and some state courts, see Smallwood v. State, No. SC11-1130, 2013 WL 1830961 (Fla. May 2, 2013); State v. Smith, 920 N.E.2d 949 (Ohio 2009). But I find the competing rationale unpersuasive.[15] Most pointedly, for the reasons explained above, Wurie himself suffered no constitutional violation during the search. If we are to fashion

---

[15] The insistence on a bright-line rule contrasts with the recent Supreme Court opinion in Missouri v. McNeely, 133 S. Ct. 1552 (2013), which rejected a bright line rule and instead relied on a totality of the circumstances analysis for warrantless blood tests of drunk drivers, id. at 1564 ("[A] case-by-case approach is hardly unique within our Fourth Amendment jurisprudence. Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules, including in situations that are [] likely to require police officers to make difficult split-second judgments."). While it can be argued that a bright-line rule is preferable, it cannot be claimed that such a rule is necessary.

-40-

a rule, it cannot elide the facts before us.  "The constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case."  Sibron v. New York, 392 U.S. 40, 59 (1968).  Yet the competing analysis focuses on hypothetical searches that have not emerged in any case or controversy before this court.  Those scenarios may one day form the basis of our reasoning in another case, but they cannot govern our analysis of Wurie's claim.

   The majority gets around this problem by requiring the government to "demonstrate that warrantless cell phone searches, as a category, fall within the boundaries laid out in Chimel."  Supra at 16.  It cites United States v. Chadwick, 433 U.S. 1 (1977), abrogated on other grounds by California v. Acevedo, 500 U.S. 565 (1991), and Arizona v. Gant, 556 U.S. 332 (2009), to support this approach.  The Supreme Court did hold on those two occasions, neither of which involved the search of items held by the arrestee, that certain types of searches require a warrant because they lack any Chimel justification.  But the Supreme Court has not extrapolated from those cases a general rule that the government justify each category of searches under Chimel, nor a requirement that the appellate courts conduct this sort of analysis.

   Indeed, if the Supreme Court wishes us to look at searches incident to arrest on a categorical basis, it is curious

-41-

**A:41**

that the Court has offered absolutely no framework for defining what constitutes a distinct category. Each arrest has its own nuances and variations, from the item searched (as in this case) to the officer's control over it (as was the case in <u>Chadwick</u>), and there could be infinite distinct categories of searches based on these variations. Yet no relevant criteria are articulated for establishing these categories. That is not a good way to impose this new paradigm, under which every arrestee is now invited to argue that his search falls into some distinct category and therefore must be justified under <u>Chimel</u>.

Thus, either we are drastically altering the holding in <u>United States</u> v. <u>Robinson</u>, 414 U.S. 218 (1973), by forcing the government to provide a <u>Chimel</u> rationale for practically every search, or we are putting ourselves in the position of deciding, without any conceptual basis, which searches are part of a distinct "category" and which are not. This runs the risk of spreading confusion in the law enforcement community and multiplying, rather than limiting, litigation pertaining to these searches.

It is argued that the categorical approach flows from the Supreme Court's opinion in <u>Gant</u>, which reaffirmed "the fundamental principles established in the <u>Chimel</u> case regarding the basic scope of searches incident to lawful custodial arrests." <u>Gant</u>, 556 U.S. at 343 (quoting <u>New York</u> v. <u>Belton</u>, 453 U.S. 454, 460 n.3 (1981)). <u>Gant</u> did take a categorical, <u>Chimel</u>-based approach to the search in

-42-

question, but its usefulness for our analysis should not be overstated.

As the government points out, the Supreme Court cases treat searches of the arrestee and the items on the arrestee -- as is the case here -- as either not subject to the Chimel analysis, or at a least subject to a lower level of Chimel scrutiny. These cases, unlike Chimel and Gant, are on point with Wurie's case, and we are not free to disregard them in favor of the principles enunciated in Gant. As an inferior court, we are cautioned against "conclud[ing] [that] more recent cases have, by implication, overruled an earlier precedent. . . . [I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." Agostini v. Felton, 521 U.S. 203, 237 (1997) (internal quotation marks and alterations omitted).

In Robinson, the Supreme Court drew a sharp distinction between two types of searches pursuant to an arrest:  searches of the arrestee and searches of the area within his control.  "The validity of the search of a person incident to a lawful arrest has been regarded as settled from its first enunciation, and has remained virtually unchallenged . . . .  Throughout the series of cases in which the Court has addressed the second [type of search,]

-43-

**A:43**

no doubt has been expressed as to the unqualified authority of the arresting authority to search the person of the arrestee." _Robinson_, 414 U.S. at 224-25. The Supreme Court did state that the basis of this authority is "the need to disarm and to discover evidence," _id._ at 235, but in the next sentence clarified that "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification," _id._

Indeed, the Court could not rely on a _Chimel_ justification in _Robinson_, as the arresting officer conceded that he "did not in fact believe that the object in [Robinson]'s coat pocket was a weapon" and that he gave no thought to the destruction of evidence either. _Id._ at 251 (Marshall, J., dissenting) (quoting the arresting officer's testimony: "I didn't think about what I was looking for. I just searched him."). _Robinson_ may not have rejected _Chimel_ in the context of searches of an arrestee and items on the arrestee, but it did establish that these searches differ from other types of searches incident to arrest.

The Supreme Court reiterated _Robinson_'s holding in _United States_ v. _Edwards_, 415 U.S. 800 (1974), in which the Court upheld the search and seizure of an arrestee's clothing ten hours after he was arrested. While most of the analysis focused on the timing of the search, the opinion assumed that law enforcement could "tak[e]

-44-

**A:44**

from [the arrestee] the effects in his immediate possession that constituted evidence of crime.  This was and is a normal incident of a custodial arrest . . . ."  <u>Id.</u> at 805; <u>see also</u> <u>id.</u> at 803 ("[B]oth the person and the property in his immediate possession may be searched at the station house after the arrest has occurred . . . .").  Once again, the Supreme Court was unconcerned with the existence or nonexistence of <u>Chimel</u> rationales.  The opinion barely discussed them, and the government did not seek to prove that they were present.  <u>Id.</u> at 811 n.3 (Stewart, J., dissenting) ("No claim is made that the police feared that Edwards either possessed a weapon or was planning to destroy the paint chips on his clothing.  Indeed, the Government has not even suggested that he was aware of the presence of the paint chips on his clothing.").

Even in <u>Chadwick</u>, where the Supreme Court did require the police to obtain a warrant for a category of searches, it continued to treat the search of an arrestee and items immediately associated with him as independently justified by "reduced expectations of privacy caused by the arrest."  <u>Chadwick</u>, 433 U.S. at 16 n.10.  Thus, the holding in <u>Chadwick</u> applied only to "luggage or other personal property <u>not immediately associated with the person of the arrestee</u>."  <u>Id.</u> at 15 (emphasis added).  These cases, taken together, establish that items immediately associated with the arrestee -- as a category -- may be searched without any <u>Chimel</u> justification.  The majority seeks a bright-line rule to govern

-45-

**A:45**

cell phone searches, but denies the fact that such a rule --
covering all items on the arrestee's person -- already exists.

But even if searches of items on an arrestee required
<u>Chimel</u> justifications, I cannot see why cell phones fail to meet
this standard if wallets, cigarette packages, address books,
briefcases, and purses do. The attempt is made to distinguish cell
phones from these other items, but those distinctions do not hold
up under scrutiny.

One argument is that these other items, unlike cell
phones, all theoretically could contain "destructible" evidence,
which justifies examining them. But the evidence in a cell phone
is just as destructible as the evidence in a wallet: with the
press of a few buttons, accomplished even remotely, cell phones can
wipe themselves clean of data. Any claim that the information is
not destructible strikes me as simply wrong.[16] Perhaps what is
meant is that the cell phone data is no longer destructible once it
is within the exclusive control of law enforcement officers. But
even accepting that the likelihood of destruction is reduced to
almost zero once the officers are in control of a cell phone, this

---

[16] The term "destructible" evidence is perhaps intended to mean
"physical" or "tangible" evidence. That distinction does not fly,
for two reasons. First, just because evidence is intangible does
not make it indestructible. As noted, an arrestee can delete data
just as easily as he can discard drugs. Second, any distinction
based on the difference between tangible and intangible evidence
ignores the fact that we have upheld the warrantless search of
intangible information during a custodial arrest. <u>United States</u> v.
<u>Sheehan</u>, 583 F.2d 30, 31 (1st Cir. 1978).

-46-

**A:46**

is equally true of cigarette packages, wallets, address books, and briefcases. Drugs do not disappear into thin air; weapons do not flee of their own accord. If that is the basis for the reasoning, then a warrant should be required before searching any object within the exclusive control of the police. I do not think that the majority is arguing for this rule, but I cannot see any other outcome under its analysis. Ironically, cell phones arguably pose a greater <u>Chimel</u> risk than most other items because, unlike cigarette packages or wallets, the evidence contained in cell phones remains destructible even after the police have assumed exclusive control of the phone via remote wiping.[17]

Another argument is that because cell phone searches are not "self-limiting," they always require a warrant. The majority does not precisely define the term "self-limiting," but I gather that it refers to the danger that cell phones, because of their vast storage capabilities, are susceptible to "general, evidence-gathering searches." <u>Supra</u> at 21 (citing <u>Thornton</u> v. <u>United States</u>, 541 U.S. 615, 632 (2004) (Scalia, J., concurring)). As an initial matter, this has never been the focus of Supreme Court

---

[17] It is also half-heartedly suggested that containers that hold physical objects, unlike cell phones, pose a risk to officer safety. "[T]he officer who conducted the search in <u>Robinson</u> had no idea what he might find in the cigarette pack, which therefore posed a safety risk." <u>Supra</u> at 23. I find it hard to believe that a reasonable police officer is more justified in remaining on guard against booby-trapped cigarette packs and wallets in the line of duty, than she is against sophisticated electronic devices.

-47-

cases discussing the search incident to arrest exception for items immediately associated with the arrestee.[18]    Thus, I am reluctant to give it much weight in assessing Wurie's constitutional claim.

Nonetheless, if we are concerned that police officers will exceed the limits of constitutional behavior while searching cell phones, then we should define those limits so that police can perform their job both effectively and constitutionally.    Instead, the majority has lumped all cell phone searches together, even while perhaps acknowledging that its broad rule may prohibit some otherwise constitutional searches.    Supra at 28 ("Thus, while the search of Wurie's call log was less invasive than a search of text messages, emails, or photographs, it is necessary for all warrantless cell phone data searches to be governed by the same rule.").    But this need not be the solution.    We can draw the appropriate line for cell phone searches, just as we have done in other contexts.    For instance, a body search, like a cell phone search, is not inherently self-limiting.    A frisk can lead to a

---

[18] For instance, in Robinson, the police conducted their search pursuant to a standard operating procedure of the police department, which trained officers to carry out a full field search after any arrest.    United States v. Robinson, 414 U.S. 218, 221 n.2 (1973).    That entailed "completely search[ing] the individual and inspect[ing] areas such as behind the collar, underneath the dollar [sic], the waistband of the trousers, the cuffs, the socks and shoes . . . [as well as] examin[ing] the contents of all the pockets' [sic] of the arrestee . . . ."    Id. (internal quotation marks omitted).    Given that Robinson was arrested for a traffic violation, and that the arresting officer conceded that he felt no personal risk during the arrest, the only conceivable purpose for this search was to gather general evidence.

-48-

A:48

strip search, which can lead to a cavity search, which can lead to x-ray scanning. But this parade of horribles has not come to pass because we have established the constitutional line, and conscientious law enforcement officers have largely adhered to it. See Swain v. Spinney, 117 F.3d 1, 5-9 (1st Cir. 1997) (holding that police officers may not conduct a strip search of an arrestee incident to the arrest); see also Roberts v. Rhode Island, 239 F.3d 107, 113 (1st Cir. 2001) (holding that indiscriminate strip searches of misdemeanant arrestees during administrative processing at a detention facility violated the Fourth Amendment). The majority has instead chosen to ignore this option in favor of a rule that sweeps too far.

Still, I share many of the majority's concerns about the privacy interests at stake in cell phone searches. While the warrantless search of Wurie's phone fits within one of our "specifically established and well-delineated exceptions," United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011) (citations omitted) (internal quotation marks omitted), due to the rapid technological development of cell phones and their increasing prevalence in society, cell phone searches do pose a risk of depriving arrestees of their protection against unlawful searches and seizures. There must be an outer limit to their legality.

-49-

**A:49**

In <u>Flores-Lopez</u>, Judge Posner suggested that courts should balance the need to search a cell phone against the privacy interests at stake.

> [E]ven when the risk either to the police officers or to the existence of the evidence is negligible, the search is allowed, provided it's no more invasive than, say, a frisk, or the search of a conventional container, such as Robinson's cigarette pack, in which heroin was found. If instead of a frisk it's a strip search, the risk to the officers' safety or to the preservation of evidence of crime must be greater to justify the search.

<u>Flores-Lopez</u>, 670 F.3d at 809 (citations omitted). I believe that cell phone searches should follow this formula. That is not to say that the police must prove a risk to officer safety or destruction of evidence in every case. There is, inherent in every custodial arrest, some minimal risk to officer safety and destruction of evidence. Moreover, <u>Chadwick</u> states that the arrest itself diminishes the arrestee's privacy rights over items "immediately associated" with the arrestee. <u>Chadwick</u>, 433 U.S. at 15. But the invasion of the arrestee's privacy should be proportional to the justification for the warrantless search.

This approach respects "the Fourth Amendment's general proscription against unreasonable searches and seizures." <u>Edwards</u>, 415 U.S. at 808 n.9 (citations omitted) (internal quotation marks omitted). It is also consistent with the core reasonable limit that has been acknowledged in <u>Robinson</u>, which does not permit "extreme or patently abusive" searches, <u>Robinson</u>, 414 U.S. at 236, and its offspring, <u>see</u>, <u>e.g.</u>, <u>Swain</u>, 117 F.3d at 5-9. The Supreme

-50-

**A:50**

Court's recent opinion in <u>Missouri</u> v. <u>McNeely</u>, 133 S. Ct. 1552 (2013), shows that the reasonableness inquiry remains a touchstone of Fourth Amendment analysis. The Court held that, in the context of warrantless blood tests of drunk drivers, courts had to look to "the totality of the circumstances" to determine whether police officers' reliance on the exigency exception was reasonable. <u>Id.</u> at 1558-63.

Similarly, while <u>Robinson</u>'s principles generally authorize cell phone searches, and certainly encompass the search in this case, there are reasonable limits to <u>Robinson</u> that we should not hesitate to enforce, especially in light of a cell phone's unique technological capabilities, for "[i]t would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology." <u>Kyllo</u> v. <u>United States</u>, 533 U.S. 27, 33-34 (2001).

I find helpful the analysis in <u>United States</u> v. <u>Cotterman</u>, 709 F.3d 952 (9th Cir. 2013) (en banc). In that case, the Ninth Circuit determined whether a warrantless forensic examination of a laptop computer during a border search violated the Fourth Amendment. The court conducted a reasonableness analysis, balancing the privacy interests of the individual against the sovereign's interests in policing its borders. <u>Id.</u> at 960. It stated that, had the search only involved "turn[ing] on the devices and open[ing] and view[ing] image files . . . we would be inclined

-51-

**A:51**

to conclude it was reasonable." Id. at 960-61. However, the invasive nature of the forensics examination, which included restoring previously deleted files, as well as "the uniquely sensitive nature of data on electronic devices," id. at 966, convinced the court that the forensics examination was an unreasonable border search absent a showing of reasonable suspicion, id. at 968.

A similar reasonableness analysis would restrain certain types of cell phone searches under Robinson. The inherent risks in a custodial arrest, along with the reduced privacy expectations of the arrestee, must be balanced against the wide range of private data available in a cell phone. But ultimately the question of what constitutes an unreasonable cell phone search should be left for another day. The majority has outlined some of the more troubling privacy invasions that could occur during a warrantless search. So long as they remain in the hypothetical realm, I think it premature to draw the line. Suffice it to say that, for the reasons I have stated, the search in this case fell on the constitutional side of that line.[19]

---

[19] If there had been a constitutional violation here, the application of the good faith exception would present an interesting question. Because I would find no constitutional violation, however, I do not address the government's good faith exception argument. But I disagree with the majority's decision not to consider the good faith exception to the extent that it based that decision on the government's failure to invoke the exception before the district court. We may affirm on any basis apparent from the record. See United States v. Sanchez, 612 F.3d.

**I respectfully dissent.**

_____

1, 4 (1st Cir. 2010).  Of course, if the record is underdeveloped because the appellee did not present the issue to the district court, the appellee must suffer the consequences.  See Giordenello v. United States, 357 U.S. 480, 488 (1958) ("To permit the Government to inject its new theory into the case at this stage would unfairly deprive petitioner of an adequate opportunity to respond.  This is so because in the District Court petitioner, being entitled to assume that the warrant constituted the only purported justification for the arrest, had no reason to . . . adduce evidence of his own to rebut the contentions that the Government makes here for the first time.").

Such is not the case here.  The good faith exception is merely an extension of the government's main argument that this search complied with existing law.  The factual record appears sufficiently developed to allow our consideration of this argument, and the government, by raising it in its brief on appeal, gave Wurie the opportunity to respond in his reply brief.  Thus, I would not bypass this argument merely because the government first raised it on appeal.  See Jordan v. U.S. Dep't of Justice, 668 F.3d 1188, 1200 (10th Cir. 2011) (holding that an appellate court may affirm on an alternate ground "provided that the alternate ground is within our power to formulate and the opposing party has had a fair chance to address it") (citations omitted) (internal quotation marks and alterations omitted).

**A:53**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 08-10071-RGS

UNITED STATES OF AMERICA

v.

BRIMA WURIE

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

May 4, 2009

STEARNS, D.J.

On March 27, 2008, a Grand Jury returned a three-count Indictment against Brima Wurie charging him with: (i) felony possession of a firearm and ammunition; (ii) distribution of cocaine base (crack cocaine) within 1000 feet of a school; and (iii) possession of crack cocaine with intent to distribute. Wurie was arrested on September 5, 2007, on suspicion of selling a small quantity of drugs. He was transported to the Area C-6 station in South Boston. There, his personal property was inventoried. Information gleaned from one of Wurie's cell phones led officers to his apartment. Pursuant to a warrant, police seized 215 grams of crack cocaine and a loaded firearm from Wurie's apartment.

Wurie moves to suppress the evidence seized from his person incident to his arrest and later from his apartment, arguing that "police violated his constitutional rights as guaranteed to him by the Fourth, Sixth and Fourteenth Amendments," that the "stop and seizure were conducted without probable cause, without consent, without a properly issued search warrant, and without any other legal justification . . . [and, that] the seizure of his

**A:54**

personal belongings and later use by the police of his phone and keys were done in violation" of these same rights.[1]  The court heard argument on the motion on January 20, 2009.  At the conclusion of the hearing, the court granted Wurie leave to file a supplemental brief, but none has been forthcoming.

<u>BACKGROUND</u>

As there are no disputed material facts, the court will rely on the factual recitations in the warrant affidavit and the parties' pleadings.[2]  Sergeant Detective Paul Murphy is a twenty-two year police veteran and the supervisor of the Area C-6 Drug Control Unit.  On September 5, 2007, shortly before 6:45 p.m., while patrolling in an unmarked vehicle, Murphy observed a man (later identified as Fred Wade), talking on a cell phone in the parking lot of a Lil Peach convenience store on Dorchester Avenue.  Wade was intently watching passing traffic.  A few minutes later, Murphy saw a white 2007 Nissan Altima sedan turn into the parking lot.  Wade got into the front passenger seat.  The only other occupant of the car was the driver (later identified as Wurie).  Wurie drove from the lot, turning left onto Dorchester Avenue in the direction of D Street.  Murphy followed.  Wurie

---

[1]The court will limit its discussion to Wurie's Fourth Amendment claim.  The protections of the Sixth Amendment apply to a defendant only *after* indictment.  <u>Kirby v. Illinois</u>, 406 U.S. 682, 688-689 (1972).  The reference to the Fourteenth Amendment is difficult to fathom.  The Fourth Amendment provides Wurie with an "explicit textual source of constitutional protection" against any unlawful police intrusion on his right of privacy.  Consequently, any Fourteenth Amendment claim is superfluous.  <u>See</u> <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989).

[2]The only relevant issue with respect to the seizure of the cocaine and firearm as will be seen is one of law, specifically, the propriety of the officers' warrantless examination of the call log of Wurie's cell phone.  But for the possible taint, the warrant affidavit fully satisfies the probable cause requirement of the Fourth Amendment.

drove approximately one hundred and fifty yards, made a U-turn, and returned to the Lil Peach.  Wade left the car and entered the Lil Peach.  Wurie then drove away.

Believing that he had witnessed a drug transaction,[3] Murphy broadcast the make, model, and license plate number of Wurie's car.  Accompanied by Officer Christopher Boyle, Murphy entered the Lil Peach and confronted Wade.  Two plastic bags, each containing an 8-ball (3.5 grams) of crack cocaine, were seized from Wade's left front pocket.  Wade stated that he had purchased the cocaine from "B."  He also told the officers that "B" lived in South Boston and sold crack cocaine in quantities no smaller than an 8-ball.

Officer Steven Smigliani, having heard Murphy's broadcast, spotted and followed the Altima.[4]  Murphy radioed Smigliani and told him what Wade had said.  Officer Smigliani waited for Wurie to park and exit his car.  He then arrested him for distributing cocaine.  Wurie was taken to the Area C-6 police station.  Police seized two cell phones, a key ring with keys, and $1,275 in cash from Wurie's person.

Approximately 5 to 10 minutes after Wurie was brought to the station, Officers Kevin Jones and Robert England, members of the C-6 Drug Control Unit, examined one of the cell phones seized from Wurie.  They observed numerous calls logged on the caller ID screen from "my house."  When the phone rang, the officers flipped it open, activating the

---

[3]According to Murphy, a popular method of selling drugs in South Boston is by car delivery, where the parties negotiate a price for the drugs over the phone, the buyer proceeds to an agreed-upon location, the dealer arrives in a car, and the parties consummate the sale in the car.  While completing the deal, the parties often drive a short distance to avoid police surveillance.

[4]The Altima had been rented earlier by Wurie.

3

backlight. They observed a "wallpaper" photo of a young black female holding a baby. They also saw that the "my house" calls originated from "617-315-7384." Officer Jones, using a police computer, typed the number into the website "AnyWho" (www.anywho.com). The number was listed to "Manny Cristal" at 315 Silver Street in Boston. The officers did not answer the call or access any other information stored in the phone.

After Murphy gave Wurie a second set of <u>Miranda</u> warnings,[5] Wurie stated that he lived at 51 Speedwell Street in Dorchester and that he was in South Boston "cruising around." He denied stopping in the Lil Peach parking lot, denied giving anyone a ride, denied speaking with anyone in South Boston that day, and denied selling cocaine. Based on the large amount of cash Wurie was carrying, his two cell phones, the rented car, the drugs found on Wade, and Wade's description of "B's" mode of drug dealing, Murphy suspected that Wurie was selling 8-balls (a fairly large street-level quantity of crack) out of a hidden mother cache.[6] Murphy also believed that Wurie was lying about living in Dorchester and that his true address was 315 Silver Street in South Boston.

Murphy and other Drug Control Unit officers proceeded to 315 Silver Street with the key ring seized from Wurie. There, they found three mailboxes outside the apartment building's front door, one of which had the names "Cristal" and "Wurie" written on it. The lights in the first floor apartment were on. Through the window, Murphy saw a young black woman talking on the phone. She appeared to be the same woman that Jones and

---

[5]Officer Smigliani had administered <u>Miranda</u> warnings to Wurie upon his arrest.

[6]According to Murphy, a telltale characteristic of a drug dealer is the use of two cell phones – one for arranging drug deals and another for personal use, and the use of rental cars to conduct business (to avoid forfeiture of their personal vehicles if caught).

England had observed in the cell phone's wallpaper photo.  Murphy used Wurie's keys to unlock the door to the front entrance of 315 Silver Street.  In the common hallway, one door led to a first floor apartment, another to an apartment on the second floor.  Murphy tried to unlock the door to the second floor apartment, using all of the keys on Wurie's key ring, but none worked.  He then tried the keys in the first floor apartment door.  One key unlocked the door.  Without opening the door, Murphy removed the key from the lock and knocked.  A young woman (later identified as Yolanda Walker), answered the door.  Murphy identified himself as a Boston Police officer and asked Walker to step into the hallway.  He could smell the distinct odor of burnt marijuana emanating from inside the apartment.  Walker told Murphy that she knew Wurie and that he occasionally stayed at the apartment.  She also admitted that he had been in the apartment the night before and earlier that day.  The officers then entered the apartment to "freeze" it while they obtained a search warrant.  Inside the apartment, the officers found a sleeping child who resembled the infant pictured on the cell phone's wallpaper.  When Murphy returned to the station to prepare the warrant affidavit, he asked Wurie why his keys opened the door to the first floor apartment of 315 Silver Street.  Wurie replied, "I don't know."

After obtaining and executing a search warrant, officers recovered from the master bedroom of the apartment 215 grams of crack cocaine, a Smith & Wesson .9 millimeter firearm loaded with five rounds of ammunition, six loose rounds of .40 caliber hollow point ammunition, four plastic bags of marijuana, photographs of Wurie and Walker and other

5

personal papers, drug paraphernalia, and $250 in cash.[7]

DISCUSSION

Probable Cause to Arrest

An arrest must be supported by probable cause for a search to be lawful.  Beck v. Ohio, 379 U.S. 89, 91 (1964).  "Probable cause" is a far less exacting standard than any test implying a degree of relative certainty, or even a "more likely than not" view of the facts.  See United States v. Melvin, 596 F.2d 492, 495 (1st Cir. 1979).  "[P]robable cause exists where, at the moment of arrest, the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual arrested has committed or was committing an offense."  Commonwealth v. Santaliz, 413 Mass. 238, 241 (1992).  Probable cause may be based on credible hearsay information that would not itself be admissible at trial.  Draper v. United States, 358 U.S. 307, 311-312 (1959).  "When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed."  Beck, 379 U.S. at 96.  In making this assessment, a court will be guided by the collective knowledge or "fellow officer" rule, that is, where police are engaged in a collaborative effort, the knowledge of each officer may be "pooled" in establishing probable cause.  United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002).  Finally, a court may consider an officer's training and experience in assessing probable cause.  Conduct that

---

[7]The Bureau of Alcohol, Tobacco, Firearms and Explosives determined that the .9 millimeter firearm was stolen on April 5, 2005, during a burglary in Columbus, Georgia.

might be perceived as innocent by a casual onlooker may in the totality of the circumstances appear suspicious to a trained officer.  United States v. Arzivu, 534 U.S. 266, 273 (2002).

Based on his experience, his knowledge of the methods used by drug dealers, and his observations of the interaction between Ward and Wurie, Murphy reasonably believed that he had witnessed a drug transaction on September 5, 2007.  See United States v. Sokolow. 490 U.S. 1, 9 (1989).  When Ward admitted purchasing the crack cocaine found on his person from someone who could only have been Wurie, Murphy had probable cause to instruct Officer Smigliani to place Wurie under arrest.  See United States v. Harris, 403 U.S. 573, 583 (1971) (an informant's admissions of his own criminal involvement - his "declarations against penal interest" - carry their own inherent indicia of credibility).

The Seizure of Wurie's Keys and Cell Phones

"If an arrest is lawful, the arresting officers are entitled to search the individual apprehended pursuant to that arrest.  The permissible purposes of such a search include preservation of evidence . . . and seizure of destructible contraband."  United States v. Uricoechea-Casallas, 946 F.2d 162, 165 (1st Cir. 1991) (internal citations omitted).  A full search of the person, his effects, and the area within his immediate reach at the time of a lawful custodial arrest may be conducted without regard to any exigency or the seriousness of the offense, and regardless of any probability that the search will yield a weapon or evidence of the crime for which the person is arrested.  United States v. Robinson, 414 U.S. 218, 236 (1973).

7

The holding of United States v. Edwards, 415 U.S. 800, 803 (1974), that "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention," is extended by Illinois v. Lafayette, 462 U.S. 640 (1983), to a booking search, although on a theory of a search incident to custody.  "[I]t is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any *container* or article in his possession, in accordance with established inventory procedures."  Id. at 648 (emphasis added).  Thus, it is irrelevant whether the keys and cell phones were taken from Wurie by Officer Smigliani immediately upon Wurie's arrest or were seized from his person at the booking (the record is not entirely clear on this point).

The "Search" of the Cell Phone

Neither the Supreme Court nor the First Circuit has directly considered the issue of whether a search incident to arrest may include a search of a cell phone's contents, and if it does, how thorough the search might be.[8]  It seems indisputable that a person has a subjective expectation of privacy in the contents of his or her cell phone.  See, e.g., United States v. Finley, 477 F.3d 250, 259-260 (5th Cir. 2007) (defendant had a sufficient privacy

---

[8]The issue is whether Officers Jones and England were entitled to look at the call log on Wurie's cell phone without a warrant.  No cognizable issue would be raised if the officers in fact examined Wurie's phone after it had been inventoried (again the record is not clear).  The prevailing rule does not bar police from taking a "second evidentiary look" at inventoried personal property whether in connection with the crime of arrest or an unrelated crime; United States v. Johnson, 820 F.2d 1065, 1072 (9th Cir. 1987); United States v. Jenkins, 496 F.2d 57, 73-74 (2d Cir. 1974); Wayne R. LaFave, 3 Search and Seizure, § 5.3(b) (4th ed. 2004).  See also United States v. Grill, 484 F.2d 990, 991 (5th Cir. 1973) (key found on arrestee's person and placed with inventoried property later retrieved and used to open the lock on a duffle bag; reasonable grounds to believe that the key would connect the defendant with the incriminating bag).

interest in his cell phone's call records and text messages to challenge their search; the search of the stored text messages, however, was permissible as incident to a valid arrest).  Decisions of district courts and Courts of Appeals (often analogizing cell phones to the earlier pager technology) trend heavily in favor of finding that the search incident to arrest or exigent circumstances exceptions apply to searches of the contents of cell phones.  See United States v. Mercado-Nava, 486 F. Supp. 2d 1271, 1277 (D. Kan. 2007) (the same exceptions apply to warrantless searches of cell phones under the Electronic Communications Privacy Act as any other warrantless search.); United States v. Deans, 549 F. Supp. 2d 1085, 1094 (D. Minn. 2008) (agreeing with the Fifth Circuit that, "if a cell phone is lawfully seized, officers may also search any data electronically stored in the device.");  United States v. Valdez, 2008 WL 360548, at *3 (E.D. Wis. Feb. 8, 2008) (search of defendant's phone was contemporaneous with his arrest and the officer was reasonably concerned that if he delayed, the information on the phone would be lost); United States v. Lottie, 2008 WL 150046, at *3 (N.D. Ind. Jan. 14, 2008) (warrantless search of a cell phone justified by exigent circumstances);  United States v. Dennis, 2007 WL 3400500, at *7 (E.D. Ky. Nov. 13, 2007) (search of a cell phone incident to valid arrest no different from the search of any other type of evidence seized incident to arrest); United States v. Parada, 289 F. Supp. 2d 1291, 1304 (D. Kan. 2003) (phone seized incident to valid arrest; exigent circumstances justified accessing cell phone's call records because continuing incoming calls would overwrite memory and destroy evidence); Cf. United States v. Morales-Ortiz, 376 F. Supp. 2d 1131 (D.N.M. 2004) (otherwise unlawful search of cell phone's memory for names and numbers was justified under the inevitable

9

A:62

discovery doctrine); United States v. James, 2008 WL 1925032 (E.D. Mo. April 29, 2008) ("[T]he automobile exception allows the search of the cell phone just as it allows a search of other closed containers found in vehicles."). [9]  See also United States v. Reyes, 922 F. Supp. 818, 834 (S.D.N.Y. 1996) (warrantless searches of the stored memory of two pagers justified (i) as incident to arrest and (ii) by general consent); United States v. Chan, 830 F. Supp. 531, 535-536 (N.D. Cal. 1993) (warrantless search of pager memory comparable to a search of container contents; search was not so remote in time to invalidate it as a search incident to arrest); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1223 (11th Cir. 1993) (agents reasonably activated defendant's pager to confirm its number). Cf. United States v. Thomas, 114 F.3d 403, 404 n.2 (3d Cir. 1997) (noting in dicta that the retrieval of a phone number from a pager found on defendant was a valid search incident to arrest).

The search of Wurie's cell phone incident to his arrest was limited and reasonable. The officers, having seen the "my house" notation on Wurie's caller identification screen, reasonably believed that the stored phone number would lead them to the location of

---

[9]But see United States v. Wall, 2008 WL 5381412, at *3-4 (S.D. Fla. Dec. 22, 2008) (declining to follow Finley; exigent circumstances might justify a warrantless search of a cell phone; but declining to allow a search of arrestee's cell phone incident to arrest; likening information stored in cell phone to a sealed letter); United States v. Quintana, 594 F. Supp. 2d 1291, 1299 (M.D. Fla. Jan 20, 2009) (officers may be justified in searching the contents of a cell phone for evidence related to the crime of arrest, but "[w]hether a cell phone may be searched incident to an arrest to prevent the destruction or concealment of evidence of another crime is a different issue."); United States v. Park, 2007 WL 1521573, at *9 (N.D. Cal. May 23, 2007) (based on "the quantity and quality of information that can be stored" a cell phone "should not be characterized as an element of an individual's clothing or person [subject to search incident to arrest], but rather as a 'possession within an arrestee's immediate control that has fourth amendment protection at the station house.'").

Wurie's suspected drug stash.  See United States v. Sheehan, 583 F.2d 30, 32 (1st Cir. 1978) (copying the names and telephone numbers from a list found in arrestee's wallet was proper under United States v. Edwards, as "it would seem to be equally respectable police work to assume that checking out known associates of a suspect in a bank robbery committed by several people might yield helpful information.").  Id.  I see no principled basis for distinguishing a warrantless search of a cell phone from the search of other types of personal containers found on a defendant's person that fall within the Edwards-Lafayette exceptions to the Fourth Amendment's reasonableness requirements.  See e.g. United States v. Rodriguez, 995 F.2d 776, 778 (7th Cir. 1993) (contents of an address book in arrestee's wallet); United States v. Rust, 650 F.2d 927, 928 (8th Cir. 1981) (per curiam) (arrestee's pockets); United States v. Garcia, 605 F.2d 349, 355 (7th Cir. 1979) (hand-held luggage); United States v. Castro, 596 F.2d 674, 677 (5th Cir. 1979) (man's wallet); United States v. Moreno, 569 F.2d 1049, 1052 (9th Cir. 1978) (woman's purse).

Briefly addressing the remaining issues, I see nothing unlawful in the use of Wurie's key to enter the common hallway of the apartment building at 315 Silver Street;[10] the insertion of Wurie's key in the lock of the apartment door to determine whether it fit,[11] or

[10]See United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998) ("It is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building.").

[11]See United States v. DeBardeleben, 740 F.2d 440, 445 (6th Cir. 1984) (insertion of keys in automobile locks to determine ownership did not infringe any significant Fourth Amendment interest); United States v. $109,179 in U.S. Currency, 228 F.3d 1080, 1087-1088 (9th Cir. 2000) (same); United States v. Lyons, 898 F.2d 210, 212-213 (1st Cir. 1990) (same, padlock on storage locker); Commonwealth v. Alvarez, 422 Mass. 198, 209-210

the "freezing" of the apartment to maintain the status quo while police obtained a warrant.[12]

ORDER

For the foregoing reasons, Wurie's motion to suppress is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

_____

(1996) (exterior door lock of an apartment ); <u>Commonwealth v. DeJesus</u>, 439 Mass. 616, 627 n.10 (2003) (same); <u>State v. Church</u>, 430 S.E.2d 462, 466 (N.C. App. 1993) (garage door).

[12]Having smelled the odor of burnt marijuana, the officers had probable cause to believe that drugs were present. "The case law is consentient that when a law enforcement officer detects the odor of marijuana emanating from a confined area . . . that olfactory evidence furnishes the officer with probable cause to conduct a search of the confined area." <u>United States v. Staula</u>, 80 F.3d 596, 602 (1st Cir. 1996). It was also reasonable for their safety to enter and secure the apartment while they (commendably) waited for a warrant to arrive. "Securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of the dwelling or its contents." <u>Commonwealth v. Blake</u>, 413 Mass. 823, 829 (1992) (citing <u>Segura v. United States</u>, 468 U.S. 796, 810 (1984)). <u>See</u> also <u>Illinois v. McArthur</u>, 531 U.S. 326, 333-334 (2001). I do not, on the other hand, agree with the government that the entry of the apartment can be justified as a "protective sweep." <u>See</u> <u>United States v. Martins</u>, 413 F.3d 139, 149 (1st Cir. 2005). "The baseline rule is that police officers, in conjunction with an arrest on residential premises, may undertake a protective sweep so long as they can point to 'articulable facts which, taken together with the rational inferences from those facts,' would warrant a reasonably prudent officer in believing 'that the area harbor[s] an individual posing a danger.'" <u>Id.</u> (quoting <u>Maryland v. Buie</u>, 494 U.S. 325, 327 (1990) (emphasis added)). "[T]he key is the reasonableness of the belief that the officers' safety or the safety of others may be at risk." <u>Martins</u>, 413 F.3d at 150. A protective search "may extend only to a cursory inspection of those spaces where a person may be found," and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." <u>Id.</u>, at 335-336. The officers had no reasonable basis to believe that Walker or her infant child posed any danger to the officers' safety (as opposed to the possible destruction of evidence).

12

**A:65**